**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | |
|---|---|
| INNOVATION SCIENCES, LLC,<br><br>Plaintiff,<br>v.<br><br>AMAZON.COM, INC., et al.,<br><br>Defendants. | Civil Action No. 4:18-cv-00474-ALM<br>(LEAD CONSOLIDATED CASE)<br><br>JURY TRIAL DEMANDED |
| INNOVATION SCIENCES, LLC,<br><br>Plaintiff,<br>v.<br><br>RESIDEO TECHNOLOGIES, INC.,<br><br>Defendant. | Civil Action No. 4:18-cv-00475-ALM |
| INNOVATION SCIENCES, LLC,<br><br>Plaintiff,<br>v.<br><br>HTC CORPORATION,<br><br>Defendant. | Civil Action No. 4:18-cv-00476-ALM |
| INNOVATION SCIENCES, LLC,<br><br>Plaintiff,<br>v.<br><br>VECTOR SECURITY, INC.,<br><br>Defendant. | Civil Action No. 4:18-cv-00477-ALM |

**AMAZON'S MOTION FOR SUMMARY JUDGMENT**
**OF NO DIRECT INFRINGEMENT OF THE '983, '798, AND '918 PATENTS**

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ........................................................................................................1

II.   STATEMENT OF THE ISSUES.................................................................................2

III.  STATEMENT OF UNDISPUTED MATERIAL FACTS .................................................2

IV.  OVERVIEW OF THE '983 PATENT FAMILY ...............................................................7

V.   OVERVIEW OF THE ACCUSED SYSTEMS..................................................................8

VI.  AMAZON DOES NOT AND CANNOT DIRECTLY INFRINGE ANY CLAIM
      OF THE '983 PATENT FAMILY AS A MATTER OF LAW. .......................................13

     A.     Amazon cannot directly infringe as a matter of law under the Federal
           Circuit's opinion in *Centillion*. ..............................................................14

          1.     Amazon does not "make" the claimed systems. ........................................15

          2.     Amazon does not "use" the claimed systems. ...........................................17

               a)     Amazon does not control the claimed systems. ...........................18

               b)     Amazon does not benefit from the accused systems. ....................21

     B.     Amazon cannot directly infringe as a matter of law under the Federal
           Circuit's opinions in *Typhoon Touch* and *Nazomi*. ................................22

VII.  CONCLUSION....................................................................................................27

CERTIFICATE OF SERVICE .................................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Acceleration Bay LLC v. Activision Blizzard, Inc.*,
  324 F. Supp. 3d 470 (D. Del. 2018) ................................................................ 22

*Akamai Techs., Inc. v. Limelight Networks, Inc.*,
  797 F.3d 1020 (Fed. Cir. 2015) (en banc) (per curiam) .................................. 15

*Centillion Data Sys., LLC v. Qwest Commc'ns Int'l, Inc.*,
  631 F.3d 1279 (Fed. Cir. 2011) ................................................................ *passim*

*Flexuspine, Inc. v. Globus Med., Inc.*,
  No. 6:15-CV-201-JRG-KNM, 2016 WL 4161887 (E.D. Tex. Aug. 5, 2016) ....... 25

*Grecia v. McDonald's Corp.*,
  724 F. App'x 942 (Fed. Cir. 2018) ............................................................. 14, 22

*Intellectual Ventures I LLC v. Motorola Mobility LLC*,
  870 F.3d 1320 (Fed. Cir. 2017) ................................................................. 20-22

*Nazomi Commc'ns, Inc. v. Nokia Corp.*,
  739 F.3d 1339 (Fed. Cir. 2014) ....................................................... 13, 22, 24-26

*Rotec Indus., Inc. v. Mitsubishi Corp.*,
  215 F.3d 1246 (Fed. Cir. 2000) ....................................................................... 18

*Sipco, LLC v. Abb, Inc.*,
  No. 6:11-CV-0048 LED-JDL, 2012 WL 31122302 (E.D. Tex. July 30, 2012) ...... 25-26

*Typhoon Touch Techs., Inc. v. Dell, Inc.*,
  659 F.3d 1376 (Fed. Cir. 2011) ....................................................... 13, 22, 24, 26

## STATUTES

35 U.S.C. § 271(a) .................................................................................... *passim*

## I.    INTRODUCTION

IS cannot show that Amazon[1] directly infringes the asserted claims of U.S. Patent Nos. 9,912,983, 9,729,918, and 9,942,798 (the "'983 patent family") as a matter of law.  IS asserts only system claims from these patents.  It maps critical elements of those claims to third-party devices that end-users combine with the accused Amazon products.  In such situations, under well-established Federal Circuit law, Amazon can directly infringe the asserted claims only if it "makes" or "uses" the claimed systems.  *Centillion Data Sys., LLC v. Qwest Commc'ns Int'l, Inc.*, 631 F.3d 1279, 1284, 1288 (Fed. Cir. 2011).  To "make" the claimed systems, *Amazon* must "combine all of the claim elements."  *Id.* at 1288.  To "use" the claimed systems, *Amazon* must "put the invention into service, *i.e.*, control the system as a whole and obtain benefit from it."  *Id.* at 1284.  IS has no evidence that Amazon combines the identified third-party devices with the accused Amazon products.  Nor does it have any evidence that Amazon controls the end-users' systems with those third-party devices or obtains any benefit from them.  Indeed, the accused devices as sold by Amazon cannot even perform the functions required by the asserted claims unless the end-users, in their sole discretion, combine the accused Amazon products with the devices of others.  And IS does not even allege that Amazon sells *any* system that includes all elements of the asserted claims. Because IS has adduced no evidence sufficient to raise a genuine dispute of material fact regarding its direct infringement claims, Amazon is entitled to summary judgment of no direct infringement of the '983 patent family.

---

[1] This motion is brought on behalf of all Amazon defendants.  However, Amazon Digital Services, Inc., Amazon Digital Services, LLC, Amazon Web Services LLC, and Amazon Fulfillment Services, Inc., who have been named as defendants in this case, do not exist, are not proper defendants, and should be dismissed.

## II.      STATEMENT OF THE ISSUES

Whether IS has any evidence sufficient to raise a genuine dispute of material fact that Amazon directly infringes the asserted claims of the '983, '798, and '918 patents, given that IS asserts only system claims and maps elements of those claims to third-party devices and functionality that Amazon neither puts into service nor combines with its own devices.

## III.     STATEMENT OF UNDISPUTED MATERIAL FACTS

1.      IS asserts four patents:  U.S. Patent Nos. 9,912,983 (the "'983 patent") (Dkt. 79-1), 9,942,798 (the "'798 patent") (Dkt. 79-3), 9,729,918 (the "'918 patent") (Dkt. 79-2), 9,723,443 (the "'443 patent") (Dkt. 79-4).  (Dkt. 79 at ¶¶ 18, 95, 122, 147.)

2.      The '983 patent is a continuation of the '918 patent, which is a continuation of the '798 patent, and the three patents share a common specification.  (Declaration of Saina S. Shamilov ("Shamilov Decl.") Ex. 1 (Dr. David Johnson Opening Report) at ¶ 66; '983 patent; '918 patent; '798 patent.)

