[redacted]

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | |
|---|---|
| INNOVATION SCIENCES, LLC,<br>Plaintiff,<br>v.<br><br>AMAZON.COM, INC., ET AL.,<br>Defendants. | Civil Action No.4:18-cv-00474-ALM<br>***Consolidated Lead Case*** |
| INNOVATION SCIENCES, LLC,<br>Plaintiff,<br>v.<br><br>RESIDEO TECHNOLOGIES, INC.,<br>Defendant. | Civil Action No.4:18-cv-00475-ALM<br>***Member Case*** |
| INNOVATION SCIENCES, LLC,<br>Plaintiff,<br>v.<br><br>HTC CORPORATION,<br>Defendant. | Civil Action No.4:18-cv-00476-ALM<br>***Member Case*** |

**INNOVATION SCIENCE, LLC'S OPPOSITION TO HTC CORPORATION'S AND RESIDEO TECHNOLOGIES, INC.'S MOTION FOR SUMMARY JUDGMENT THAT PLAINTIFF LACKS THE RIGHT TO SUE**

[redacted]

**TABLE OF CONTENTS**


I. RESPONSE TO DEFENDANTS' STATEMENT OF ISSUES ........................................ 1

II. RESPONSE TO DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS ........................................ 2

III. LEGAL STANDARDS ........................................ 3

IV. DEFENDANTS' MOTION FOR SUMMARY JUDGMENT SHOULD BE DENIED.... 6

A. Defendants Lack Prudential Standing to Litigate Qorvo's Potential Ownership Claim ........................................ 6

B. Whether Qorvo Owns an Interest in the Patents-In-Suit Does Not Raise a Question of Standing........................................ 7

C. RFMD's Employment Agreement Did Not Assign the '983 Inventions to RFMD Because the '983 Patent Inventions Did Not Relate to RFMD's Business ........................................ 7

D. RFMD's Employment Agreement Did Not Assign Any of Innovation's Inventions Because Ronald Wang's portion of the Inventions Were Developed on His Own Time Using His Own Resources ........................................ 13

E. RFMD's Employment Agreement is Unenforceable as Against the Public Policy of California........................................ 14

F. Title 35 U.S.C. § 261 Voids Qorvo's Potential Ownership Claim ........................................ 15

V. CONCLUSION........................................ 17

[redacted]

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) .......... 3, 5

*Athena Diagnostics, Inc. v. Mayo Collaborative Servs., LLC*,
915 F.3d 743 (Fed. Cir. 2019) .......... 4

*Colorado v. New Mexico*,
467 U.S. 310 (1984) .......... 5

*Computer Docking Station Corp. v. Dell, Inc.*,
519 F.3d 1366 (Fed. Cir. 2008) .......... 8

*Danos v. Jones*,
652 F.3d 577 (5th Cir. 2011) .......... 7

*Duke Power Co. v. Carolina Environmental Study Group, Inc.*,
438 U.S. 59 (1978) .......... 6

*Eli Lilly and Co. v. Barr Laboratories, Inc.*,
251 F.3d 955 (Fed. Cir. 2001) .......... 5

*Enplas Display Device Corp. v. Seoul Semiconductor Co.*,
909 F.3d 398 (Fed. Cir. 2018) .......... 4

*Fisk Elec. Co. v. DQSI, L.L.C.*,
894 F.3d 645 (5th Cir. 2018) .......... 4

*Greenwich Ins. Co. v. Capsco Indus., Inc.*,
934 F.3d 419 (5th Cir. 2019) .......... 4

*Ironshore Europe DAC v. Schiff Hardin, L.L.P.*,
912 F.3d 759 (5th Cir. 2019) .......... 4

*LifeNet Health v. LifeCell Corp.*,
2014 WL 5456521 (E.D. Va. 2014) .......... 6

*Little v. Liquid Air Corp.*,
37 F.3d 1069 (5th Cir. 1994) .......... 3

*Microsoft Corp. v. i4i Ltd. P'ship*,
564 U.S. 91 (2011) .......... 5

*Miller v. Dep't of Justice*,
842 F.3d 1252 (Fed. Cir. 2016) .......... 5

[redacted]

*National Presto Indus., Inc. v. West Bend Co.*,
76 F.3d 1185 (Fed. Cir. 1996) ..... 5

*Price v. Symsek*,
988 F.2d 1187 (Fed. Cir. 1993) ..... 5

*Renwick v. PNK Lake Charles, L.L.C.*,
901 F.3d 605 (5th Cir. 2018) ..... 4

*St. Paul Fire & Marine Ins. Co. v. Labuzan*,
579 F.3d 533 (5th Cir. 2009) ..... 6

*Superior MRI Services, Inc. v. Alliance Healthcare Services, Inc.*,
778 F.3d 502 (5th Cir. 2015) ..... 6

*Talecris Biotherapeutics, Inc. v. Baxter Intern. Inc.*,
510 F. Supp. 2d 356 (D.Del. 2007) ..... 6