3.      IS asserts only system claims from the '983 patent family patents.  (Shamilov Decl. Ex. 2 (Joseph McAlexander Opening Report ("McAlexander Op. R.")) at ¶ 37 ("It is my understanding that none of the claims asserted in this case are method claims."); *id.* Ex. 3 (Transcript of Joseph McAlexander Deposition ("McAlexander Depo.")) at 8:16-22; McAlexander Op. R., Att. A at ¶ 1, Att. B at ¶ 1, Att. C at ¶ 1, Att. D at ¶ 1.)

4.      IS accuses versions of Amazon's Echo, Fire TV, Fire Tablet, and the Alexa Voice Service of infringing these system claims.  (McAlexander Op. R. at ¶ 73.)

5.      IS accuses these products because they all provide access to Amazon's Alexa, which end users may use to control "smart home" devices like the Philips Hue Lightbulb.  (McAlexander Op. R. at ¶ 79 ("Specifically, Amazon's Echo products, Fire TV products and Fire Tablet products all incorporate what is known as the Alexa voice technology and the ability to manage

smart home devices, supporting the operation of those devices through the Amazon cloud."); *id.*, Att. A-a10 ("You Can Now Voice Control Philips Hue Devices with the Alexa Voice Service.") (citing Amazon document).)

6.      Amazon's Alexa is a virtual intelligent assistant.  (Shamilov Decl. Ex. 4 (Non-Infringement Expert Report of Dr. David Johnson ("Johnson Reb. R.")) at ¶¶ 29–43.)  It is a cloud-based voice service that allows end users to access a vast array of functionalities, including playing music, receiving answers to questions, making to-do lists, setting timers, streaming podcasts, playing audiobooks, and retrieving real-time information such as current weather, news, traffic, and sport scores.  (*Id.*)  End users interact with Alexa by speaking to it.

7.      IS asserts claims 28, 112, and 113 of the '918 patent.  (McAlexander Op. R. at ¶ 1.)

8.      IS alleges that Fire TV products and Fire Tablet products infringe claim 28 of the '918 patent.  (McAlexander Op. R., Att. A at ¶¶ 2–3.)

9.      Claim 28 of the '918 patent requires the "wireless signal conversion apparatus is configured to:  communicate, through the wireless communication network, information about an updated status of a household item in conjunction with a short range wireless communication regarding the updated status."  ('918 patent.)

10.      The Court construed the claim term "a short range wireless communication" (across all asserted patents) as "communication using Zigbee, Bluetooth, UWB, or other similarly-ranged communication protocols."  (Dkt. No. 229 at 75.)

11.      The Court construed the terms "updated item status" (across all asserted patents) and "updated [status of . . . item]" as "a change in [item] status."  (Dkt. No. 229 at 63.)

12.      IS's expert, Mr. McAlexander, maps the "short range wireless communication regarding the updated status" of claim 28 of the '918 patent to a communication between a Philips

Hue Lightbulb and Philips Hue Bridge.  (McAlexander Op. R., Att. A-a10 (Amazon Fire TV Products), Att. A-b6 (Amazon Fire Tablet Products).)

13.     IS alleges that Fire TV products and Fire Tablet products infringe claims 112 and 113 of the '918 patent.  (McAlexander Op. R., Att. A at ¶¶ 2–3.)

14.     Claims 112 and 113 of the '918 patent require the "wireless signal conversion apparatus . . . wherein the operations further comprises: communicating information about an updated status of a household item in conjunction with a short range wireless communication regarding the updated status."  ('918 patent.)

15.     Mr. McAlexander maps the "short range wireless communication regarding the updated status" of claims 112 and 113 of the '918 patent to a communication between a Philips Hue Lightbulb and Philips Hue Bridge.  (McAlexander Op. R., Att. A-a25 (Amazon Fire TV Products), Att. A-b15 (Amazon Fire Tablet Products).)

16.     IS asserts claims 5, 6, and 52 of the '798 patent.  (McAlexander Op. R. at ¶ 1.)

17.     For the '798 patent, IS alleges that Fire TV products and Amazon Alexa Voice Service infringe claim 5; Fire TV products and Fire Tablet products infringe claim 6; and Fire Tablet products and Alexa Voice Service infringe claim 52.  (McAlexander Op. R., Att. C at ¶¶ 2–4.)

18.     Claims 5, 6, and 52 of the '798 patent require "the centralized hub system configured to . . . communicate information for managing a household item status of a household item in conjunction with a short range wireless communication regarding an updated status of the household item."  ('798 patent.)

19.     Mr. McAlexander maps the "short range wireless communication regarding an updated status of the household item" of claims 5, 6, and 52 of the '798 patent to a communication

between a Philips Hue Lightbulb and Philips Hue Bridge.  (McAlexander Op. R., Att. C-a9 (Amazon Fire TV Products), Att. C-b6 (Amazon Fire Tablet Products), Att. C-c7 (Amazon Alexa Voice Service).)

20.     IS asserts claims 22, 24, 39, 62, 64, 67, 80, 105, and 108 of the '983 patent.  (McAlexander Op. R. at ¶ 1.)

21.     IS alleges that Fire TV products, Fire Tablet products, and Echo products infringe claims 22, 24 and 39 of the '983 patent.  (McAlexander Op. R., Att. B at ¶¶ 2–4.)

22.     Claims 22, 24, and 39 of the '983 patent require "the wireless HUB system is further configured to communicate, through the network communication channel, information for managing an item status of an item in connection with a short range wireless communication regarding an updated status of the item."  ('983 patent.)

23.     Mr. McAlexander maps the "short range wireless communication regarding an updated status of the item" of claims 22, 24, and 39 of the '983 patent to a communication between a Philips Hue Lightbulb and Philips Hue Bridge.  (McAlexander Op. R., Att. B-a12–13 (Amazon Fire TV Products), Att. B-b5 (Amazon Fire Tablet Products), Att. B-c6 (Amazon Echo Products).)

24.     For the '983 patent, IS alleges that Fire TV products, Fire Tablet products, and Echo products infringe claim 62; Echo products infringe claim 64; Fire TV products and Fire Tablet products infringe claim 67; and Echo products infringe claim 80.  (McAlexander Op. R., Att. B at ¶¶ 2–4.)

25.     Asserted claims 62, 64, 67, and 80 of the '983 patent require "the wireless HUB is further configured to communicate, through the network communication channel, information for managing an item status of an item based on a signal regarding an updated status of the item."  ('983 patent.)

26.     For the accused Fire TV products and Fire Tablet products, Mr. McAlexander maps

the "signal regarding an updated status of the item" of claims 62, 64, 67, and 80 of the '983 patent

to a communication sent or received by third-party "'smart home' (household items) devices,"

such as "cameras, cooking appliances, entertainment devices, lights, locks, sensors, and thermo-

stats."  (McAlexander Op. R., Att. B-a22 (Amazon Fire TV Products), Att. B-b12 (Amazon Fire

Tablet Products).)  Mr. McAlexander specifically lists "Philips Hue Devices" as an example of

"smart home devices."  (McAlexander Op. R., Att. B-a23 (Amazon Fire TV Products), Att. B-b12

(Amazon Fire Tablet Products).)

27.     For the accused Echo products, Mr. McAlexander maps the "signal regarding an

updated status of the item" of claims 62, 64, and 80 of the '983 patent to a communication sent or

received by third-party "'smart home' devices."  (McAlexander Op. R., Att. B-c16–17 (Amazon

Echo Products).)  Again, Mr. McAlexander specifically uses Philips products as an example of

smart home devices.  (McAlexander Op. R., Att. B-c17 (Amazon Echo Products).)