*United States v. Johnson*,
632 F.3d 912 (5th Cir. 2011) ..... 6

*Warren v. Fed. Nat'l Mortg. Ass'n*,
932 F.3d 378 (5th Cir. 2019) ..... 4

*Warth v. Seldin*,
422 U.S. 490 (1975) ..... 6

**Statutes**

35 U.S.C. § 261 ..... 1, 2, 15

35 U.S.C. § 282(a) ..... 5

California Labor Code § 2870 ..... passim

*SiRF Tech., Inc. v. Int'l Trade Com'n*,
601 F.3d 1319 (Fed. Cir. 2010) ..... 16

**Rules**

Fed. R. Civ. P. 56(a) ..... 4

[redacted]

Plaintiff Innovation Sciences, LLC ("Innovation") opposes Defendant HTC Corporation's ("HTC's") and Defendant Resideo Technologies, Inc's ("Resideo's") motion for summary judgment that Innovation lacks the right to bring suit (Dkt. 441). HTC and Resideo are collectively referred to as "Defendants" for purposes of the present motion.

## I. RESPONSE TO DEFENDANTS' STATEMENT OF ISSUES

1. Innovation has the right to bring suit for infringement of the Asserted Patents. Innovation is the sole owner of the Asserted Patents.

2. Defendants do not have standing to litigation whether Qorvo (or any other party) has an ownership interest in the patents-in-suit.

3. Defendants bear the burden of proof on all elements of their motion.

4. Assuming *arguendo* that the relevant employment agreement between co-inventor Dr. Ronald Wang and his former employer, RFMD, applies, that agreement did not constitute an assignment from Dr. Wang to RFMD because the Innovation inventions developed in part by Dr. Wang did not relate to RFMD's business at the time or result from Dr. Wang's work for RFMD.

5. Assuming *arguendo* that the relevant employment agreement between co-inventor Dr. Ronald Wang and RFMD applies, that agreement did not constitute an assignment from Dr. Wang to RFMD because Dr. Wang developed his portion of the Innovation inventions entirely on his own time using his own resources.

6. The RFMD employment agreement requires assignment of inventions in situations that are not permitted under California Labor Code § 2870 (b). As a result, the RFMD employment agreement is against the public policy of California and is unenforceable as required by the statute.

7. Under 35 U.S.C. § 261, ¶4, an "interest [in a patent] that constitutes an assignment, grant or conveyance shall be void as against any subsequent purchaser or mortgagee for a valuable consideration, without notice, unless it is recorded in the Patent and Trademark Office within three months from its date or prior to the date of such subsequent purchase or

[redacted]

mortgage." If Qorvo (or RFMD) had an ownership in the patent-in-suit, it never recorded its assignment to that patent. Innovation via its predecessor in interest, SellerBid, Inc., recorded its assignments to the three patent applications that were filed during the time Dr. Wang was employed by RFMD. The assignments were for valuable consideration and were executed without any knowledge of the invention-assignment obligations in RFMD's employment agreement. Therefore, any potential ownership interest Qorvo may have had has been voided by operation of 35 U.S.C. § 261.

## II. RESPONSE TO DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS

A. Ronald Wang was never an officer, director, or employee of SellerBid or of its successors and Defendants provide no evidence otherwise.

B. While Ronald worked for RFMD, RFMD made radio frequency integrated circuits ("RFICs"). Those components could be used in a wide variety of applications including portable gaming systems, industrial radios, satellite radio, Global Position System ("GPS"), utility meter reading systems, two-way paging, interactive toys, PC modem cards, and bar coding. None of those components were "specifically related to 'security systems'" as alleged by Defendants.

Ronald and Anne worked together during Ronald's employment at RFMD. By using the phrase "throughout his employment," Defendants make it sound like Ronald and Anne worked together on a daily basis.

There is no evidence that the so called "signal conversion technology" disclosed in the '418 application was the subject of Ronald's April 11, 2017 email to Anne. The article HTC attaches as Exhibit 18 refers to "face to face" calls. But there is no evidence that such calls use the "signal conversion technology" disclosed in the '418 application.

HTC mischaracterizes Innovation's counsel's statements at the November 4, 2019 hearing. Innovation's counsel did not refer to any specific patent applications. There is evidence that Ronald told RFMD about patents and patent applications when he applied for a job at

[redacted]

RFMD and during his job interview. Ronald's job application list patents and patent applications that existed as of the time he applied for a job at RFMD. Exh. 27 at INNOVEML0008932. He also testified that his patent applications were discussed during his RFMD interview. Exh. 28, January 31, 2020 depo, pp. 35-36.

C. Defendants incorrectly assert that Ronald did not receive "good and valuable consideration." Ronald and Anne agreed that he would be paid for his patent rights from the licensing revenue received by SellerBid, and he was so paid. Valuable consideration does not have to be in the form of money. But in this case, he was paid money for his rights in the patents.