28.     IS alleges that the Alexa Voice Service infringes claim 105 of the '983 patent.

(McAlexander Op. R., Att. B at ¶ 5.)

29.     Claim 105 of the '983 patent requires "the management center system is configured

to communicate information about the updated status with a centralized HUB system; wherein the

centralized HUB system is configured to receive the wireless signal regarding the updated status

through a short range wireless communication."  ('983 patent.)

30.     Mr. McAlexander maps the "short range wireless communication . . . regarding the

updated status" of claim 105 of the '983 patent to a communication sent or received by third-party

"smart home devices," such as "cameras, locks, lights, and sensors."  (McAlexander Op. R., Att.

B-d8 (Amazon Alexa Voice Service).)  Mr. McAlexander specifically lists "Philips Hue Devices"

as an example of smart home devices.  (McAlexander Op. R., Att. B-d8–9 (Amazon Alexa Voice

Service).)

31.     IS alleges that Amazon Alexa Voice Service infringes claim 108 of the '983 patent. (McAlexander Op. R., Att. B at ¶ 5.)

32.     Claim 108 of the '983 patent requires "the management center system is configured to communicate information about an updated status of an item in association with a short range wireless communication regarding the updated status."  ('983 patent.)

33.     Mr. McAlexander maps the "short range wireless communication regarding the up-dated status" from claim 108 of the '983 patent to a communication sent or received by a third-party "smart device," such as a "light bulb" or "camera."  (McAlexander Op. R., Att. B-d13 (Am-azon Alexa Voice Service).)  Mr. McAlexander specifically lists Philips products as an example of a smart device ("An example of an item is a Philips Hue Lightbulb") and cites "Philips Hue Devices" as an example of an "item."  (McAlexander Op. R., Att. B-d12–13 (Amazon Alexa Voice Service).)

34.     Amazon does not make the Philips Hue Bridge or Philips Hue Lightbulb, or any other third-party smart home devices identified in Mr. McAlexander's report.  (Johnson Reb. R. at ¶ 98.)

## IV.     OVERVIEW OF THE '983 PATENT FAMILY

The '983, '918, and '798 patents share a common specification.  The specification de-scribes several distinct ideas, including the three described below, which are related to the subject matter of the asserted claims.

The first idea is to transmit a secure payment using a short range wireless communication to something referred to as a local wireless HUB that in turn communicates with a remote server. (*See* '443 patent at 2:52–3:4 ("Summary of the Invention").)  Once a user's mobile device is au-thenticated by the wireless HUB using a short range near field identification tag, such as RFID or NFC, the wireless HUB sets up a higher bandwidth wireless connection with the mobile device to

receive the payment information from the user.  (*See id.*)  The wireless HUB can then forward the payment information to a remote merchant server to complete the purchase.  (*See id.*; *id.* at Figures 3 and 4.)

The second idea is a system for sensing whether a diaper is wet or soiled, *i.e.* determining the diaper's status, and sending a corresponding "diaper status update" to alert the appropriate caregiver.  (*Id.* at 3:5–15; *see generally id.* at Figs. 5–7, 10:9–12:17.)  When multiple diapers are being monitored, a unique identifier is associated with each diaper sensor and is included with each transmitted status update.  (*Id.* at 3:16–21, 11:29–35.)  The diaper management system may also order additional diapers using the first idea.  (*Id.* at 12:18–24; *see generally id.* at 12:18–13:39.)

The third idea is directed generally to video conversion.  The specification describes receiving a compressed multimedia signal at a device, decompressing the multimedia signal, and then encoding the decompressed signal for transmission and display at another device.  ('918 patent at 3:36–57.)  The "mobile terminal signal conversion module" is the core of the system and processes video signals from a mobile device to display on a display monitor.  (*Id.* at 16:63–67, 17:11–12.)

## V.      OVERVIEW OF THE ACCUSED SYSTEMS

IS accuses several Amazon product lines that "incorporate what is known as the Alexa voice technology and the ability to manage smart home devices."  (McAlexander Op. R. at ¶ 79.) IS contends that the Fire TVs and Fire Tablets infringe the asserted claims of the '918, '983, and '798 patents, the Alexa Voice Service infringes the '983 and '798 patents, and the accused Echo devices infringe the '983 patent.  (McAlexander Op. R., Att. A at ¶¶ 1–3, Att. B at ¶¶ 1–4, Att. C at ¶¶ 1–4.)

***Fire TVs.***  Fire TVs are media streaming devices that allow Amazon end users to stream

movies, TV programs, and music on traditional TVs.  (*Id.* at ¶ 56; *see also, e.g.*, McAlexander Depo. at 28:3–9.)  Fire TVs come in several form factors and connect to an end users's traditional TV through HDMI and to the internet via the customer's WiFi network.  (Johnson Reb. R. at ¶¶ 61–62.)  End users can control their Fire TVs with an Alexa Voice Remote or a remote control with traditional TV remote buttons, such as Power, Play/Pause, and Volume, as well as a Voice button.  (*Id.*)  An end user can push the Voice button and speak a command, such as "Alexa, turn up the volume" or "Alexa, tune to ESPN."  (*Id.* at ¶ 58.)  The Voice Remote records the verbal command and sends the audio recording of the command to the Alexa Voice Service for speech recognition and formulation of a response.  (*Id.* at ¶ 32.)  Alexa, upon processing the command, directs the Fire TV to turn up the TV's volume or to tune to ESPN.

**Fire Tablets.**  Fire Tablets are tablet computers with color touchscreens that range from 7 inches to 10.1 inches in size.  (*Id.* at ¶ 65.)  Like Fire TVs, Fire Tablets allow end users to access millions of movies, TV episodes, games, apps, eBooks, and songs via the Amazon Appstore.  (*Id.* at ¶ 66.)  Users can also access Alexa by pressing and holding a Home button located at the bottom of the screen.  Also like the Fire TVs, Fire Tablets record the end user's verbal command and transmit the audio recording to Alexa, which processes the command (*e.g.*, play video or music, open an app, check the weather) and generates a response (*e.g.*, invoking the requested video or music, directing the requested app to open, speaking the requested weather information).  (*Id.* at ¶¶ 30–32.)

**Echos**.  Echos are a line of speakers that provide end users with access to Amazon's Alexa. While these devices come in various form factors, they all include a microphone and speaker to interact with Alexa.  (*Id.*  at ¶ 69.)  One can think of these devices as voice recorders; they record users' verbal commands and forward the audio recordings to Amazon's cloud for processing.  (*Id.* at ¶¶ 30–31.)  Users can ask Alexa via an Echo to stream music, ask for information such as news,

9

sports scores, and weather, and much more.  (*Id.* at ¶ 69.)  For certain Echo models that include touchscreens, users may control the devices through the touchscreens as well as by speaking to Alexa.  (*Id.*)

 ***Alexa Voice Service.***  Alexa is a voice-controlled virtual assistant that understands human speech and responds to human requests.  (*Id.* at ¶ 29.)  It resides in Amazon's cloud and is primarily accessed by end users via Amazon's Echos, which are dedicated speakers for accessing Alexa. (*Id.* at ¶ 30.)  But it can also be accessed via an Alexa app that end users can install on their smartphones or tablets, as well as through various third-party devices.  (*Id.* at ¶¶ 30–31.)  Alexa is activated by an end user saying a wake-word, such as "Alexa."  (*Id.*)  A human request that follows the wake-word is received by Alexa (from an end user device such as an Echo, a smartphone, a tablet) and processed by a sophisticated and complex multi-stage process that uses machine learning and statistical models.  (*Id.* at ¶¶ 31–43.)  Alexa can respond to a variety of requests ranging from playing music, to requesting calendar schedules, to making a phone call, to checking sport scores or weather.  (*Id.* at ¶ 29.)  It can also help control smart home devices by interacting with third-party software and third-party cloud infrastructures, which is the crux of IS's infringement allegations in this case.  (*Id.* at ¶¶ 44–55.)