Qorvo has never had any rights in the patents-in-suit. *Before* Vector filed its motion for lack of standing, Innovation sought to avoid litigation over this issue by seeking a statement from Qorvo that it did not have any such rights. Qorvo's counsel suggested that Innovation pay for such a statement. Innovation offered to pay Qorvo for a statement or agreement that it either did not have any rights or that if it had any rights, it transferred those rights to Innovation. No statement or agreement was obtained from Qorvo. Qorvo has never asserted that it owns any interest in the asserted patents.

## III. LEGAL STANDARDS

Federal Rule of Civil Procedure 56(c) authorizes a Court to grant summary judgment where "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." A dispute about a material fact is "genuine" if the evidence presented, viewed in the light most favorable to the nonmoving party, would permit a reasonable jury to find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). However, such evidence, whether it is offered by the movant to satisfy their initial burden or by the nonmovant to defeat a properly supported motion for summary judgment, may not consist entirely of "conclusory allegations" or "unsubstantiated assertions." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

[redacted]

This Court evaluates a motion for summary judgment under the law of the Fifth Circuit. *See Enplas Display Device Corp. v. Seoul Semiconductor Co.*, 909 F.3d 398, 405 (Fed. Cir. 2018) ("We review the district court's grant of summary judgment under regional circuit law."). In the Fifth Circuit, "[s]ummary judgment is appropriate when 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Warren v. Fed. Nat'l Mortg. Ass'n*, 932 F.3d 378, 382 (5th Cir. 2019) (citing Fed. R. Civ. P. 56(a)). Put another way, since the movant bears the burden on summary judgment, the movant's failure to wholly foreclose the existence of genuine disputes of material fact will preclude summary judgment. *See id.*; Fed. R. Civ. P. 56(a).

"A fact is material if it would affect the outcome of the case, and a dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.* (quoting *Renwick v. PNK Lake Charles, L.L.C.*, 901 F.3d 605, 611 (5th Cir. 2018)) (internal quotation marks omitted). "Evidence at the summary judgment stage must be viewed in the light most favorable to the non-moving party, and reasonable inferences must be drawn in that party's favor." *Id.* (citing *Fisk Elec. Co. v. DQSI, L.L.C.*, 894 F.3d 645, 650 (5th Cir. 2018)). While the Court is not required to search the record for facts not expressly addressed by the parties, material factual disputes that are readily apparent from the "underlying facts contained in the affidavits, depositions, and exhibits of record" will preclude summary judgment. *Greenwich Ins. Co. v. Capsco Indus., Inc.*, 934 F.3d 419, 422 (5th Cir. 2019). In the context of patent litigation, the patents-in-suit are exhibits of record because they are "considered to 'merge[ ] into the pleadings' ...." *Athena Diagnostics, Inc. v. Mayo Collaborative Servs., LLC*, 915 F.3d 743, 755 (Fed. Cir. 2019) (applying First Circuit law); *accord Ironshore Europe DAC v. Schiff Hardin, L.L.P.*, 912 F.3d 759, 763 (5th Cir. 2019) (requiring the Court to review "the complaint, any documents attached to the complaint, and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint" in evaluating a motion to dismiss under Rule 12).

The amount of evidence necessary to create a dispute of fact is impacted by the

[redacted]

substantive evidentiary burden of proof at trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986). "[A] higher burden of proof should have a corresponding effect on the judge when deciding whether to send the case to the jury" or to grant summary judgment. *Id.* In a context where a party must prove its claims by clear and convincing evidence, "the clear-and-convincing standard of proof should be taken into account in ruling on summary judgment motions ...." *Id.* at 255. Clear and convincing evidence "has been described as evidence which produces in the mind of the trier of fact an ***abiding conviction*** that the truth of a factual contention is '***highly probable***.' " *Miller v. Dep't of Justice*, 842 F.3d 1252, 1257–58 (Fed. Cir. 2016) (quoting *Price v. Symsek*, 988 F.2d 1187, 1191 (Fed. Cir. 1993)); *see also Colorado v. New Mexico*, 467 U.S. 310, 316 (1984).

To succeed on summary judgment, the movant must completely foreclose any material factual disputes about either the "abiding" or "highly probable" nature of its allegations. *See Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 101 (2011)*; Miller*, 842 F.3d at 1257–58; *Colorado*, 467 U.S. at 316. Conversely, when the nonmovant shows that an issue is not completely clear, or that there is a dispute as to the convincingness of the movant's evidence, summary judgment is inappropriate. *See Microsoft Corp.*, 564 U.S. at 101; *Miller*, 842 F.3d at 1257–58; *Colorado*, 467 U.S. at 316.

An accused infringer has the burden of proving invalidity by clear and convincing evidence, because a patent is presumed to be valid, and the presumption may be overcome only by clear and convincing evidence. *See* 35 U.S.C. § 282(a); *National Presto Indus., Inc. v. West Bend Co.*, 76 F.3d 1185, 1189 (Fed. Cir. 1996); *Microsoft Corp. v. i4i Ltd. Partnership*, 564 U.S. 91, 112-13 (2011).