 ***Controlling smart home devices via Alexa.***  Smart home devices are internet-enabled devices such as lights, heaters, and door bells that can be controlled remotely.  Smart home device manufacturers, like Philips, typically offer their customers a variety of ways to control their smart devices.  (*Id.* at ¶ 50.)  The primary control mechanism is usually an app, such as the Philips Hue Bridge app, designed by the manufacturer and installed on mobile devices such as smartphones by the device users.  (*Id.*)  To use the app, the users must purchase a smart home hub provided by the manufacturer, like the Philips Hue Bridge, and pair it with a smart home device, like the Philips Hue Lightbulb, in the user's home.  (*Id.*; *see also* Shamilov Decl. Ex. 5 (Philips page titled "Hue

Bridge app – Control smart lights").)  The user must connect the hub to the Internet so the hub can communicate with the manufacturer's cloud, like the Philips cloud, to enable control of the connected smart devices.  (Johnson Reb. R. at ¶ 50)

Some smart home device makers offer voice-control interfaces to their infrastructures via popular cloud-based voice service platforms, such as Amazon Alexa, Apple HomeKit, Microsoft Cortana, and Google Assistant, to allow their customers to control their smart devices using spoken commands.  (*Id.* at ¶ 51.)  One can think of these voice service platforms as providing voice interfaces to the services provided by the smart home device manufacturers so that those manufacturers do not need to build their own voice processing systems, which are highly complex and sophisticated AI systems.  Before Alexa can be used as a voice interface to control smart home devices in the home, both the manufacturers and the users must set up their respective systems.  (*Id.* at ¶¶ 89–98.)

As part of that set up, a smart home device manufacturer, like Philips, must register with Amazon and build software called a "skill" (using application program interfaces, or "APIs," provided by Amazon), which allows Alexa to communicate with the manufacture's cloud or other back-end infrastructure.  (*Id.* at ¶¶ 52–53.)  This skill, hosted in the Amazon Web Services (AWS) cloud, is invoked by Alexa when it determines that the user is attempting to control the manufacturer's device.  (*Id.* at ¶ 55.)  The skill must be designed to receive the processed user request from Alexa, communicate with the manufacturer's cloud, and return a response to Alexa once the manufacturer's cloud processes the request in a manner designed by that manufacturer.  (*Id.*)  For example, when an Alexa-enabled device, like an Echo, records a user's voice command "Alexa, turn the kitchen light to 50 percent," it sends the audio recording of the command to the Alexa Voice Service to process and understand.  (*Id.*)  Once Alexa processes the command and determines that it is directed to a third-party smart home device, it sends the processed command to that

third-party's skill, which communicates with the third-party's cloud using communication chan-

nels that the third party defined to set the brightness on the end user's kitchen light.  (*Id*.)  The

third-party cloud, in turn, using the third-party's implementation, is responsible for identifying the

appropriate smart home device and performing the operation the user requested.  (*Id.*)  Once that

is done, the skill responds to Alexa with a message, called an event, to indicate whether the oper-

ation was successful.  (*Id*.)  This event is then used to provide an appropriate verbal response to

the user by Alexa, such as an "OK" to indicate that the requested action was successfully executed.

(*Id*.)

Before any of this can take place, however, the user must set up a smart home system in

his or her home.  (McAlexander Op. R., General Tabs at Tab VV at 2 (detailing user-required setup

of Amazon account, Alexa App, user WiFi, Philips Hue App, Philips Hue Bridge, Alexa Smart

Home Skill, and Hue Skill); Johnson Reb. R. at ¶¶ 89–98.)  First, the user must obtain the smart

home devices, such as Philips Hue Lightbulbs.  (*Id.*)  The user must then set up the third-party

devices, including configuring a WiFi network in the user's home and connecting these devices to

that network.  (*Id.*)  The user must also register the devices and authorize them to work with the

accused Alexa-enabled devices.  (*Id.*)

For example, to set up an Echo device as the voice interface to control a Philips Hue Light-

bulb, an end user must first obtain a Philips Hue Lightbulb and Philips Hue Bridge and set up these

devices as instructed by Philips.  (*See* Shamilov Decl. Ex. 6 (Philips Hue setup guide); Johnson

Reb. R. at ¶¶ 89–98; McAlexander Op. R., General Tabs at Tab VV at 2.)  Step one of the set up

requires connecting the Philips Hue Lightbulb to the Philips cloud.  (*Id.*)  To do this, the Philips

Hue Lightbulb user must create a Hue account in the Hue app and link the account to the Philips

Hue Bridge.  (*See* Shamilov Decl. Ex. 7 (Philips page titled "How to create a Hue account and link

to your Hue Bridge?"); *see also* Johnson Reb. R. at ¶¶ 89–98; McAlexander Op. R., General Tabs

at Tab VV at 2.)

Next, the Echo device owner must authorize and enable the Philips Hue Skill developed by Philips to allow its customers to control their smart home Philips Devices via Alexa.  (*See* Shamilov Decl. Ex. 8 (Amazon page titled "Connect Smart Home Devices to Alexa"); Johnson Reb. R. at ¶¶ 89–98; McAlexander Op. R., General Tabs at Tab VV at 2.)  As part of this enabling step, the Echo device owner must log into his or her Philips Hue account and link the owner's Philips account with the owner's Alexa account.  (*Id.*)  Once the accounts are linked, the Echo device owner must add the smart lightbulb to the Alexa account by asking Alexa to "discover" the Philips Hue smart lightbulb, by saying "Discover my devices," or by selecting "Add Device" in the Devices section of the Alexa app.  (*Id.*)

## VI. AMAZON DOES NOT AND CANNOT DIRECTLY INFRINGE ANY CLAIM OF THE '983 PATENT FAMILY AS A MATTER OF LAW.

The Court should grant Amazon summary of non-infringement of the '983 patent family because IS's infringement theory requires functionality provided by third parties, and Amazon neither puts the claimed systems into service nor combines all elements of the claimed systems, as required to show infringement of system claims under the Federal Circuit's opinion in *Centillion*.[2] 631 F.3d at 1284.  Indeed, the accused Amazon products as sold do not even meet the limitations of the asserted claims without further post-sale configuration and thus cannot infringe as a matter of law on this basis as well.  *See Typhoon Touch Techs., Inc. v. Dell, Inc.*, 659 F.3d 1376, 1380–82 (Fed. Cir. 2011) (holding that to infringe, a device "as provided must be 'capable' of performing the recited function, not that it might later be modified to perform that function"); *Nazomi Commc'ns, Inc. v. Nokia Corp.*, 739 F.3d 1339, 1345–46 (Fed. Cir. 2014) (rejecting argument that

---

[2] Like its direct infringement theories, IS's indirect infringement theories for the '983 patent family also fail.  These theories are addressed in Amazon's contemporaneously filed summary judgment motion of no indirect infringement.