"A moving party seeking to invalidate a patent at summary judgment must submit such clear and convincing evidence of invalidity so that no reasonable jury could find otherwise." *Eli Lilly and Co. v. Barr Laboratories, Inc.*, 251 F.3d 955, 962 (Fed. Cir. 2001). "[W]here the ... 'clear and convincing evidence requirement applies, the trial judge's summary judgment inquiry as to whether a genuine issue exists will be whether the evidence presented is such that a jury applying that

[redacted]

evidentiary standard could reasonably find for either the plaintiff or the defendant.'" *LifeNet Health v. LifeCell Corp.*, 2014 WL 5456521, at *7 (E.D. Va. 2014) (citing *Talecris Biotherapeutics, Inc. v. Baxter Intern. Inc.*, 510 F. Supp. 2d 356, 359 (D.Del. 2007).

## IV. DEFENDANTS' MOTION FOR SUMMARY JUDGMENT SHOULD BE DENIED

### A. Defendants Lack Prudential Standing to Litigate Qorvo's Potential Ownership Claim

Defendants' argument that Innovation is not the sole owner of the asserted patents is based on a claim that Qorvo owns an interest in Innovation's patents-in-suit. As such, Defendants must first establish that they have the requisite standing to assert such a claim defensively in this case.

"Prudential standing requirements exist in addition to the immutable requirements of Article III as an integral part of judicial self-government." *Superior MRI Services, Inc. v. Alliance Healthcare Services, Inc.*, 778 F.3d 502, 504 (5th Cir. 2015) (*quoting St. Paul Fire & Marine Ins. Co. v. Labuzan*, 579 F.3d 533, 539 (5th Cir. 2009)). Among other principles, prudential standing requires that a claimant "generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *United States v. Johnson*, 632 F.3d 912, 919-20 (5th Cir. 2011) (*quoting Duke Power Co. v. Carolina Environmental Study Group, Inc.*, 438 U.S. 59, 80 (1978)). Moreover, "[a] similar standing issue arises when the litigant asserts the rights of third parties defensively, as a bar to judgment against him." *Warth v. Seldin*, 422 U.S. 490, 501 n.12 (1975).

Here, Defendants assert that Qorvo owns an interest in the patents, and thus, Innovation allegedly lacks the right to prosecute these cases. As such, Defendants are seeking to litigate whether Qorvo owns such rights. Qorvo has not made any claim of ownership on its own behalf. Under the controlling Supreme Court and Fifth Circuit authority, Defendants cannot assert Qorvo's potential ownership rights as a defense to a judgment in this case. Prudential standing requires that if any party is allowed to assert that Qorvo owns an interest in the patents-in-suit, it is Qorvo that must make that claim. *See Warth*, 422 U.S. at 509 ("In short the claim of these

[redacted]

petitioners falls squarely within the prudential standing rule that normally bars litigants from asserting the rights or legal interests of others in order to obtain relief from injury to themselves."); *Danos v. Jones*, 652 F.3d 577, 582 (5th Cir. 2011) (holding that Danos lacks standing to assert claim because "prudential considerations require that a party generally must assert [her] own legal rights and interests, and cannot rest [her] claim to relief on the legal rights or interests of third parties.") (internal quotation omitted). Qorvo has never made a claim of ownership. But even if it had, allowing Defendants to litigate that ownership claim here on Qorvo's behalf violates the prudential standing requirements.

### B. Whether Qorvo Owns an Interest in the Patents-In-Suit Does Not Raise a Question of Standing

The issues raised in Defendants' motion do not deprive Innovation of its constitutional standing to bring its claim of patent infringement against Defendants. That was this Court's ruling when it denied Vector's motion to dismiss for lack of standing. *See* Dkt. 314 at 4.

### C. RFMD's Employment Agreement Did Not Assign the '983 Inventions to RFMD Because the '983 Patent Inventions Did Not Relate to RFMD's Business

In order for the Inventions, Confidentiality and Non-Solicitation Agreement ("Employment Agreement") to have effectuated an assignment of an invention from Ronald Wang to RFMD, the invention had to be related to RFMD's business. The relevant language of the Employment Agreement reads:

[redacted]

Dkt. 441, Exh. 6, §2.

Defendants make much about the alleged technical relationship between the inventions of the patent-in-suit and the business of RFMD at the time Ronald Wang was employed there. But, Defendants only can make this argument by abstracting its description of RFMD's business and its description of the inventions of the '983 patent to such a degree that it appears that

[redacted]

Innovation's inventions have some superficial relationship to RFMD's business. Obviously, if one abstracts the description of two technologies enough, they will appear to be related.