"the accused devices infringe if they 'ha[ve] the capability of being configured or programmed to perform the stated function,' even though the accused devices were not structured to perform that stated function as sold").

### A.     Amazon cannot directly infringe as a matter of law under the Federal Circuit's opinion in *Centillion*.

Taking every infringement opinion of IS's technical expert Mr. McAlexander as true, no genuine issue of material fact precludes summary judgment of non-infringement.  IS does not map all the elements of the asserted claims of the '983 patent family to a single Amazon product.  Instead, it maps the claims to a system that end users put together and relies on multiple non-Amazon components to establish infringement.  Indeed, IS does not map the critical claim requirement—a short range wireless communication regarding the updated status of a household item—to any component or functionality provided by Amazon itself.  (Shamilov Decl. Ex. 9 (chart showing third-party reliance by Mr. McAlexander).)  Instead, it points to *unaccused third-party* products, operations, and networks to show purported infringement.  (*Id.*)  IS's infringement theory fails as a matter of binding Federal Circuit law.

The Federal Circuit's opinion in *Centillion* governs the infringement analysis where, as here, the patentee asserts infringement of *system* claims—the only claims at issue in this case—by an accused system consisting of multiple components provided by different entities.  *Centillion*, 631 F.3d at 1283-84; *see also Grecia v. McDonald's Corp.*, 724 F. App'x 942, 946 (Fed. Cir. 2018) (*Centillion* applies when "different parties possess[] different claim elements, and no single party possesse[s] each and every claim element.").  In *Centillion*, the Federal Circuit addressed the meaning of "using" or "making" a system that includes elements in the possession of more than one actor.  631 F.3d at 1283-84, 1287-88.  The Federal Circuit held that under § 271(a) to "make" a system for purposes of infringement, a party "would need to combine all of the claim elements."

14

*Id.* at 1288.  And to "'use' a system for purposes of infringement, a party must put the invention into service, *i.e.*, control the system as a whole and obtain benefit from it."  *Id.* at 1284.  This "requires a party to use each and every element of a claimed system."  *Id.* (alteration omitted).  Amazon neither makes nor uses the accused system.[3]

### 1.    Amazon does not "make" the claimed systems.

It is undisputed that Amazon does not make any of the Phillips (or other third-party) products that IS maps to the critical elements of the asserted claims.  IS's expert, Mr. McAlexander, maps the requirement of *a short range wireless communication regarding an updated status of a household item* to communications between the Philips Hue Lightbulb and Philips Hue Bridge:

> In the configuration case of the Philips Hue Lightbulb, the Philips Hue Lightbulb and Philips Hue Bridge communicate with each other over a ZigBee network.  As such, both the command from the Philips Hue Bridge to the lightbulb and the message from the lightbulb to the Philips Hue Bridge are sent through a ZigBee short range wireless communication channel.  When the bulb status changes, information about the change is communicated from the lightbulb to the bridge via ZigBee and then from the bridge to the Wi-Fi network to the ███████████████████████ █████████████████████████████████████.

(McAlexander Op. R., Att. A-a10.)

Amazon does not make the Phillips Hue Lightbulb or Phillips Hue Bridge.  (Johnson Reb. R. at ¶ 98.)  Amazon does not provide the ZigBee communication—the alleged "short range wireless communication"—between the Philips Hue Bridge and the Philips Hue Lightbulb.  (Johnson Reb. R. at ¶¶ 92–93.)  Nor does Amazon make the WiFi networks that its end users use in their

---

[3] IS vaguely asserts that Amazon "controls operation of the [accused] system . . . by certifying the [third-party] devices [for compatibility with Alexa] prior to sale" (McAlexander Op. R. at ¶ 71), apparently applying the "direction and control" standard for joint infringement under *Akamai Techs., Inc. v. Limelight Networks, Inc.*, 797 F.3d 1020, 1022 (Fed. Cir. 2015) (en banc) (per curiam).  The *Akamai* standard applies to *method* claims where "more than one actor is involved in practicing the steps" of a claim.  *Id.*  Because that standard does not apply to claims for infringement of system claims, and IS asserts only system claims rather than method claims, IS and Mr. McAlexander's arguments regarding certification, even if true, are irrelevant.

homes.  (*Id.* at ¶ 93.)  It is the end users, not Amazon, who set up and authorize interactions between the mapped Philips products, their WiFi networks, and Amazon, all in their own sole discretion.  (*Id.* at ¶¶ 92–98.)

Indeed, what IS accuses in this case is no different than the Qwest systems accused in *Centillion*.  There, Centillion accused several Qwest billing systems of patent infringement.  *Centillion*, 631 F.3d at 1281–82.  The accused products included two parts:  "Qwest's back office systems and front-end client applications that a user may install on a personal computer."  *Id.* at 1281.  The Federal Circuit found that because "[t]he customer, not Qwest, completes the system by providing the 'personal computer data processing means' and installing the client software," Qwest did not "make" the system under § 271(a.).  *Id.* at 1288.

The same is true here.  It is the *end user* who must provide the Phillips products (or any other third-party products) and WiFi network required under IS's infringement theory.  (Johnson Reb. R. at ¶¶ 89–98; *see also* McAlexander Op. R., General Tab (VV) at 2 (chronicling user-required setup of Amazon account, Alexa App, user WiFi, Philips Hue App, Philips Hue Bridge, Alexa Smart Home Skill, and Hue skill).)  It is the *end user* who must connect their Phillips device to the Philips cloud (or the cloud of another third-party).  (*Id.*)  It is the *end user* who must log into their Philips Hue account to link their Philips account with their Amazon Alexa account.  (*Id.*)  It is the *end user* who must use the Alexa app to enable the Philips Hue Skills.  (*Id.*)  And it is the *end user* that must ask Alexa to discover the Philips Hue Lightbulb (or any other third-party device) either by saying "Discover my devices" or selecting "Add Device" in the Devices section of the Alexa app.  (*Id.*; Shamilov Decl. Ex. 8 (Amazon page titled "Connect Smart Home Devices to Alexa"); *see also* Johnson Reb. R. at ¶ 74.)

And Amazon is not vicariously liable for any of these actions for the same reasons that Qwest was not vicariously liable for its customers' actions.  In *Centillion*, the Federal Circuit held

that Qwest cannot be "vicariously liable for the actions of its customers" because the customers did "not act as Qwest's agents as a matter of law nor [were] they contractually obligated by Qwest to act." 631 F.3d at 1288.  The Federal Circuit found that even though Qwest provided the accused software and technical assistance to its customers, it was "entirely the decision of the customer whether to install and operate this software on its personal computer data processing means." *Id.* at 1287.  Similarly, it is entirely the decision of Amazon's customers whether to purchase the Phillips products, whether to install them, whether to set up and connect them to their home WiFi networks, and whether to use them at all.  (Johnson Reb. R. at ¶¶ 89–98.)  As in *Centillion*, Amazon's customers do not act as Amazon's agents as a matter of law and are not contractually obligated by Amazon to act in an allegedly infringing manner.