The inventions of the patent-in-suit (*i.e.*, the '983 patent) are recited in the claims. *See Computer Docking Station Corp. v. Dell, Inc.*, 519 F.3d 1366, 1373 (Fed. Cir. 2008) ("The words of the claims define the scope of the patented invention."). Innovation has accused Defendants of infringing various claims of the patents-in-suit. Generally, those claims apply to smart home systems that can be used to monitor or control devices in the home, such as video cameras, door locks, security systems, smart appliances, etc. For example, claim 22 of the '983 patent recites a "wireless HUB system" comprising "an input interface," a "decoder," a "network interface," wherein the HUB system converts a wireless signal to accommodate production of corresponding information content, and wherein the HUB system manages an item status of an item. Claim 62 of the '983 patent is similar. Claim 117 of the '983 patent recites a "wireless HUB system" comprising "a memory," a "network interface," the HUB receiving a signal from an item status sensing device indicating an updated status of the item, and wherein the HUB system communicates information about the updated status to a user associated with the item, and wherein the HUB system is configured to notify a user of the updated status according to a configuration setting that indicates when or how the system communicates the updated status to the user. Similar claims are asserted from the '918 patent and the '798 patent.

Defendants abstract the description of Innovation's inventions to such a degree that they bear little resemblance to the subject matter of the claims, or the specification for that matter. Defendants argue that the patents-in-suit are directed to "various wireless communication technologies .. for 'providing systems and methods for efficient communication.'" Dkt. 441 at 10. Defendants then characterize RFMD's business as "the development and manufacture of electronic wireless communications technologies." *Id*. "Wireless communication technologies" is such a broad and generic technology description that it would apply to dozens of unrelated technologies. For example, the Global Positioning System ("GPS") and a wireless television remote control are both "wireless communication technologies." But no reasonable person

[redacted]

would argue that they are related to each other.

Defendants cite to snippets of the patent specification to zero in on the various references to the types of communications that can be used with the inventions. For example, Defendants point to cellular, wireless personal area networks (WPAN), Zigbee, Bluetooth, UWB, and RFID. Dkt. 441 at 9-10. While the specification and certain of the claims describe certain types of wireless communications used in the inventions, the inventions are not directed to those types of wireless communications. For example, with respect to Figure 5, Bluetooth may be used to communicate between transmitter 514 and the CRC 520. '983 patent at 13:3-17.[1] But that does not make the invention disclosed in Figure 5 a Bluetooth invention or even related to a Bluetooth invention. As the patent states, Figure 5 is "an example of a diaper management systems 510." '983 patent at col. 12:43-44. "The diaper management system 500 includes a diaper condition sensing module 510 and a central receiver/controller (CRC) 520." '983 patent at col. 12:44-46. Bluetooth is simply one of the underlying technology building blocks that *may* (but does not have to be) used as part of the invention of Figure 5. Indeed, an alternative to Bluetooth (*i.e.*, ZigBee) is disclosed in the specification. '983 patent at col. 13:14-16. If Bluetooth were "the invention" of Figure 5, it would not be replaceable by ZigBee. The same is true throughout the '983 patent.[2] Each time a particular communication protocol or category such as ZigBee, Bluetooth, Wi-Fi, cellular, WPAN, NFC, etc. are identified, they are described as a preexisting tool that can be used in the much larger distributed system that is the subject of the claims of the '983 patent, not the invention itself. The inventions described and claimed in the '983 patent involve systems comprised of multiple devices that are in communication with one another. *See* Exh. 1, Declaration of Ronald Wang, Ph.D. ("Ronald Wang Decl."), ¶¶ 6-7.

Defendants describe RFMD as being in the development and manufacture of "electronic wireless communications technologies." Dkt. 441 at 10. Once again, that is an abstract

---

[1] The '983 patent is attached as Exhibit 1 to Defendants' motion for summary judgment (Dkt. 441).

[2] The '983, '798, and '918 patents share a common specification.

[redacted]

description. The reality is that RFMD made and sold specific integrated circuits ("ICs" or "chips") for particular types of radio frequency ("RF") communications. One of Defendants' exhibits is an alleged screen capture from RFMD's website that is purportedly dated July 18, 2006 and that is described as a "product guide." *See* Dkt. 441, Exh. 27. That purported product guide lists several products allegedly sold by RFMD at the time. But a random sampling of the data sheets associated with those products shows that they are merely integrated circuits, or a pair of integrated circuits (*i.e.*, a "chipset") in the case of the Polaris 2 module. *See* Exhs. 2-8.