Indeed, IS's infringement theories are even more attenuated from the claims than the infringement theories that were at issue in *Centillion*.  In *Centillion*, the accused infringer provided both the front-end software (that the customers installed in their sole discretion) and the back-end system; and the Federal Circuit found that not to be enough to directly infringe the claims.  631 F.3d at 1281, 1284.  The front-end in IS's infringement theory is not any software provided by *Amazon*, but third-party devices that customers purchase, setup, register, and use in their sole discretion.  Amazon does not make the claimed systems of IS's patents.

### 2.  Amazon does not "use" the claimed systems.

Amazon also does not use the claimed systems of IS's patents.  To use the claimed systems, Amazon "must put the claimed invention into service, *i.e.*, control the system and obtain benefit from it" and "us[e] all portions of the claimed invention." *Id.* at 1284, 1286.

It is the end users, not Amazon, who put the accused systems as a whole into operation; it is the end users, not Amazon, who control the claimed systems; and it is the end users, not Amazon, who benefit from the accused systems.  Therefore, it is the end users who use all portions of the

claimed systems, not Amazon.  *See Rotec Indus., Inc. v. Mitsubishi Corp.*, 215 F.3d 1246, 1252 n.2 (Fed. Cir. 2000) ("[O]ne may not be held liable under § 271(a) for 'making' or 'selling' less than a complete invention.").

        a)      <u>Amazon does not control the claimed systems.</u>

Every asserted claim of the '983 patent family requires the communication of information regarding the updated status of a household item.  ('983 patent claims 22, 24, 39, 62, 64, 67, 80, 105, 108; '918 patent claims 28, 112, 113; '798 patent claims 5, 6, 52; *see also* Johnson Reb. R. at ¶ 89.)  And all asserted claims but claim 62 of the '983 patent and its dependents require this communication to be in conjunction with "a short range wireless communication" regarding an updated status of the household item.  ('983 patent claims 22, 24, 39, 105, 108; '918 patent claims 28, 112, 113; '798 patent claims 5, 6, 52; *see also* Johnson Reb. R. at ¶ 89.)

According to IS, the accused Amazon products themselves do not communicate a short range wireless communication regarding the updated status of a household item.  (McAlexander Op. R., Atts. A, A-a, A-b, B, B-a, B-b, B-c, B-d, C, C-a, C-b. C-c; *see also* Shamilov Decl. Ex. 9 (chart showing third-party reliance by Mr. McAlexander).)  Instead, IS relies on third-party products, such as the Philips Hue Lightbulb and Philips Hue Bridge, for those required communications.  (McAlexander Op. R., Atts. A, A-a, A-b, B, B-a, B-b, B-c, B-d, C, C-a, C-b. C-c; *see also* Johnson Reb. R. at ¶ 89.)  Indeed, for all claims except claim 62 of the '983 patent and its dependents, IS alleges that the claimed "short range wireless communication" is a ZigBee communication between the Philips Hue Lightbulb and the Philips Hue Bridge.  (*See, e.g.*, McAlexander Op. R. at Att. A-a10 ("[B]oth the command from the Philips Hue Bridge to the lightbulb and the message

from the lightbulb to the Philips Hue Bridge are sent through a ZigBee short range wireless communication channel."); *see also* Shamilov Decl. Ex. 9; Johnson Reb. R. at ¶ 92.)[4]  And for claim 62 and its dependents, which do not recite short range wireless communications but still require communication of "information for managing an item status . . . based on a signal regarding an updated status of the item," IS alleges that the "item" is one of many third-party "smart home devices" such as "cameras, cooking appliances, entertainment devices, lights, locks, sensors, and thermostats."  (McAlexander Op. R. at Att. B-a22.)

It is the end user who decides to purchase the third-party smart home devices, such as the Phillips Hue lightbulb and Philips Hue Bridge, and who configures them to communicate with each other through the end users's own WiFi network.  Amazon does not even know, let alone use, the protocol the Philips Hue Lightbulb (or another smart home device) uses to communicate with the Philips Hue Bridge (or another smart home hub purchased by the end user).  (Johnson Reb. R. ¶ 92.)  Amazon does not direct its customers, or Philips for that matter, to use any particular communication between a Philips Hue Lightbulb and Philips Hue Bridge, or between any other smart home hub and device.  (*Id.*)  IS has no evidence that it makes any difference to Amazon whether the communication between the Philips Hue Lightbulb and Philips Hue Bridge (or another smart home device and another smart home hub) is a "short range wireless communication," or if it occurs as a long-range wireless communication, or a wired communication, or if it even occurs at all.  (*Id.*)  Amazon has no way to direct or instruct any of the third-party smart home devices on how to act, communicate, or operate.  (*Id.* at ¶¶ 89–98.)  Nor does it have any mechanism for doing so.  (*Id.*)  It is the end users, not Amazon, who select and configure the third-party devices for use

---

[4] The vast majority of the accused Amazon devices do not even support ZigBee communications and cannot receive any short range ZigBee communications mapped by IS.  (Johnson Reb. R. at ¶¶ 62, 102 (noting that all accused Fire TVs only have WiFi capability, not ZigBee); *id.* at ¶¶ 65–67, 144 (same for all accused Fire Tablets); *id.* at ¶¶ 74, 207 (noting that all accused Echos except for the Echo Plus and Echo Show 2 only have WiFi capabilities, not ZigBee).)

in their homes.

And although Amazon allows third parties to create "skills" that enable third-party devices to be controlled via Alexa, under *Centillion*, merely offering a software interface for third parties to interface with is insufficient to show infringement by Amazon.  631 F.3d at 1286.  Indeed, in *Centillion*, the Federal Circuit held that "[s]upplying the software for the customer to use is not the same as using the system." *Id.*  Here, Amazon does not even provide its customers with any software to install on their Alexa-enabled devices to interact with the third-party smart home devices.  (Johnson Reb. R. at ¶¶ 50–55; 89–98.)  Amazon merely provides an interface for third parties to build their own software in their own discretion.  (*Id.*)  And it is those third parties who control how that software operates in response to customers' request to control a system the customers set up in their own homes, which Amazon does not use, does not provide, and does not control.  (*Id.*; *see Intellectual Ventures I LLC v. Motorola Mobility LLC*, 870 F.3d 1320, 1329 (Fed. Cir. 2017) (explaining that a single party "must control (even if indirectly) and benefit from each claimed component" to "use" a system).)

IS's expert, Mr. McAlexander, opines that this reliance on third-party products makes no difference to the strength of IS's case.  But seemingly worried that the Court may disagree, he espoused a new theory during his deposition:  an end user saying "Alexa, turn on Light 1" meets the claimed communication of information about an updated status of the household item in conjunction with a short range wireless communication regarding the updated status.  (McAlexander Depo. at 53:6–14; *see also* 45:8–50:2; 115:17–116:1.)