Dr. Ronald Wang testified that RFMD was in the business of making and selling radio frequency ICs for cellular phone manufacturers such as [redacted]. Exh. 1, Ronald Wang Decl., ¶¶ 10-11. RFMD did not make smart home products or smart home communication networks. Exh. 1, Ronald Wang Decl., ¶ 11. Further, Dr. Wang's understanding was that RFMD [redacted]. Exh. 1, Ronald Wang Decl., ¶ 11. Dr. Haigang Feng is a former co-worker of Dr. Ronald Wang's from their time at RFMD. Exh. 9, Declaration of Haigang Feng, Ph.D. ("Feng Decl."), ¶ 3. While Dr. Feng was employed at RFMD, RFMD was in the business of designing and selling radio frequency integrated circuits and a few printed circuit boards that included those integrated circuits as a chipset. Exh. 9, Feng Decl., ¶ 4. Those products were sold to cellular phone manufacturers such as [redacted]. *Id.* RFMD also made other integrated circuits used in radio frequency communications. *Id.* Dr. Feng has testified that he reviewed the '983 patent, and in his view, the technologies disclosed and claimed in that patent are not related to the business of RFMD at the time he was employed there. Exh. 9, Feng Decl., ¶¶ 5-6. Dr. David Lyon, another former RFMD employee, was deposed by Defendants and he also testified that RFMD was in the business of making and selling integrated circuits or "chips." Exh. 24, Lyon Depo. at 58, 167-174.

The inventions of the patents-in-suit are not related to integrated circuit technology. There is no disclosure in the patents related to the construction of, improvement to, or testing of, an integrated circuit. The details of the specific chips used in the Innovation inventions are

[redacted]

irrelevant to the claimed inventions. They all work equally well from the standpoint of those inventions.

Defendants' citation to U.S. Patent No. 8,103,224 provides further support for the idea that Innovation's inventions were not related to RFMD's business. The '224 patent is assigned to RFMD, but its invention is directed to the specific circuit elements that go into a particular integrated circuit. Exh. 10, Figs. 2-5. The "Field of Invention" for the '224 patent states "[t]he present invention relates to the field of integrated circuits. More particularly, the present invention relates to the field of integrated circuit design of phase locked loops and power amplifiers (PA) as part of a fully integrated transceiver." Exh. 10 at col. 1:18-21.[3] RFMD was in the business of making and selling RF integrated circuits. It was not in the business of developing, making, or selling smart home systems.

Dr. Ronald Wang advises that to the extent he worked in RFMD's research and development groups, that effort was limited to power amplifier and filter ICs. Exh. 1, Ronald Wang Decl., ¶ 12. An automobile manufacturer that produces a car that provides a Wi-Fi capability is not fairly characterized as being in Wi-Fi integrated circuit business. The reverse is equally true. A manufacturer of Wi-Fi integrated circuits cannot fairly be characterized as being in the automobile manufacturing business because automobile manufacturers include Wi-Fi integrated circuits in their cars. And yet Defendants' motion is based on such logic. RFMD was not in the business of building smart home devices and it certainly was not in the business of creating smart home communication networks. Similarly, Innovation's inventions are not directed to improvements in the structure, function or operation of individual integrated circuits.

The RFMD Employment Agreement is circumscribed by California Labor Code §2870,

---

[3] Defendants also refers to two other U.S. patents as allegedly showing the business of RFMD. Dkt. 163 at 4. But U.S. Patent No. 6,064,709 is directed to a storage rack for nuclear fuel assemblies and is assigned to A.T.E.A. Societe Atlantique de Techniques Avancees of France. Exh. 11. U.S. Patent No. 7,095,353 is directed to frequency to digital conversion. But contrary to Defendants' motion, it is assigned to Amalfi Semiconductor Corporation – not RFMD. Exh. 12.

[redacted]

which allows employers to require assignment of inventions under certain circumstances. California Labor Code § 2870 reads:

> (a) Any provision in an employment agreement which provides that an employee shall assign, or offer to assign, any of his or her rights in an invention to his or her employer shall not apply to an invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities, or trade secret information except for those inventions that either:
>
> (1) Relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer; or
>
> (2) Result from any work performed by the employee for the employer.
>
> (b) To the extent a provision in an employment agreement purports to require an employee to assign an invention otherwise excluded from being required to be assigned under subdivision (a), the provision is against the public policy of this state and is unenforceable.

Exh. 13, California Labor Code § 2870. Statutes such as California Labor Code § 2870 serve the public policy of protecting employers from unscrupulous employees. It would be fundamentally unfair to allow an employee who works all day developing the next generation power amplifier of an integrated circuit to claim that they developed that technology at home, on their own time, and obtain a patent on the improved power amplifier. But it would be equally unfair to allow an employer to claim that it owns the rights to a new smart home monitoring and/or control system developed by such an employee because the devices that may be used by that system include integrated circuits, especially where, as here, no aspect of the smart home system developed by that employee is dependent upon the selection of an integrated circuit. The creation of the smart home communications hub was entirely separate from the work done by Dr. Ronald Wang at RFMD and the scope of RFMD's business. Exh. 1, Ronald Wang Decl., ¶¶ 8-9, 14-15. The misuse of that statute could easily exploit employees. That would be wrong and against public policy as even noted in the California statute. But it is not RFMD who is raising this claim – it is Defendants raising it for the first time thirteen years later.