This new argument effectively reads out the requirement that communicating "information about an updated status of a household item" must be "*in conjunction with* a short range wireless communication regarding the updated status," as required by the claims.  (*See, e.g.*, '918 patent, claim 27, from which asserted claim 28 depends.)  Under this new theory, Mr. McAlexander still

maps the "updated status" to the light turning on.  (McAlexander Depo. at. at 57:8–11.)  But as
Mr. McAlexander himself concedes, when the user says "Alexa, turn on Light 1," the light has not
yet turned on, *i.e.* its status has not been updated.  (*Id.* at 54:23–55:16; *see also id.* at 120:3–14.)
Thus, it's impossible for a user telling Alexa to "turn on Light 1" to communicate "information
about an updated status" because the updated status (*i.e.*, the light turning on) has not happened.
(*Id.* at 52:3–9 ("Q. So there is no updated status, and your testimony is that nonetheless, infor-
mation about an updated status can be communicated in conjunction with a short range wireless
communication regarding the updated status. Is that your testimony?  A. In this particular instance
and arrangement, yes."); *see also id.* at 116:23–117:9.)  Indeed, when pressed, Mr. McAlexander
failed to articulate how the accused Amazon devices become aware of the required "short range
wireless communication regarding the updated status," much less how these devices communicate
information "in conjunction with" that communication.  (*Id.* at 50:17–58:23.)

This is because, as discussed, Amazon does not know or care about the protocol third par-
ties use to control their devices.  (Johnson Reb. R. at ¶¶ 89–98.)  The communication that Mr.
McAlexander now points to, "Alexa, turn on light 1," is communicated when and if a user speaks
those words.  (*Id.* at ¶¶ 30–31.)  It is not triggered by, or in conjunction with, a change in status of
an item.  (*Id.*)  As such, it cannot be triggered by a short range wireless communication between
third-party devices regarding such a change in status.  (*Id.*)  Mr. McAlexander's half-baked theory
does not save IS's claims.  More importantly, it does not eliminate his reliance on third-party
devices to prove infringement, which is fatal to IS's claims under *Centillion*.

### b)    Amazon does not benefit from the accused systems.

Amazon also does not benefit from *each and every element* of the system the customers set
up in their homes using third-party smart home devices.  *Intellectual Ventures I,* 870 F.3d at 1329
("[P]roof of an infringing 'use' of the claimed system under § 271(a) requires the patentee to

demonstrate that the direct infringer obtained 'benefit' from each and every element of the claimed system.").  IS has no evidence that Amazon derives any tangible benefit "tethered to the claims" because the communication between the Philips Hue Lightbulb (or another smart home device) and Philips Hue Bridge (or another smart home hub) is a "short range wireless communication," or a long-range wireless communication, or a wired communication, or any communication at all. *Grecia*, 724 F. App'x at 947 ("The alleged benefit should be tangible, not speculative, and tethered to the claims.").  It is the user, not Amazon, who benefits from being able to control a lightbulb. Indeed, IS's expert, Mr. McAlexander, has no analysis in his report of any purported "element-by-element benefits" that Amazon derives from its customers' set up and use of smart home systems in their homes.  *Acceleration Bay LLC v. Activision Blizzard, Inc.*, 324 F. Supp. 3d 470, 482–83 (D. Del. 2018).

Amazon does not "use" the claimed systems as a matter of law and does not and cannot directly infringe the asserted claims under 35 U.S.C. § 271(a).

**B.     Amazon cannot directly infringe as a matter of law under the Federal Circuit's opinions in *Typhoon Touch* and *Nazomi*.**

To meet the limitations of the '983 patent family, the accused systems must be *configured to* perform a plethora of functions.  For example, claim 9 of the '918 patent requires "[a] wireless signal apparatus comprising"; "an input interface configured to receive a multimedia signal through a wireless communication network"; a "processing unit configured to perform a conversion of the multimedia signal"; "a high definition digital output interface configured to transmit the encoded signal to the destination device"; and a "wireless signal conversion apparatus . . . configured to transmit the encoded signal to the destination device."  ('918 patent, cl. 9.)  Similarly, claim 27 of the '918 patent, from which asserted claim 28 depends, requires that the "wireless signal conversion apparatus is configured to:  communicate, through the wireless communication

network, information about an updated status of a household item in conjunction with a short range wireless communication regarding the updated status." ('918 patent, cl. 27.)

It is undisputed that, as sold by Amazon in the box shipped to the customer, the accused Amazon products are not configured to and do not perform these functions—for example, receiving a multimedia signal over a wireless communication network or communicating information regarding status of a household item—and will never perform these functions unless and until they are combined with and configured to operate with third-party devices such as a local WiFi network and Philips Hue Bulbs and Bridges and the like. (McAlexander Op. R., General Tabs at Tab VV at 2; Johnson Reb. R. at ¶¶ 89–98.) The bulk of the accused products—Fire TV and Fire Tablet devices—will never even be used to control smart home devices in the manner accused by IS as they are primarily used as media streaming devices. (*See, e.g.*, Johnson Reb. R. at ¶¶ 56, 66 (discussing primary functionality of Fire TV and Fire Tablet devices).)

To save its infringement theories, IS, through its expert Mr. McAlexander, argues that the devices as sold by Amazon in their original boxes infringe the asserted claims of the '983 patent family because they are *capable of being configured*, at some point in the future by some end users, to operate with third-party devices to perform the claimed functions. (*See, e.g.*, McAlexander Depo. at 33:9–34:4 (testifying that Fire TV products are "configured to communicate" information regarding status of a household item "in a use condition where it is part of a wireless communication network and there is an item such as . . . in a communication with the ZigBee network on a Philips light bulb, with the Philips Hue"), 50:11-24 (admitting that the Fire TV as sold by Amazon "does not either send or receive a short range wireless communication regarding the updated status," but arguing that "it's not required by the claim"); 85:10-87:2 (Fire Tablet cannot transmit a signal to a high definition display when shipped in the box, but is "configured" to do so when connected to a separate display via a separate HDMI cable).) Indeed, Mr. McAlexander identifies

as purportedly infringing "Configuration Cases for Alexa"—*post-sale* combinations of the accused

Amazon devices with *third-party* smart home devices and software.  (McAlexander Infringement

Report at General Tab VV at 2-6.)  The Federal Circuit has repeatedly rejected such infringement

theories.

In *Typhoon Touch*, the patents-in-suit were directed to "keyboardless" touch screens for

portable computing devices.  659 F.3d at 1379.  The representative claim recited a "portable, key-

boardless, computer" comprising, among other things, (1) "a memory for storing at least one data

collection application"; (2) "a processor . . . for executing said data collection application"; and

(3) "a run-time utility operating in conjunction with said processor to execute said application."

*Id.* at 1379–80.  The district court granted summary judgment in favor of the defendant because

the accused products did not perform the claimed functions.  *Id.*  On appeal, the patentee argued

that the claims required only that "the device has the *capability of being programmed or configured*

to execute" the claimed functions—the very argument IS and its expert make here.  *See id.* at

1380–81 (emphasis added).  The Federal Circuit rejected the patentee's arguments that the district

court "incorrectly included a 'use' limitation in an apparatus claim" and that "it suffices if the

computer-implemented structures can be configured to operate in conjunction with each other,

whether or not they have been so configured in the device charged with infringement."  *Id.*  The

Federal Circuit found that to infringe, "the apparatus *as provided* must be 'capable' of performing

the recited function, not that it might later be modified to perform that function."  *Id.* at 1380 (citing

*Microprocessor Enhancement Corp. v. Tex. Instruments Corp., Inc.*, 520 F.3d 1367 (Fed. Cir.

2008)) (emphasis added).