[redacted]

In short, the inventions described in the asserted patents do not relate to RFMD's business at the time Ronald Wang was employed there. Consequently, the Employment Agreement could not have constituted an assignment of any rights in the asserted patents to RFMD.

### D. RFMD's Employment Agreement Did Not Assign Any of Innovation's Inventions Because Ronald Wang's portion of the Inventions Were Developed on His Own Time Using His Own Resources

Under California Labor Code § 2870 (a), an employment agreement cannot require the assignment of an invention to an employer if "the employee developed [the invention] entirely on his or her own time without using the employer's equipment, supplies, facilities, or trade secret information." Exh. 13. The only exceptions are if the invention (1) "[r]elate[d] at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer" or (2) "[r]esult[ed] from any work performed by the employee for the employer." *Id.*

With respect to the exceptions to § 2870, as explained above, the inventions of the asserted patents and their predecessors were not related to the business of RFMD at the time Dr. Ronald Wang worked there. The inventions are generally applicable to smart home technology. RFMD was in the business of making and improving integrated circuits.

Second, the exceptions related to the "actual or demonstrably anticipated research or development of the employer" and "any work performed by the employee for the employer" do not apply here because the Employment Agreement does not state that inventions conceived or reduced to practice in those areas were to be assigned to RFMD. The Employment Agreement is limited to inventions "[redacted]." Dkt. 441, Exh. 6, §2.

Moreover, Ronald Wang's contribution to the inventions of the '983 patent were developed "entirely on his [] own time without using [RFMD's] equipment, supplies, facilities, or trade secret information." Exh. 1, Ronald Wang Decl., ¶¶ 8-9. Dr. Wang also testified that he conceived of the idea of using a hub network to communicate status information regarding a local item, such as a soiled diaper, to a local care provider or a parent in 2003 or 2004. Exh. 1,

[redacted]

Ronald Wang Decl., ¶¶ 14-15.

Therefore, even if the Employment Agreement is enforceable (it isn't), it did not assign any of Innovation's inventions to RFMD because Ronald Wang developed his contribution to those inventions on his own time using his own resources.

### E. RFMD's Employment Agreement is Unenforceable as Against the Public Policy of California

The invention-assignment related provisions of RFMD's Employment Agreement are unenforceable as against the public policy of California. California Labor Code § 2870 (b) provides that:

> (b) To the extent a provision in an employment agreement <u>*purports*</u> *to require an employee to assign an invention otherwise excluded from being required to be assigned under subdivision (a)*, the provision is against the public policy of this state and is unenforceable.

Exh. 13 (emphasis added). Section 2870 (a) only permits an employment agreement to require assignment of an invention if related "at the time of conception or reduction to practice of the invention" to the employer's business. Exh. 13. If an agreement purports to require assignment of an invention based on an event other than conception or reduction to practice, that employment agreement is unenforceable because it requires assignment in circumstances other than those permitted by § 2870.

Here, RFMD's Employment Agreement purported to require assignment of inventions if an invention was [redacted] during the employment term. The relevant language of the Employment Agreement reads:

> [redacted]

Dkt. 441, Exh. 6, §2 (bracketed numbering added). RFMD's Employment Agreement adds [redacted] as two circumstances that would trigger an assignment of an invention that

[redacted]

are not permitted by California Labor Code § 2870. Section 2870 is limited to "conception or reduction to practice."

It is easy to envision circumstances where [redacted] would ensnare an invention that would not be captured by "conception or reduction to practice." For example, assume that an RFMD employee conceived and reduced to practice an invention before the employee began working for RFMD. After the employee begins working for RFMD, the employee makes a new copy of the same invention. In this situation, the RFMD Employment Agreement would require assignment of the invention. But California Labor Code § 2870 would not permit such an invention to be required to be assigned because the conception and reduction to practice occurred before employment began. Thus, RFMD's Employment Agreement purports to require assignment of inventions in circumstances other than those permitted by § 2870. The result is that RFMD's Employment Agreement is against the public policy of California and is unenforceable under § 2870(b).

For this additional reason, the Employment Agreement could not have caused an assignment of any of Innovation's inventions to RFMD. Defendants' motion must be denied on this basis.[4]

### F. Title 35 U.S.C. § 261 Voids Qorvo's Potential Ownership Claim

Under 35 U.S.C. § 261, ¶4, an "interest [in a patent] that constitutes an assignment, grant or conveyance shall be void as against any subsequent purchaser or mortgagee for a valuable consideration, without notice, unless it is recorded in the Patent and Trademark Office within three months from its date or prior to the date of such subsequent purchase or mortgage."

During the period that Ronald Wang was employed by RFMD (*i.e.*, October 2005

---

[4] Even if RFMD had a potential ownership interest in Innovation's inventions in the 2005-2006 period, RFMD sold the Bluetooth business at which Ronald Wang worked to Qualcomm in December 2006. *See* Exh. 23 (RFMD 10-Q re Qualcomm Asset Purchase Agreement), PDF page 29 of 49. RFMD's December 30, 2006 SEC Form 10-Q states that the asset sale to Qualcomm included sale of the intellectual property associated with that business. *Id*. Thus, it appears that any potential ownership claim RFMD may have had was assigned to Qualcomm.