The Federal Circuit reaffirmed this rule in *Nazomi Communications, Inc. v. Nokia Corp.*

739 F.3d at 1344–46.  The *Nazomi* court affirmed a district court's holding that the functions re-

cited in the asserted claims were actual limitations and that, to infringe the claims, "the claimed

apparatus must *itself* be capable of performing the claimed functions." *Id.* at 1343 (emphasis added). The court again rejected the very argument made by IS and its expert here: "that the accused devices infringe if they 'ha[ve] the *capability of being configured or programmed* to perform the stated function,' even though the accused devices were not structured to perform that stated function as sold." *Id.* at 1346 (quoting *Typhoon Touch*, 659 F.3d at 1380) (emphasis added); *see also, e.g.*, *Flexuspine, Inc. v. Globus Med., Inc.*, No. 6:15-CV-201-JRG-KNM, 2016 WL 4161887, at *5–7 (E.D. Tex. Aug. 5, 2016) (establishing infringement of claim reciting medical device "configured to" perform functions "requires proving more than mere capability" because interpreting claim as requiring only capability of being used in infringing manner "would render these [configured to] limitations 'devoid of meaning'").

So did another court in this district, applying the same and by now well-established Federal Circuit rule. *Sipco, LLC v. Abb, Inc.*, No. 6:11-CV-0048 LED-JDL, 2012 WL 31122302 (E.D. Tex. July 30, 2012). The patents at issue in *Sipco* were "generally directed towards [systems for] monitoring or controlling remote devices using wireless mesh communications technology." *Id.* at *1. Like the claims of the '983 patent family, the representative claim in *Sipco* recited a system consisting of generic computing and networking components "configured to" achieve various functions: "[a] system for remote data collection, assembly, and storage comprising . . . a computer configured to execute at least one computer program that formats and stores select information for retrieval upon demand from a remotely located device"; "at least one wireless transmitted configured to transmit select information and transmitter identification information"; "a plurality of . . . transceivers . . . configured to receive select information transmitted from at least one nearby wireless transmitter and further configured to transmit the select information," and a "gateway . . . configured to farther transmit the translated information to the computer." *Id.* at *5 (emphasis removed). Just like IS and its expert here, Sipco argued that "'configured to' 'simply means

the device is programmed or equipped with hardware or software to be capable of performing the function.'" *Id.* at \*10. Sipco argued that the claimed "wireless transceivers need not actually be programmed or equipped with hardware to perform the functions recited above, they need only be 'capable' of performing these functions." *Id.* at \*11. The court rejected Sipco's argument, noting that "[i]nterpreting 'configured to' as requiring only *mere capability would eliminate any meaningful limits to the claims*" and would render the "configured to" limitations "virtually devoid of meaning." *Id.* (emphasis added). The identical argument advanced by IS and its expert fail for the same reason.

The accused Amazon devices as sold cannot by themselves perform the limitations of the asserted claims. Mr. McAlexander's "Configuration Cases for Alexa" themselves illustrate that the accused devices must be configured and connected to a system with third-party devices and networks in order to meet all elements of the asserted claims. Indeed, until the accused devices are connected to an end user's home network and coupled with the end user's smart home devices provided by third parties such as Phillips, there is no "updated status" or a "household item" to manage as the asserted claims require. IS cannot establish direct infringement of the '983 patent family claims by the accused devices as sold as a matter of law for this reason as well. *Typhoon Touch*, 659 F.3d at 1380; *Nazomi*, 739 F.3d at 1344–46.

Notably, the accused Amazon devices provide a way to send voice commands to Alexa. What is possible with those voice commands is limitless and depends on the devices that third parties may design and build (from essential oil diffusers to pet feeders to twerking bears to smart toilets[5]). IS's argument that an accused Amazon device is *configured to* perform all those limitless

---

[5] (Shamilov Decl. Ex. 10 (ASAKUKI Smart Wi-Fi Essential Oil Diffuser, App Control Compatible with Alexa); *id.* Ex. 11 (Petnet SmartFeeder, Automatic Pet Feeder for Cats and Dogs, Compatible with Alexa); *id.* Ex. 12 (Gemmy Twerking Christmas Bear Bluetooth Plush – Compatible with Alexa); *id.* Ex. 13 (Alexa is everywhere: Kohler's smart toilet brings voice assistant into bathrooms)).

functionalities at the time it is sold—before its owner even buys any of those third-party devices let alone pairs them with the accused Amazon device or registers them—defies logic and has already been rejected by the Federal Circuit and courts in this district.

## VII.    CONCLUSION

For the reasons stated, Amazon respectfully requests that the Court grant its motion for summary judgment of no direct infringement of all claims of the '983 patent family.

February 25, 2020

Respectfully submitted,

By: */s/ J. David Hadden*
    J. David Hadden
    CA Bar No. 176148 (Admitted E.D. Tex.)
    Email: dhadden@fenwick.com
    Saina S. Shamilov
    CA Bar No. 215636 (Admitted E.D. Tex.)
    Email: sshamilov@fenwick.com
    Ravi R. Ranganath
    CA Bar No. 272981 (Admitted E.D. Tex.)
    Email: rranganath@fenwick.com
    **FENWICK & WEST LLP**
    Silicon Valley Center
    801 California Street
    Mountain View, CA 94041
    Telephone: (650) 988-8500
    Facsimile: (650) 938-5200

    Todd R. Gregorian
    CA Bar No. 236096 (Admitted E.D. Tex.)
    Email: tgregorian@fenwick.com
    Dargaye Churnet
    CA Bar No. 303659 (Admitted E.D. Tex.)
    Email: dchurnet@fenwick.com
    TJ Fox
    CA Bar No. 322938 (Admitted E.D. Tex.)
    Email: tfox@fenwick.com
    **FENWICK & WEST LLP**
    555 California Street, 12th Floor
    San Francisco, CA 94104
    Telephone: 415.875.2300
    Facsimile:  415.281.1350

    Jeffrey Ware
    CA Bar No. 271603 (Admitted E.D. Tex.)
    Email: jware@fenwick.com
    **FENWICK & WEST LLP**
    1191 Second Avenue, 10th Floor
    Seattle, WA 98101
    Telephone: 206.389.4510
    Facsimile:  206.389.4511

Melissa R. Smith
State Bar No. 24001351
**GILLAM & SMITH, LLP**
303 South Washington Avenue
Marshall, Texas 75670
Telephone: (903) 934-8450
Facsimile: (903) 934-9257
Email: melissa@gillamsmithlaw.com

*Counsel for Defendants*
AMAZON.COM, INC.,
AMAZON DIGITAL SERVICES LLC,
AND AMAZON WEB SERVICES, INC.

## CERTIFICATE OF SERVICE

I hereby certify that on February 25, 2020, a true and correct copy of the foregoing document was served on each party through their counsel of record via email.

Donald Lee Jackson
Email: djackson@davidsonberquist.com
Alan Arthur Wright
Email: awright@davidsonberquist.com
Gregory Albert Krauss
Email: gkrauss@davidsonberquist.com
James Daniel Berquist
Email: jay.berquist@davidsonberquist.com
Davidson Berquist Jackson & Gowdey LLP
8300 Greensboro Drive Suite 500
McLean, VA 22102

*Counsel for Plaintiff*
Innovation Sciences, LLC


*/s/ Ravi R. Ranganath*
Ravi R. Ranganath