[redacted]

through September 2008), Innovation's predecessor-in-interest filed three regular U.S. patent applications with the U.S. Patent and Trademark Office ("PTO"). Those applications were Patent Application No. 11/540,637 filed on October 2, 2006; Patent Application No. 11/501,747 filed on August 10, 2006; and Patent Application No. 11/802,418 filed on May 22, 2007. Ronald Wang executed assignments transferring his interest to each of those applications to one of Innovation's predecessors-in-interest named SellerBid, Inc.[5] The '637 application assignment was executed by Dr. Ronald Wang on November 2, 2006 and originally recorded with the PTO on November 9, 2006. Exh. 14 ('637 assignment); Exh. 15 ('637 assignment abstract). The '747 application assignment was executed by Dr. Wang on August 14, 2009 and recorded with the PTO on August 14, 2009. Exh. 16 ('747 assignment); Exh. 17 ('747 assignment abstract). The '418 application assignment was executed by Dr. Wang on October 8, 2010 and recorded with the PTO on December 22, 2010. Exh. 18 ('418 assignment); Exh. 19 ('418 assignment abstract). The recording of an assignment with the PTO "creates a presumption of validity as to the assignment and places the burden to rebut such a showing on one challenging the assignment." *SiRF Tech., Inc. v. Int'l Trade Com'n*, 601 F.3d 1319, 1328 (Fed. Cir. 2010).[6]

Moreover, SellerBid was a purchaser of the applications for valuable consideration. Each assignment states that "good and valuable consideration" was provided in exchange for the assignment of rights. Dr. Anne Wong testified that SellerBid or its successors paid Dr. Ronald Wang for assignment of his rights and his research and development work. Exh. 25 at 100, 102, 109; Exh. 26 at 349, 351. Additionally, SellerBid did not have any knowledge of the invention-assignment provisions in the RFMD Employment Agreement. Exh. 20, Declaration of Anne

---

[5] SellerBid changed its name to Virginia Innovation Sciences, Inc. on May 30, 2012. Exh. 21 (Virginia name change). Virginia Innovation Sciences merged into Innovation Sciences, LLC on November 9, 2018. Exh. 22 (TX Cert. of Merger).

[6] The *SiRF* decision analyzes whether a party has all substantial rights in a patent as implicating Constitutional standing. *See SiRF Tech.,* 601 F.3d at 1325. However, that decision was issued prior to the Supreme Court's 2014 decision in *Lexmark* and the Federal Circuit's 2019 decision in *Lone Star* which holds that failure to hold all substantial rights does not deprive a plaintiff of Constitutional standing based on the *Lexmark* decision.

[redacted]

Wong, Ph.D. ("Anne Wong Decl."), ¶ 3.

To this day, Qorvo has not recorded an assignment of rights in any of Innovation's patents. Even if RFMD obtained some ownership interest in the Innovation patents, Innovation was a subsequent purchaser for value without knowledge of the RFMD Employment Agreement. Therefore, any potential ownership interest Qorvo may have had has been voided by operation of 35 U.S.C. § 261. Defendants' summary judgment motion should be denied for this additional reason.

## V. CONCLUSION

For the foregoing reasons, Innovation respectfully requests that the Court deny Defendants' motion for summary judgment that Innovation lacks the right to maintain this action and that it does not own all rights in the asserted patents.

Dated: March 18, 2020

Respectfully submitted,

*/s/ Donald L. Jackson*
Donald L. Jackson
VA Bar No. 42,882 (Admitted E.D. Tex.)
James D. Berquist
VA Bar No. 42,150 (Admitted E.D. Tex.)
Gregory A. Krauss
VA Bar No. 84839 (Admitted E.D. Tex.)
Alan A. Wright
VA Bar No. 46506 (Admitted E.D. Tex.)
Davidson Berquist Jackson & Gowdey, LLP
8300 Greensboro Dr., Suite 500
McLean, Virginia 22102
Tel.: (571) 765-7700
Fax: (571) 765-7200
djackson@davidsonberquist.com
jay.berquist@davidsonberquist.com
gkrauss@davidsonberquist.com
awright@davidsonberquist.com

*Attorneys for Plaintiff Innovation Sciences, LLC*

[redacted]

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was filed under seal on March 18, 2020, and was served electronically on all counsel who have consented to electronic service in compliance with Local Rule CV-5(a)(7)(D). Pursuant to Fed. R. Civ. P. 5(d) and Local Rule CV-5, any counsel of record who have not consented to electronic service were served with a true and correct copy of the foregoing by regular first class mail.

DATED: March 18, 2020

*/s/ Donald L. Jackson*
Donald L. Jackson