1

|   |   |
|---|---|
| 1 | UNITED STATES DISTRICT COURT |
|   | EASTERN DISTRICT OF TEXAS |
| 2 | SHERMAN DIVISION |

```
 3  INNOVATION SCIENCES, LLC      :        DOCKET NO. 4:18CV474
                                  :
 4  VS.                           :        SHERMAN, TEXAS
                                  :        SEPTEMBER 2, 2020
 5  AMAZON.COM, INC., ET AL       :        8:25 A.M.
```

```
 6                      TRANSCRIPT OF TRIAL
              BEFORE THE HONORABLE AMOS L. MAZZANT,
 7          UNITED STATES DISTRICT JUDGE, AND A JURY
```

8  APPEARANCES:

```
 9  FOR THE PLAINTIFF:            MR. DONALD LEE JACKSON
                                 MR. JAMES DANIEL BERQUIST
10                               MR. GREGORY A. KRAUSS
                                 MR. ALAN A. WRIGHT
11                               MR. ALDO NOTO
                                 MR. WALTER D. DAVIS
12                               DAVIDSON BERQUIST JACKSON
                                 8300 GREENSBORO DR., SUITE 500
13                               MCLEAN, VA  22102

14                               MS. LISA BLUE
                                 ATTORNEY AT LAW
15                               3300 OAK LAWN, THIRD FLOOR
                                 DALLAS, TX  75219
16
                                 MR. ROGER D. SANDERS
17                               MR. J. MICHAEL YOUNG
                                 SANDERS MOTLEY YOUNG GALLARDO
18                               111 S. TRAVIS
                                 SHERMAN, TX  75090
19
    FOR AMAZON:                  MR. J. DAVID HADDEN
20                               MS. SAINA S. SHAMILOV
                                 MR. TODD R. GREGORIAN
21                               MR. RAVI R. RANGANATH
                                 MR. JEFFREY WARE
22                               MR. T.J. FOX
                                 FENWICK & WEST
23                               SILICON VALLEY CENTER
                                 801 CALIFORNIA STREET
24                               MOUNTAIN VIEW, CA  94041
```

25

2

```
 1                                    MR. DERON R. DACUS
                                      DACUS FIRM
 2                                    821 ESE LOOP 323, SUITE 430
                                      TYLER, TX  75701
 3

 4   COURT REPORTER:                  MS. CHRISTINA L. BICKHAM
                                      OFFICIAL REPORTER
 5                                    101 E. PECAN
                                      SHERMAN, TEXAS  75090
 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24   PROCEEDINGS REPORTED BY MECHANICAL STENOGRAPHY, TRANSCRIPT

25   PRODUCED BY COMPUTER-AIDED TRANSCRIPTION.
```

3

1          (Open court.  All parties present.)

2          (Jury not present.)

3      THE COURT:  Please be seated.

4      And, Mr. Jackson or Mr. Krauss, if you want to

5  address -- I know that y'all raised one issue on the charge,

6  before I bring the --

7      You can start bringing the jury down, but don't bring

8  them in yet.

9      MR. KRAUSS:  Yes, Your Honor.  It's on the

10  ineligibility charge.  And I understand that Your Honor made a

11  change this morning, but I'm going to suggest that that just

12  causes additional confusion.  I believe the way it's currently

13  worded is to succeed on its claims for invalidity as it relates

14  to ineligibility, Amazon must show.

15      And --

16      THE COURT:  Okay.  Well, what are you suggesting?

17      MR. KRAUSS:  That we just change -- from the version

18  that was last night, just change the word "invalidity" to

19  "ineligibility."

20      The problem with the way it is now is that, as you

21  know, Your Honor, the verdict form says that ineligibility

22  and invalidity, that question, they're unrelated.  And they

23  are, because ineligibility is 101 and invalidity is 102,

24  103.  They're completely different parts of the statute.

25  And I think this just causes confusion, especially in light

4

1    of what was agreed to on the verdict form.

2            MS. SHAMILOV:  Good morning, Your Honor.

3            THE COURT:  Good morning.

4            MS. SHAMILOV:  The defense of invalidity absolutely

5    includes it can be based on 101, and it is based on this -- in

6    this case.  There is no confusion with the verdict form.  The

7    verdict form says what it says, and it is a defense of

8    invalidity for us as it relates to patent eligibility.  That is

9    a correct statement.

10            THE COURT:  I'm not sure why you -- don't understand

11    why you think it's confusing, considering that the verdict

12    separates this kind of invalidity from Question 2, which goes

13    to everything else.

14            MR. KRAUSS:  Well, they're completely different

15    concepts and just changing the word "invalidity" to

16    "ineligibility" I think would be the cleaner and easier fix,

17    Your Honor, from the version last night.

18            MS. SHAMILOV:  But it is our defense of invalidity,

19    Your Honor, so --

20            THE COURT:  I mean, you agree it's a -- it is a

21    defense of invalidity.

22            MR. KRAUSS:  Well, it's a defense of ineligible

23    subject matter.

24            MS. SHAMILOV:  Which results in an invalid patent.

25    It's a defense of invalidity.

5

1      MR. KRAUSS:  Which does not go to the jury, as we

2  discussed.

3      THE COURT:  Well, this one is unique because they

4  don't get the full question.  They only answer a part of it.

5      Okay.  I'll go ahead for purposes -- to make sure

6  there's not any confusion, I'll go ahead and change that to

7  proceed on its claim for patent -- and I'm going to say

8  patent ineligibility, Amazon must prove.  Okay?

9      MR. KRAUSS:  Thank you, Your Honor.

10      THE COURT:  Any other -- any other issues with the

11  charge, other than I know you all will have your objections to

12  make and everything later.  That's not --

13      MS. SHAMILOV:  We have a list of exhibits we want to

14  move in on the record.

15      THE COURT:  Your mic's not on.

16      MS. SHAMILOV:  Sorry, Your Honor.  We have a list of

17  exhibits we want to move in on the record.  I don't know if you

18  would like us to do it now or during the morning break.

19      THE COURT:  Have y'all discussed that so there's no

20  issues?

21      MS. SHAMILOV:  We did.  There are -- there are a

22  couple of disputes that you will need to resolve.  It's not

23  final otherwise, Your Honor.  But it's just, I think, two.

24      THE COURT:  Why wouldn't there be any of this, you

25  know?

6

1          MS. SHAMILOV:  I'm sorry?

2          THE COURT:  I said, why wouldn't there be any

3     disputes here on the last day, so...

4          MS. SHAMILOV:  Yeah.  So, I think -- well, so,

5     there's one exhibit that Innovation Sciences wants to move in,

6     which is 970A -- PTX-970A, which is a printout from their

7     damages expert report.  It's an exhibit that their damages

8     expert prepared.  So, those are -- that's not evidence.  It was

9     demonstratives.  They showed it.

10       We've operated this entire case with the expert reports

11    and, you know, exhibits that experts prepared is not

12    evidence and it doesn't go in.  So, that is the PTX-970

13    issue -- 970A issue.

14         THE COURT:  Okay.  I thought we were talking about

15    your exhibits so...

16         MS. SHAMILOV:  Oh, I'm sorry.  Well, that was my

17    objection.  Our exhibit is -- that we would want to move in is

18    1179, which is that -- you know, the box with the software of

19    HAL.

20         THE COURT:  Okay.  Make sure -- I'm going to make

21    sure, so, the first dispute is over which exhibit?

22         MS. SHAMILOV:  970A.  That is PTX-970A that we object

23    to.  And the second dispute is --

24         THE COURT:  Let's deal with -- let's deal with one at

25    a time then, so...

7

1            MS. SHAMILOV:  Sure.

2            MR. BERQUIST:  Your Honor, Jay Berquist.  May I

3   respond?

4            THE COURT:  Yes.

5            MR. BERQUIST:  If -- Your Honor may recall that the

6   sales information provided by Amazon came in electronic

7   spreadsheets, which we have the electronic spreadsheets.  And

8   then we also printed, and I believe they are Exhibits 401 and

9   401A, because they gave us an initial disclosure that is

10  supplemental for additional months after the original.

11       So, what our expert did, because it's -- it's in a

12  form, you might imagine, of electronic spreadsheet, it's not

13  readily understandable.  You would have to -- you would have

14  to have a degree in accounting to work through it.

15       So, what our expert did in creating 970A is he went

16  through for each of the product models -- the Fire TV, the

17  Fire Tablet, and the Echo -- by month.  He put down the

18  summary of each of the sales for those products, totaling

19  down by -- at the end -- at the end for those products.  So,

20  we -- we believe that it's a fair summary of the electronic

21  information that's been provided.

22            MS. SHAMILOV:  That's, at a minimum, hearsay, Your

23  Honor.  That is not our document.  Our documents with that data

24  are in.  This is something their expert compiled.  It's

25  hearsay.  It shouldn't be coming in as an exhibit.  They showed

8

1    it as a demonstrative.  They talked about it to clarify the

2    data.  They also showed the native files to the jury.  The jury

3    will have the native files.

4            MR. BERQUIST:  We believe the foundation for what the

5    information is -- and, Your Honor, it's simply to make the

6    jury's life a little easier to understand what the sales are.

7            MS. SHAMILOV:  There is a lot of documents that would

8    make the jury's life easier that don't come in.

9            THE COURT:  No, I understand.  But, Ms. Shamilov,

10   there's no -- you don't believe any of the information is

11   recorded incorrectly?

12           MS. SHAMILOV:  I actually do not know that, Your

13   Honor.  We've never sat down and cross-checked that

14   demonstrative to the native spreadsheet.  I don't know.

15           THE COURT:  Well, can someone do that on your team?

16           MS. SHAMILOV:  It is a very long spreadsheet.  It

17   will take time.

18           THE COURT:  Okay.  Well --

19           MS. SHAMILOV:  We can do that, but I'm just --

20           THE COURT:  I'll conditionally admit it, subject to

21   making sure it's factually accurate so...

22           MR. BERQUIST:  Thank you, Your Honor.

23           THE COURT:  What's the next dispute?

24           MS. SHAMILOV:  It's Defendant's Exhibit 1179.  That's

25   that HAL video -- the HAL box with the install CD in it.  So,

9

1    that is evidence of the HAL system that goes in.

2         Now, I believe their objection is that on the install

3    video with the program software itself, there's also that

4    Oprah Winfrey video, which we agree is a demonstrative.

5         There is no way to separate that CD.  We can't get into

6    it.  And the jury actually cannot open the CD because it

7    won't work on any modern computer.  So, for all intents and

8    purposes, the Oprah video is -- they won't be able to see

9    it.  It doesn't go in.

10        We agree that the Oprah Winfrey video is a

11   demonstrative.  There's just no way to separate it from the

12   actual HAL software that is -- you know, that is evidence

13   and needs to go in.

14             MR. DAVIS:  Your Honor, that's exactly the problem.

15   So, as Your Honor remembers from Monday morning, I believe it

16   is, the three videos from Mr. Shriver were allowed as

17   demonstratives but not admitted.  I have that right here.

18        Then yesterday Mr. Hadden, during his examination of

19   Dr. Johnson, explicitly mentioned the box and said:  And

20   does that box also include the install CD with the video of

21   the Oprah Winfrey TV show demonstrating the HAL system that

22   we watched yesterday?

23        The video is -- is a demonstrative.  It's not admitted.

24   It should not be back there, regardless of whether or not

25   the jurors may or may not be able to play it.

10

1          MS. SHAMILOV:  Well, but the install CD is

2    indisputably an exhibit and evidence that goes in.  The issue

3    is -- that counsel has is that the CD also has a demonstrative

4    on it.  It is physically impossible to separate those.  It's

5    just technologically impossible.  And, so, the jurors won't be

6    able to see it.  It is -- it is also technologically impossible

7    for them to open the CD.

8          But we agree -- we are in agreement that the Oprah

9    Winfrey video is a demonstrative.  It is not evidence.  But

10   that cannot mean that the actual install and software -- the

11   software and the install CD of that software is not

12   evidence, because it is, which is -- there is no way to

13   separate those two.

14          MR. DAVIS:  If there is no way to separate those two,

15   then, you know, it's unfortunate for Amazon, but it should not

16   go back.

17          MS. SHAMILOV:  Your Honor --

18          MR. DAVIS:  If it -- excuse me.  The video was just a

19   demonstrative, not admitted.

20          MS. SHAMILOV:  Your Honor, this is highly prejudicial

21   to not let an important piece of evidence go in when we know

22   that the jury cannot even see the demonstratives.  We are not

23   putting the video in.

24          THE COURT:  Well, you know, to be fair, I understand

25   that.  I mean, they can't play it but -- and it can't be

11

1   separated, but it is part of their case, so I'm going to admit

2   it.  I've already -- I've admitted it.

3           MS. SHAMILOV:  Oh, I'm sorry.  Thank you.

4           THE COURT:  I know you were talking.

5           MS. SHAMILOV:  Thank you, Your Honor.  Appreciate it.

6           THE COURT:  Anything else?

7           MS. SHAMILOV:  That's it.  There is just the list of

8   the numbers that I can do at the break, just whichever way --

9           THE COURT:  That's fine.  Don't forget to do that.

10  The jury is outside, so anything else?  We have one more

11  witness and then --

12          MR. KRAUSS:  Did we discuss D73?  That's the Shriver

13  declaration that's subject to the motion in limine.

14          MS. SHAMILOV:  Yeah.  I don't think that's an issue.

15          MR. KRAUSS:  Oh, you've agreed that's out?  Thank

16  you.

17          THE COURT:  That was only for the purposes of the

18  Court, not for the jury.

19          MS. SHAMILOV:  Yes, Your Honor.

20          MR. KRAUSS:  Thank you, Your Honor.

21          THE COURT:  Okay.  Everyone ready?

22      Okay.  Let's go ahead and bring the jury in.

23                      (Jury enters the courtroom, 8:38 a.m.)

24          THE COURT:  Good morning, ladies and gentlemen.

25  Welcome back.

12

1            And, Mr. Berquist, what's next?

2            MR. BERQUIST:  Your Honor, Innovation recalls

3    Dr. Devrim Ikizler to the stand, please.

4            THE COURT:  Welcome back.  And you understand you're

5    still under oath?  You understand you're still under oath?

6            THE WITNESS:  Say it again.

7            THE COURT:  You understand you're still under oath?

8    We didn't swear you in again because we never released you

9    fully, so --

10           THE WITNESS:  Yes.

11           THE COURT:  Okay.  Very good.  Go ahead.

12                        DEVRIM IKIZLER,

13      DEVRIM IKIZLER, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN,

14                      DIRECT EXAMINATION

15   BY MR. BERQUIST:

16   Q   Dr. Ikizler, thank you for returning from Austin for a

17   second day for us, and a big thank you to your wife who let

18   you come back, even though she is eight and a half months

19   pregnant.

20   A   Yes, sir.  I'm going to have to hit a few stores on the

21   way back, for sure.

22   Q   I just have a few questions I would like to follow up

23   with you on.

24       You were here in the courtroom yesterday when Dr. Ugone

25   testified, were you not?

```
 1   A    Yes, I was.
 2   Q    And Dr. Ugone asserts that you overstated the product
 3   models in your damages model.  How do you respond to that?
 4   A    So, there was one Echo Input product that he identified
 5   and then three Fire Tablet Kid models that were identified.
 6   And I spoke to Joe McAlexander and he testified yesterday in
 7   the court that the tablet models that are kid versions are
 8   not any different from the infringement standpoint than the
 9   other Fire Tablets.  Therefore, it's my understanding that
10   they are infringing, and that's his testimony.  So, they
11   should not be excluded from the damages analysis, whereas he
12   testified yesterday that he didn't actually analyze Echo
13   Input.  So, for that reason I calculated the amount of
14   damages that were attributable to Echo Input and I took them
15   out of the damages numbers.
16          MR. DACUS:  Your Honor, I'll need to object.  This is
17   outside of his report.
18          MR. BERQUIST:  Your Honor, it just follows up on the
19   testimony that's occurred in this case and, in fact, I believe
20   it was Amazon that made the argument that these sales need to
21   come out of his analysis.
22          THE COURT:  Well, overruled.
23          MR. BERQUIST:  Thank you.
24   BY MR. BERQUIST:
25   Q    Were you finished, Dr. Ikizler?
```

1  A    No.   I was going to tell you how much damages was

2  attributable to Echo Input.

3       So, I calculated that out of the sales.  $4.7 million

4  worth of sales was attributable to Echo Input, and then that

5  corresponds to -- with the two and a half percent royalty

6  rate, $120,000 of damages.  So, initially damages was 100.8

7  million.  Now it's 100.7 million.

8  Q    Let's -- let's change topic for a minute and talk about

9  product feature apportionments.  It dawned on me yesterday

10 that we've heard Dr. Simonson's name a couple of times.  It

11 may not be clear who Dr. Simonson is in this case.  Who is

12 Dr. Simonson?

13 A    Dr. Simonson is one of Amazon's experts that designed

14 the survey in conjunction with this lawsuit and identified

15 944 potential smart speaker buyers and interviewed them with

16 a series of questions.

17 Q    And did you -- do you understand whether or not

18 Dr. Simonson testified in court in this matter?

19 A    I understand that he couldn't travel for some reasons

20 that I don't know.

21 Q    Well, what information did you learn from the free form

22 responses in Dr. Simonson's survey?

23 A    So, I studied this survey -- by the way, this survey

24 wasn't done when I filed -- when we filed our first report,

25 which was in December.  He conducted and -- he published his

1    results essentially in this court.  He submitted them in

2    January.

3         So, I reviewed his open form -- his questions, because

4    this was a piece of data that we didn't have available, and

5    he asked people specifically what product features do you

6    care about before you buy a smart speaker.  And remember,

7    these are 944 people.  For them to be eligible in this

8    survey, they have to be considering to purchase a smart

9    speaker, which is a very valuable piece of information to

10   us.

11        So, I went through these 944 responses and I identified

12   120 of them.  And I want to point out here one thing.

13   Dr. Ugone yesterday said that -- actually, he just -- he

14   quoted me.  He said that I quoted controlling a device, and

15   he looked for that search term and he did have zero hits.

16   So, I want to point out to --

17             THE WITNESS:  Can you pull up from page 12 of my

18   supplemental report?

19   A   Our reports in this case are very long and, of course,

20   then I present -- I don't get to present it.  I only present

21   about an hour and a half, so I don't get to tell you all the

22   details of the work I did.

23        So, I want to explain to you what it means "controlling

24   a device", which I explained in my report in detail, which I

25   assumed the other side's experts would have studied them.

BY MR. BERQUIST:

Q   We'll have to come back to that, Dr. Ikizler.  We can't find your supplemental report here this morning.

A   It's in that batch that I prepared for Paul.

THE WITNESS:  It's the second item, Paul, not the first one.

MR. BERQUIST:  I think that's the third item, Paul.

THE WITNESS:  That's the third item, yes.

A   Well, while we wait for that, I want to tell you what happened.

So, with the survey results I want to -- one of the critiques that Dr. Ugone highlighted yesterday, they said my search terms was over-inclusive, and they even put some testimony from the technical expert, Joe McAlexander.  They said look, these terms are too broad.

So, I want to make the distinction between when they say too broad, what they did not touch on.  To capture the entire patented features, we only used eight search terms.  Eight search terms.  And they say they are too broad.

What they did not specify is in specific language we're looking at 12,000 customer reviews.  We're trying to identify customers, what did they like about these products and what they liked about these products, do they tie back to the patented features.

Only used eight search terms.  And imagine how people

17

1    use these products in infringing ways.  You speak to your

2    Echo, say, "turn my lights on", "turn my lights off".  You

3    can say, "lock my door."  You can say, "adjust my -- adjust

4    the temperature", "increase the AC, decrease the AC."

5        I limited only to eight terms, but they're claiming

6    that these eight terms are too broad.  But what they are not

7    taking into account is there's a lot of terms that was not

8    in those search terms.  In other words, it wasn't biased

9    towards over-inclusion.  It was just not targeted enough.

10   It wasn't targeted enough is what they're trying to say.

11       And that's what Joe McAlexander was trying to say,

12   because I used search terms "smart home," "automation,"

13   "sound quality", "video quality", "audio quality,"

14   "resolution."

15       These terms, broad, yes.  But are they biased towards

16   increasing the percentage?  No.  And I explained this in my

17   deposition in January to Amazon's counsel very carefully.

18       So, they capture some things that are not related to

19   the patents, but they also fail to capture a lot of the

20   customer reviews, such as the examples I gave you, turning

21   the lights on.

22       Nowhere in my customer review search terms, they could

23   not be captured.  In other words, I spot-checked my results,

24   but I did not want to alter what Dr. Joe McAlexander gave me

25   as the search terms because they generally balance each

```
 1   other out.  There was some over-captured, some
 2   under-captured.
 3        But after my deposition, this issue came up.  So, I
 4   went back to this survey, which I didn't have at the time.
 5   I looked at people's 944 responses.  How did they explain
 6   how they enjoy these products?
 7        So, I noted --
 8             THE WITNESS:  Thank you.  This is actually great
 9   timing because that's exactly where I was.
10   BY MR. BERQUIST:
11   Q   Is this -- is this the portion in your report --
12   A   Yes.
13             THE WITNESS:  Can you make it slightly smaller?
14   Slightly smaller.  Great.
15   A   So, this is coming from my supplemental report.  It's in
16   the data appendix, and I understand sometimes people don't
17   read the appendix.  I do typically.
18        And Dr. Ugone -- that's why I said controlling a device
19   in quotations.  You can see on the left side I defined it in
20   my report what it means.
21        And I didn't define it myself.  I -- I defined it using
22   Dr. Simonson's analysis, went through 944, because --
23   because I was criticized for being too broad.  So, I
24   specified, okay, let's focus on controlling smart home.
25   What did people use as terminology to explain this concept
```

1    of controlling a device?  So, I identified the specific

2    terms.

3        And then what did I do?  I went back to the customer

4    reviews with these specific terms because they -- I was

5    criticized it wasn't targeted enough or too broad.  So, I

6    redid the analysis.  What do I find?  12.7 percent.

7        And what was the average percentage I had found

8    originally?  11.5 percent.

9        That's why I explained to you guys in my original

10   presentation as validation.  What I meant to say is I redid

11   the analysis with the more focused terms, but I still get

12   the same results.  So, just -- that's my clarification.

13            MR. BERQUIST:  Let me have Ugone slide 32.  Ugone

14   slide 32.

15   BY MR. BERQUIST:

16   Q   Let's change topics.  You heard Dr. Ugone assert that

17   your profitability analysis was overstated or inflated, in

18   his words.

19   A   Correct.  And I'm going to actually display his slide

20   here on the screen.  This is what he showed.

21            THE WITNESS:  Can you show the next one real quick?

22   A   He said this was what has to be done.  This is the

23   argument.

24       And let me explain, you -- I'm sure you guys are

25   slightly confused, how can two economists just say two

20

1   things so separately and they both claim to be professional.

2   Let me explain to you guys how -- how this formula is being

3   misused here and why the first formula is the correct one.

4            THE WITNESS:  Can you go back to the first one, Paul?

5   A   So, I'm going to use Dr. Ugone's own example.  Remember

6   the example he said you buy an Echo device and there's a

7   book, right?  You buy an Echo device and three days later --

8   that's after you buy the Echo device, a month later, let's

9   say, you buy a book from Amazon.  This is the downstream

10  revenue for Amazon.  That's downstream profit.

11       When you calculate profitability from an accounting

12  perspective, you calculate profitability of what you're

13  selling.  Am I selling to customers a book and an Echo

14  device combined as a package?  Sometimes you go on a

15  website, you see a bundle of goods sold together, so you

16  know when you're clicking on the buy button you're paying

17  for a book and an Echo device.

18       In this instance is the accused product sold together

19  with the downstream products?  No.

20            THE WITNESS:  Can you go to next slide, Paul, the one

21  that's 614, page 19?

22  A   And he also -- in his deposition testimony, Dr. Ugone

23  testified he did not know it was causally tied -- let's read

24  this.  This is very important.  This summarizes the entire

25  case for my purposes:  Profitability model -- start from the

1    second sentence:  As customers engage with their devices,

2    they increase their engagement with other Amazon businesses

3    in a way that provides economic value to Amazon and in a way

4    that can be causally tied back to the device purchase or

5    registration.

6         And also when I highlight, it says it's used to monitor

7    profitability.  So, Amazon says these DSI revenues are used

8    to monitor profitability and it's necessary to measure.

9         So, the point I want to make here is this book is

10   causally tied, it's only sold because this device is sold.

11   And the customer didn't purchase the book when they

12   purchased the Echo.  They changed their habits.  They

13   started buying more from Amazon.

14        Amazon has some of the world's best economists using

15   statistical causal models that was used -- described earlier

16   in this case to calculate this.  And Amazon thinks it's

17   important to measure the profits.

18             THE WITNESS:  So, can you go to the 520, page 9,

19   please?

20   BY MR. BERQUIST:

21   Q    For the record, we're talking about Exhibit PTX-520.

22   A    Okay.  So, this is the Amazon Echo device BRD that we

23   talked about.  This is -- so, I want to just highlight how

24   we did not make up anything.  This entire number calculation

25   is coming from this formula.

22

1      And I don't know where Dr. Ugone is getting the idea

2  that DSI revenues have to be the denominator, because I

3  haven't seen DSI revenues mentioned in any of these

4  documents.  So, let's take a look at this.

5           THE WITNESS:  Can you show -- can you not highlight

6  one second?  Show the whole page?

7           TECHNICAL PERSONNEL:  Yes.

8  A   This page here, program financials for Echo device, it

9  starts with units forecast, comes down to highlighted

10 lines 7 through 11 which measures about profitability.

11     So, nowhere in this page I see DSI revenues.  I see DSI

12 profits being mentioned and being used for decision-making

13 for high level executives, as I highlighted, like Jeff

14 Bezos.  Why don't they just list the DSI revenues if it

15 mattered to them?

16          MR. DACUS:  Your Honor, I don't want to interrupt,

17 but if we're going to talk about this, under the Court's

18 procedures, we'll have to seal the courtroom.

19          THE COURT:  Okay.

20          MR. BERQUIST:  Oh, I apologize.  I didn't even think

21 of that.

22          THE COURT:  Okay.  Well, we'll go ahead and anyone

23 who's not subject to the protective order will need to leave at

24 this point.  It shouldn't take -- won't take very long.

25               (Courtroom sealed.)

30

1   ████████  ████  ████  ██  ███████.

2                    (Courtroom opened.)

3   BY MR. DACUS:

4   Q   Let me try to unpack a little bit of that if I could,

5   sir.

6            MR. DACUS:  Ms. Conrad, I'm trying to get the

7   document camera.

8            THE COURTROOM DEPUTY:  It takes a second.  It should

9   be up.

10           MR. DACUS:  Thank you.

11  BY MR. DACUS:

12  Q   So, I just want to make sure I understand on this issue

13  of counting products and the ones that you counted in the

14  damages calculation, okay?  Are you with me so far?

15  A   Yes.

16  Q   All right.  So, you admit to the jury that the Echo

17  Input, Mr. McAlexander actually didn't claim that it

18  infringed, correct?

19  A   Yes.  He said he didn't analyze it, so, I excluded it.

20  Correct.

21  Q   And then as I understand it, the position is that these

22  Fire HD tablets that also have separate kids' versions,

23  three different separate kids' versions, the claim is that

24  those were included in just the analysis of the regular Fire

25  HD products; is that correct?

1   A    That's correct.   That's -- I'm citing Mr. McAlexander's

2   testimony.

3   Q    So, you see over here Mr. McAlexander separately broke

4   out the kids' products for the Echos, correct?

5   A    I see that, yes.

6   Q    But the contention is that he did not separately break

7   those out for the tablets.   He just included them in the

8   regular tablet analysis.   Is that the -- is that the claim?

9   A    He said that -- his claim is that Fire Tablets that are

10  kid versions are not -- from an infringing standpoint, they

11  are not different than the Fire Tablets, the non-kid

12  versions, but they may not be applicable to the Echo Kid

13  versions.   I don't know how products differ for kid

14  versions.   I haven't analyzed these products.

15  Q    Okay.  Let's talk briefly -- you and I talked at length

16  the other day, but let's talk briefly about this calculation

17  that you did, and let's make sure we're clear here.

18      The goal is and your requirement is to tie the profits

19  that you're claiming to the specific patented feature, true?

20  A    To the patents at issue.

21  Q    Correct.   To the patented features in the patents in

22  this lawsuit.   That's what you have to do in your

23  calculation of damages, correct?

24  A    It's slightly different.   It's not to tie to the

25  patented features one by one necessarily.   It's to

32

1   understand what would Amazon agree the value of the patent

2   to them at the time.

3       And the reason I'm making the distinction is -- which I

4   didn't explain this, I think, probably very well on my

5   testimony first.  It's the issue of if I have five fingers,

6   they may be valuable one at a time -- this is $1 million

7   worth, this is $2 million worth, this is $2 million.  But

8   together as a hand, they may be more valuable.

9       That's why I'm disagreeing with you that it's not just

10  a feature-by-feature separation that's necessary.  You have

11  to look at the whole thing together.

12  Q   So, let me see if I understand, Dr. Ikizler.  Let's

13  assume that I had a patent on a cake recipe.  Have you ever

14  made a cake?

15  A   I do actually.

16  Q   Okay.

17  A   I'm a good baker.

18  Q   So, let's assume that I had a patent on a cake recipe.

19  So, included in that cake recipe is going to be eggs, flour

20  and sugar, maybe among some other things, correct?

21  A   I understand, yes.

22  Q   So, you would agree with me, sir, that if you were

23  valuing the value of that new recipe, I should not value the

24  eggs, the flour, and the sugar separately because those

25  existed long before my new recipe, correct?

1    A    Let me give you an example using your own example.

2    Q    I'd like for you just to answer my question.

3    A    It would --

4    Q    You actually agree with me, sir, that you should not be

5    valuing the value of the egg separately, the flour

6    separately, and the sugar separately, because those existed

7    long before your recipe.  Isn't that a true statement, sir?

8    A    I think we're on the same page, because I said exactly

9    the same thing.  I said don't -- don't value the fingers

10   separately.  I think you're saying the same thing.  Not

11   because they are patented, but that's also a factor, but

12   what is the patent -- patent's contribution?  Is it about

13   the hand coordination?

14        In the cake example that you're giving, if you have a

15   specific way you scrambled the eggs before you fold the

16   cake, let's say, there's certain steps that you could

17   contain -- that step that could contain an egg.  The way you

18   process the egg may matter, but the egg itself, of course,

19   you didn't invent the egg.  But the way you process the egg

20   may affect the total -- the output.

21   Q    And let's try to move from our example to what's going

22   on in this case.  In this case, at least as best as I can

23   understand it, the invention is a smart home control

24   integrated system, correct?

25   A    I heard those terms yesterday many times.  I don't want

34

1    to -- if my -- my lay understanding, that all sounds correct

2    to me.  But from a technical perspective, I don't want to be

3    judging any of the technical terms.

4    Q    And, so, based on what you've told us, what we need to

5    do, and what you're required to do, is to value that alleged

6    new inventive system.  You agree with that, correct?

7    A    No.  I never agreed to that.  I said what would Amazon

8    want to pay to that.  Again, I gave you the example.  This

9    is not something you buy and resell.  It's valuable -- if

10   Dr. Wong was trying to sell me this technology, I wouldn't

11   pay anything because I have nothing to do with this.  Why

12   would I license this technology?

13        But to Amazon it means a lot.  So, it really matters --

14   I mean, if -- if somebody came up to me, you want to license

15   my patents?  On this I'm in the product development for that

16   technology.  It does not mean anything to me.  So, I don't

17   agree with that question.

18   Q    Let's see if we can do it this way, sir.  You agree that

19   you absolutely, in performing your analysis, you relied on

20   Mr. McAlexander's selection of terms, correct?

21   A    For the first analysis in the original December report.

22   Not the supplemental report.  The eight search terms I said,

23   eight search terms are coming from him directly.

24   Q    Let's look a little closer.  This is Exhibit 12D from

25   your report, correct?

1    A    Yes.

2    Q    You see those terms in the middle row there or column

3    entitled Section?

4    A    Correct.

5    Q    All of those came from Joe McAlexander, correct?

6    A    Correct.  And I just want to clarify.  This has nothing

7    to do with the search terms.  And it's been confusing the

8    whole time to the jury, because it's been misused in

9    Dr. Ugone's presentation yesterday.  Search terms used in

10   customer reviews.  This is BRD analysis.

11   Q    Correct.  You used the BRD analysis in -- in part of

12   your calculation, correct?

13   A    Yes.  Yes.

14   Q    Okay.  And you got these terms from Mr. McAlexander,

15   correct?

16   A    Again, it's not terms.  It's sections.  He identified

17   sections.

18   Q    You got these sections from Mr. McAlexander, correct?

19   A    No.  He identified -- we're both looking at the same

20   document over the phone.  He told me the section numbers on

21   the phone.  We were looking at it.  All right.  Next page.

22   Which sections are related to or benefited from the patented

23   technology.  That was the exact line of questioning.  He

24   identified the section.  I listed them all in my report.

25   That is -- that summarizes the whole process.

36

1   Q    Okay.  And, so, all I'm trying to confirm here, sir,

2   is -- let's just use, for example, you see the word "audio"

3   there?

4   A    Correct.

5   Q    So, you took the search term "audio," and you used that

6   in your calculation, correct?

7   A    There is no search term here.  I've been trying to

8   correct you every time.

9   Q    You used the term "section" in your calculation,

10  correct?

11  A    There's no term analysis.

12       So, could you pull up the BRD?  I can explain to you

13  exactly what happened so nobody is confused about this.

14  Q    You and I have already been through that, sir.

15       At a high level, what you did is you took these

16  sections that you contend relate to the patented features in

17  this case and you divided it by the total sections in the

18  BRD to come to a percentage.  That's what you did; isn't

19  that true?

20  A    That is correct, yes.  Now you correctly -- correctly

21  characterized it.

22       And that audio section, for example, has multiple

23  information in a big box, in one page-long box, the

24  technical details of how Amazon uses audio in their

25  products.

37

1   Q   And, so, I have two questions for you, sir.  With

2   respect to audio, you agree, at least based on what you've

3   heard in this trial, that the Echo product has hundreds, if

4   not thousands, of audio features that were developed by the

5   engineers at Amazon and have nothing to do with these

6   patents.  Will you at least agree with that?

7   A   I agree with that statement except with -- I agree with

8   your statement.  That's very accurate, because audio can be

9   used in so many different features.  Even if you don't have

10  a smart home in your product, you could still use audio.

11      But the issue is the way you use the audio feature to

12  send a signal to controlling your device is also part of the

13  audio ability.  And if you don't do it high quality, you

14  can't offer high quality smart home controlled device to

15  your clients.  So, it contributes to the selling of this

16  product.

17  Q   My point is, sir, when you included -- let me back up

18  and ask you a question to make sure we agree.

19      You agree that there was hundreds, if not thousands, of

20  audio features in the Echo that existed long before this

21  alleged invention, correct?

22  A   Absolutely.

23  Q   Okay.  So, just to tie this back to our early example,

24  what you've done here, sir, is you've taken the eggs in that

25  cake recipe and you've individually valued the eggs, because

38

1   the audio features existed long before this alleged new

2   recipe or system that was designed or invented by Anne Wong,

3   correct?

4   A    No.  Where is the value in this exhibit?  Where is the

5   value for audio here?  Tell me the value for audio.

6   Q    You're the one that took all of these sections, sir, and

7   you put them in the numerator, including audio, which, by

8   your own admission to this jury 30 seconds ago, includes

9   hundreds, if not thousands, of features that are not related

10  to the patents, correct?

11  A    That's correct.  But I didn't attribute a value to the

12  audio, sir.  I did not attribute a value, say what's the

13  value attributable to audio in this device.  I collectively

14  looked at all of these things together, all of them as a

15  package.  Because, again, as I agree with you, we're trying

16  to value the -- the value of the recipe to Amazon, in your

17  case the cake recipe, not the value of audio.

18       I don't have a value in my report that says if -- if

19  Amazon just wants to buy the audio-related technology of the

20  feature, this is how much it would cost.  That's not an

21  analysis that would have been appropriate.

22  Q    How about you and I leave it at we have a dispute and

23  we're about to have closing arguments and the jury can

24  decide whether or not you did that part of the calculation

25  correct?  Does that sound fair?

39

1    A    I think that sounds very fair.

2    Q    Thank you.

3         Now let's talk about this profit calculation that you

4    did.  Okay?

5    A    Yes.

6    Q    And so that we all know what we're talking about, in

7    your calculation -- this is the information or the slide

8    that you showed the jury related to your calculation,

9    correct?

10   A    Yes.

11   Q    And what I've circled here, this lifetime value divided

12   by the average selling price, that's sort of what you -- not

13   sort of.  That's what you contend is the, quote, profit,

14   correct?

15   A    Profit -- profitability, I would say.

16   Q    Profitability?

17   A    Correct.

18   Q    And that's what you used in your calculation, correct?

19   Those numbers, true?

20   A    Yes.  That's the beginning -- that's the start -- that's

21   the starting point for the analysis.

22   Q    And here's what I want to be very clear, sir.  This

23   lifetime value number includes the downstream sales of other

24   products, correct?

25   A    Profits coming from downstream sales.

1   Q    Profits from downstream sales.

2        You agree, sir, and you would certainly admit that none

3   of those downstream sales use these patented features.

4   They're not accused in this case, correct?

5   A    They are not accused products, no, but they are sold

6   thanks to the -- causally, by the accused products.  As I

7   explained, if you don't have these features, you're not

8   going to sell as many Echo speakers.

9   Q    And that's what I want to make sure.  So, your position

10  to this jury is because people use an Echo Dot to buy other

11  products -- shoes, tennis rackets, whatever -- that they

12  should include that in this calculation, correct?

13  A    Here's I would say -- what you said is mechanically

14  correct, but I would say when Amazon decides should I

15  license this product or not, they would think about can I

16  sell this Echo to my customers.  They would have considered

17  what does it bring to me.  And those shoe sales and book

18  sales that you mentioned, it would have been in Amazon's

19  minds because it's in every document they talk about.

20  Q    Let's go back to where we started this and let's make

21  sure we're still on the same page.  Your job, and ultimately

22  the jury's job, is to value only the patented features,

23  correct?

24  A    To Amazon.

25  Q    To Amazon. And the patented feature is, allegedly, a

1    smart home control integrated system, correct?

2    A    Smart home control features.  Can we say that, just so I

3    don't agree to some terminology?  I know it was in dispute

4    yesterday with the technical expert.  I don't understand

5    that integrated thing.

6    Q    So you just want to call it smart home features?

7    A    Controlling devices, controlling smart home devices.

8    Can we just call it that way?

9    Q    So, in order for your theory to work, knowing what you

10   told us that the profit has to be tied to the features -- in

11   order for your theory to work, the jury has to believe that

12   someone bought tennis shoes and tennis rackets and whatever

13   else they bought --

14   A    Yes.

15   Q    -- that are not accused, because there was a smart home

16   feature in the Echo Dot, correct?

17   A    It's one of the reasons.  That's why we did the

18   apportionment.  That is why you multiply that profit with

19   the next column which says incremental.

20   Q    So, your position is -- just so we're clear, and we

21   don't need to argue, your position is people bought tennis

22   shoes and shirts on their Echo Dot because there's a smart

23   home feature included in the Echo Dot.  Yes or no?

24   A    10 percent, yes, because that's what the apportionment

25   shows.  10 to 12 percent of the people, they buy it because

42

1    of that feature.

2    Q   I do want to address one thing before I sit down,

3    Mr. Ikizler.  You referred to Dr. Simonson, correct?

4    A   Correct.

5    Q   You, of course, know Dr. Simonson is well into his late

6    70s, correct?

7    A   I did not know that at all.

8    Q   You knew that's why he didn't travel here for this

9    lawsuit, correct?

10   A   I did not know any of that stuff.

11   Q   You also know, sir, that these lawyers at this table

12   took Dr. Simonson's deposition, correct?

13   A   I know he got deposed, yes.

14   Q   And if there was anything in Dr. Simonson's deposition

15   that they thought was advantageous or beneficial to their

16   case, they certainly could have played it.  You agree with

17   that?

18   A   Of course, yeah.  I just want to clarify, I didn't know

19   that he didn't travel -- I didn't imply anything bad for

20   Dr. Simonson not traveling.  I mean, my wife didn't want me

21   to travel.

22   Q   And then I have one last thing to address with you.

23   When folks are sitting at a negotiating table and they are

24   negotiating a patent license, if I'm the individual or the

25   company that is attempting to gain a license to a patent,

43

1    you understand who I am and what I'm talking about in my

2    hypothetical?

3    A    Yes, sir.

4    Q    As you've said, that person sitting at that table is

5    going to be thinking about what value do these patented

6    features have to my products, correct?

7    A    Absolutely.

8    Q    I mean, that's going to be first and foremost in their

9    mind, correct?

10   A    I think that's correct.

11   Q    So, when LG and Samsung are sitting at that table, first

12   and foremost in their mind, according to you, is what do

13   these patented features contribute to my product, correct?

14   A    Yes, patents, not the features again.  Patents, yes.

15   Q    And, so, the thing that you and I just said, sir, sounds

16   an awful lot like -- in fact, exactly like apportionment,

17   correct?

18   A    Yes.

19   Q    So, when you say Dr. Ugone did not consider

20   apportionment, that's not a true statement, is it, sir?

21   A    Oh, it is very true.  He looked at -- he assumed -- he

22   has no idea what -- what the smart phones that he counts in

23   his comparison, what did the -- how did the smart home

24   benefit from these patents.  He doesn't know.

25   Q    What he does know, from real world and not from

44

1    calculations done for the purpose of a lawsuit, is that LG

2    and Samsung sat at that table and, according to you, first

3    and foremost in their mind was how do I apportion the value

4    of these patented features so that I can buy a license.  And

5    what they paid, at least for LG, was $1.85 million, correct,

6    sir?

7    A    Correct.

8              MR. DACUS:  All right.  That's all I have.

9         Pass the witness, Your Honor.

10             THE COURT:  Anything else?

11             MR. BERQUIST:  Just one or two quickly, Your Honor.

12             MR. DACUS:  Where are we on time, Judge, so that I

13   know the time?

14             THE COURT:  I'd have to ask my trustee assistant

15   here.

16             MR. DACUS:  Understood.

17             THE COURT:  We'll get it for you.

18        Go ahead.

19                    REDIRECT EXAMINATION

20   BY MR. BERQUIST:

21   Q    Dr. Ikizler, hopefully I just have two quick questions.

22        Now, is it your theory or was it Amazon's theory that

23   the LTV for each product is measured by adding the profit

24   per unit plus the DSI?

25   A    That's exactly how Amazon does it, and it's -- that's

1   why Amazon calls it LTV per device.  I showed it so many

2   times I don't know how to dispute with what Amazon does.

3   LTV per device.  They don't say LTV per device plus, in

4   parentheses, shoes, books, et cetera that could be

5   attributable down the line.  They say LTV per Echo device.

6   It is attributed to Echo.

7   Q   So, just so we're clear, you saw that Amazon approaches

8   it this way and you accepted it.  You didn't create that

9   theory.

10  A   No.  I used exactly what -- that's exactly why they do

11  the pricing strategy they do.  It's exactly what they do.  I

12  just followed it.

13  Q   And let's talk about the causation.  Did you decide that

14  the -- that the downstream sales -- that there is a causal

15  connection to the sale of the accused products or was that

16  Amazon?

17  A   I didn't decide it.  I showed actually the jury five

18  documents that say causally tied using statistical causal

19  models.  It's not coincidence that when somebody buys Echo

20  they happen to buy more shoes.  Right after they purchase

21  it, they start buying more.  This is historical data.  They

22  look at your customer purchase behavior before and after you

23  buy it.  It's -- it's fully contributed only to the sales of

24  the accused products causally.

25  Q   My question is more simple than that.  Was that your

1    theory or Amazon's theory that you accepted?

2    A    It's fully coming from Amazon documents which I

3    presented in my direct testimony.

4              MR. BERQUIST:  Thank you.  That's all I have.

5              THE COURT:  Additional questions?

6              MR. DACUS:  Just a couple, Your Honor.

7                        RECROSS-EXAMINATION

8    BY MR. DACUS:

9    Q    Let's just be very clear, Mr. Ikizler.  What Amazon

10   measures -- and there is no dispute -- is the profit on

11   products that folks buy if they purchase an Echo Dot,

12   correct?

13   A    Yes.

14   Q    And that's the information you used, correct?

15   A    Yeah.  Yes.

16   Q    But your job here, as you've already admitted, is very

17   different.  Your job here is to determine which of those

18   purchases downstream were caused by this smart home

19   invention, correct?

20   A    That's correct, and I -- that's exactly what I did.

21   Q    And that's very different than who bought shoes and

22   shirts because they bought an Echo Dot.  Those are two very

23   different questions.  Don't you agree?

24   A    How is it different?

25   Q    So, you see them as the same?

47

1   A   Echo causes people to buy more, and what makes people

2   buy Echo?  One of the reasons what makes people buy Echo is

3   ability to control smart home devices.  They are fully,

4   clearly -- I don't understand how somebody could dispute

5   this.  You buy Echo because it has features.  In fact,

6   people say clearly and loudly, I need the smart home

7   feature.  If there is not smart home feature, you would not

8   have sold as many units.  It's simple math.

9   Q   So, one last question, and then I'll sit down.

10      So, what you've just said to the jury, sir, is some

11  portion of the people, at least under your theory, buy an

12  Echo because of the smart home feature, correct?  That's

13  what you said.

14  A   Not my theory.  Amazon's own survey expert's findings.

15  Q   And you said 10 percent.  That's -- that's what you just

16  said, correct?

17  A   10 to 12 percent, yes.

18  Q   Yet, when you step over to downstream sales, you don't

19  just take 10 percent of those, which is what the patented

20  feature, at least in your theory, contributes to people

21  buying Echo Dots.  You take the entirety, 100 percent of

22  these downstream sales, just because people bought an Echo

23  Dot.  That's a true statement, correct, sir?

24  A   It's -- it's absolutely so wrong on so many levels

25  because, first of all, it's DSI profits, not revenues.

1    Second, I multiply it with 10 percent.  I explain it so

2    many times.  I take the profits and multiply it with the

3    apportionment rate.  I only attribute the multiplication,

4    profits times apportionment.

5            MR. DACUS:  That's all I have, Your Honor.

6            THE COURT:  Anything else?

7            MR. BERQUIST:  Nothing, your Honor.  Thank you.

8            THE COURT:  Okay.  Ladies and gentlemen, you know the

9    drill.  If you have a question or whether -- whether you do or

10   don't, if you'll just fold a piece of paper and pass it over to

11   the court security officer.

12                    (Pause in proceedings.)

13           THE COURT:  Could I have counsel approach?

14                    (Bench conference, off the record.)

15           THE COURT:  I've got a few questions from the jury.

16       Was there an individual dollar amount given to each

17   section in the analysis for, like example, audio?  That's

18   the -- they said as an example.

19       So, was there an individual dollar amount given to each

20   section in the analysis, i.e., like audio, et cetera?

21           THE WITNESS:  No.  That analysis only gave us

22   percentage for the entire patented product.  That's it.  No

23   individual dollar amounts for audio nowhere in my report.  It

24   was never part of the opinion.  It was misrepresented by the

25   counsel.

49

1        THE COURT:  And then are Amazon's marketing skills or

2   Innovation Sciences' inventions the main reasons for the

3   downstream profits?

4        THE WITNESS:  It's 10 -- it's exactly 10 to

5   12 percent of the reason, and that's the whole purpose of the

6   apportionment.  Because apportionment tells us what percent of

7   this -- why do people buy this product.  And we estimated 10 to

8   12 percent comes from the patented features.

9      And then we look at the profits, and then we split it

10  to one-tenth to say, okay, if you're making $2 billion in

11  profits -- clearly not -- but you divide it by 10 percent,

12  because that's the only part of the profits that's

13  attributable.

14        THE COURT:  And then, if you know, did you look to

15  see what the value of the diaper invention was or is?

16        THE WITNESS:  I only saw it with you guys on the --

17  on the stand here.  I understand that was a different patent

18  application, but that's all I know.

19        THE COURT:  And what are the main factors you and

20  Dr. Magee believe makes Amazon liable for a hundred million

21  dollars?

22        THE WITNESS:  I missed the first part of the --

23        THE COURT:  Sure.

24      What are the main factors you and Dr. Magee believe

25  makes Amazon liable for a hundred million dollars?

50

1              THE WITNESS:  That's a great question.  It comes down

2    to, okay, to summarize why it's a hundred million dollars.  I

3    guess why I wanted to highlight the important points in this

4    slide.

5         First of all, Dr. Ugone identified the non-infringing

6    alternatives, which means if Amazon sat down at that

7    hypothetical negotiation table and just wanted to walk away,

8    I'm not licensing this product, but I'm not going to

9    infringe on it because that's not lawful, they could have

10   offered the product to the marketplace that is not

11   compatible with Bluetooth or ZigBee, just used WiFi.  That's

12   what he said.  Or just only allow people to use -- adjust

13   their temperatures off-line, which means connected device to

14   Internet.

15        Think about how marketable it is.  In my opinion, it's

16   not marketable at all.

17        And the third option is just do not offer -- offer

18   smart home features.

19        Let's think about these three options.  If you do not

20   offer smart home features altogether, your sales go down --

21   will go down.  It's evident that 10 percent people said in

22   the survey, per Amazon's expert's survey -- that they would

23   consider they want to have the smart home feature in -- when

24   they purchase a smart speaker.  So, there would -- their

25   sales would go down, right?  That's exactly 10 percent of

1    Amazon's profits we attribute to the sales.

2        Second option, you offer this product without the

3    WiFi -- sorry -- without Bluetooth and ZigBee.  And I, as a

4    purchaser myself, I go online.  I do some research before I

5    purchase a product.  If I'm trying to think about -- if I'm

6    thinking about I'm going to buy a smart home system that can

7    connect to my devices that I already have, too, if I can't

8    use Bluetooth to connect to my devices, to me, it will make

9    me less likely to purchase an Amazon device compared to its

10   competitors.  So, it damages its competitive advantage.  So,

11   again, that's the other option.

12       But to summarize the point, why $100 million, good

13   question.  That's why we have to use a systematic approach.

14   For me, the most reasonable approach, which we decided, is

15   find out exactly how much Amazon benefited from sales of the

16   accused products, right?  The profits.  And then calculate

17   exactly 10 percent of it, because that was -- the 10 percent

18   is thanks to the patented invention.  And that's the maximum

19   that they would pay at the table.  They would not want to

20   pay more than that.  That's why.

21            THE COURT:  Thank you.

22       Any follow-up?

23            MR. BERQUIST:  No, Your Honor.

24            MR. DACUS:  No, Your Honor.  Thank you.

25            THE COURT:  Okay.  You may step down.  Thank you.

52

1        What says the Plaintiff?

2               MR. JACKSON:  We have no more rebuttal witnesses.

3               THE COURT:  Okay.  So, you -- so, you close?

4               MR. JACKSON:  Yes.  We're closing, Your Honor.

5               THE COURT:  Defense?

6               MR. DACUS:  Amazon has no more witnesses, your Honor,

7   and at this time Amazon closes.

8               THE COURT:  Very well.

9        Okay.  So, ladies and gentlemen, you have now heard all

10  the evidence.  The next thing we need to do is have the

11  closing arguments for both sides and then my final

12  instructions.

13       We're just going to take like a 10-minute break, send

14  you back to the jury room just to get reset up for the

15  closing arguments, and then we'll have those.

16       Just so you know, I've given each side about an hour

17  and 15 minutes each, and we're going to go through both sets

18  of closing arguments, and then I'll check and see if you

19  need a break before I give you my final instructions.  Or we

20  can go straight through.  We'll just see how y'all feel

21  about that, and I will ask that.

22       But, again, even though you've heard all the evidence,

23  you still can't discuss it.  So, please don't discuss the

24  case when you go back to the jury room.  And then come back

25  and we're -- we're almost done.  So, thank you very much.

53

1          (Jury exits the courtroom, 9:35 a.m.)

2          THE COURT:  Okay.  So, anything further from

3    Plaintiff?  Did you -- let me ask, did y'all work out an

4    agreement on -- I know it was starting to be discussed at our

5    charge conference last night in terms of your motions and

6    everything.

7          MR. JACKSON:  We made a proposal by e-mail, Your

8    Honor, for the ability to file those motions on the papers

9    within 14 days of today.  I haven't really been keeping up with

10   my e-mail; but as far as I know, I haven't received anything

11   back.

12         MS. SHAMILOV:  Sorry, Your Honor.  We received that

13   at 2:00 a.m.  We -- we can't agree to that, Your Honor.

14         THE COURT:  Okay.  So -- okay.  So, I mean, we can

15   make all the motions.  We can do it after we finish today,

16   then?  If you want to do it all orally, that's fine.

17         MR. DACUS:  I think our concern, Your Honor, is just

18   procedurally waiting two weeks on 50(a) motions.  We're fine

19   filing written 50(a) motions today, as long as we do so by

20   midnight.  We're fine with that process, but we have some

21   concern about waiting two weeks on 50(a) motions.

22         MR. JACKSON:  We're flexible on the time.  Unlike

23   Amazon, we haven't written those motions yet.  So, a midnight

24   deadline tonight would be, I think, practically speaking,

25   unworkable for us.  So, I mean, I'm flexible.  I originally

54

1    talked --

2              THE COURT:  What about like noon tomorrow?

3              MR. DACUS:  That's fine.

4              THE COURT:  Not that I'm trying to negotiate this

5    but --

6              MS. SHAMILOV:  That's fine with us.

7              THE COURT:  Okay.  So, we have agreement on those by

8    noon tomorrow?

9              MR. DACUS:  I'm just being overly cautious here, Your

10   Honor.  I just want it on the record that by filing our 50(a)

11   motions by noon tomorrow, those will be considered timely, as

12   if they had been presented prior to presentation to the jury,

13   correct?

14             THE COURT:  Correct, Mr. Dacus.  I'm trying to make

15   this -- I am not -- there is no waiver.  I am not trying --

16   this is not a trick by the Court.  I'm just trying to make it

17   the most efficient use of everyone's time and the jury's time.

18        And then also there is no waiver.  We'll do any

19   objections to the charge.  We can do those after the jury

20   goes out.  Again, no waiver from -- since they should happen

21   now before they go to the jury but --

22             MS. SHAMILOV:  That's perfect, Your Honor.

23             THE COURT:  So --

24             MR. JACKSON:  That's acceptable, Your Honor.

25             THE COURT:  Very well.  Okay.  So, just we'll take

55

1   ten minutes or as soon as you -- hopefully it doesn't take ten

2   minutes to get reset up for closing arguments.

3       Did y'all want hard copies?  I think my lawyer has hard

4   copies to give to each side of the -- I believe it was just

5   that one small change.

6           MR. DACUS:  Please.

7           THE COURT:  And then I will give the jury a copy of

8   the charge right before I -- when I read it to them.  They

9   won't get a copy until then.  But you are welcome to use, of

10  course, the charge and the verdict throughout your closing

11  arguments.

12      Any questions?

13          MS. SHAMILOV:  Just on the exhibits that I needed to

14  move into evidence --

15          THE COURT:  Oh.

16          MS. SHAMILOV:  -- because those have to go to the

17  jury.

18          THE COURT:  Yes, I understand.  And --

19          MS. SHAMILOV:  Whenever you would want me to do that,

20  I just want to --

21          THE COURT:  We can do it -- I mean, everyone's agreed

22  to that list, right?

23          MS. SHAMILOV:  Yes.

24          THE COURT:  So that we don't waste any more time for

25  the jury, we'll do that -- just do it first thing when we get

1    out so it's part of the record.

2              MS. SHAMILOV:  Will do.

3              THE COURT:  Not a problem.

4         Okay.  See you back in ten minutes or maybe less.

5                        (Recess, 9:38 a.m.)

6                        (Open court.  All parties present.)

7                        (Jury not present, 9:50.)

8              THE COURT:  Is everyone ready to go?

9              MR. BERQUIST:  Yes, Your Honor.

10                       (Open court.  All parties present.)

11                       (Jury present, 9:53.)

12             THE COURT:  Ladies and gentlemen, you've now heard

13   all the evidence.  Please pay close attention.  These are the

14   closing arguments, which is not evidence, but it's the

15   attorneys' summation of what they believe the evidence has

16   shown.

17        And, so, we'll start off.  The Plaintiff gets to go

18   first, then the defense, and then the Plaintiff, of course,

19   gets to finish.

20        Mr. Jackson.

21             MR. JACKSON:  Thank you, Your Honor.

22        A company cannot take the idea, the patented idea, of

23   any American citizen and use that idea without permission or

24   compensation.  That's where we started the case, and that's

25   where we end this case, too, and that's the reason we're

57

1   here.

2       And we are counting on you, the members of the jury, to

3   look at the evidence.  And if you agree with us -- and we

4   hope that you do.  We certainly hope you do.  And I'm going

5   to go through a sort of high level summary of the evidence

6   today -- that you will find in favor of Innovation Sciences

7   in this case.

8       So, let me start and -- and let me just give you a

9   little bit of a lay of the land of what I want to do.

10      And I guess, really, before I do, I want to thank you

11  all for your attention to this case, your patience.  It's

12  been a long -- a long eight days or so, and -- and you've

13  taken time out of your daily lives to serve on this jury.

14  It's -- it certainly doesn't go unnoticed by our team, and

15  I'm sure that's true by Amazon as well.  So, we do really

16  appreciate that.

17      What I want to do is -- is, obviously, I'm going to

18  tell you a little bit about our view of the evidence, but I

19  also want to show for you a little bit about what you're

20  going to be asked to do back in the jury room.

21  Specifically, I'll show you maybe some clips of some of the

22  jury instructions that Judge Mazzant will -- will give you

23  later, as well as show you some of the questions that you're

24  going to be asked on the verdict form.  There are five

25  questions on the verdict form.

1    And, so, what I want to do is show you the verdict

2    form, talk a little bit about the evidence, and then show

3    you the way we think you should answer those five questions.

4         So, let me -- let me get started.

5         First of all, Paul, if you would put up the first

6    slide.  I'm already behind the eightball.

7         I wanted to, again, thank you very much.

8         In the opening statement, I told you that Innovation's

9    inventors played by the rules.  They did what they were

10   supposed to do.

11        Paul, if you would go to the next slide.  Actually, I'm

12   sorry.  I forgot I have the clicker.  Thank you.  This time

13   I'm driving.

14        As I had mentioned, I believe, in the opening, you

15   know, they -- they played by the rules.  They disclosed

16   their inventions to the Patent Office.  They told the Patent

17   Office about the prior art that they were aware of.  They

18   paid the fees, which the government fees are not

19   inexpensive.  And eventually, after dealing with the Patent

20   Office and negotiating the scope of those claims at the

21   Patent Office, they got their patents.  And three of those

22   patents are the patents that we're dealing with here in this

23   case.

24        Now, in terms -- and I also want to comment on -- on

25   Dr. Anne Wong, who you've heard from in this trial and heard

1    a lot about in this trial.  And she, too, played by the

2    rules.

3         She received scholarship offers from schools here in

4    the U.S. and, you know, wanted to pursue her -- her version

5    of the American dream.  I think every -- every immigrant to

6    this country has their version of the American dream, and

7    that was -- she had her version, and that was her

8    opportunity to come here.

9         And after going through graduate school and getting --

10   you know, being here on student visas, eventually she

11   transitioned to work visas, and then there's a -- I'm not an

12   expert on this, by any means, but I understand there's a

13   period of time you have to wait, and eventually you can

14   qualify to become an American citizen.  And there's a whole

15   process for that, and she did that.  She's here.  She's here

16   legally.  She's an American citizen.

17        She changed her name from her Chinese birth name to

18   Anne, an American name, because she wanted to fit into this

19   country.  And she's -- she's done that.

20        Now, I want to turn now to the issues in this case and

21   focus really on the kind of things you're going to be asked

22   to decide, and I want to start --

23        Let's assume I know how to drive this thing.  I'm going

24   to -- well, I'll get do that in just a second.  I apologize.

25        So, I want to talk about Mr. McAlexander.  And you'll

60

1    recall that Mr. McAlexander came in here, and he showed you

2    the evidence that he relied on to come to his infringement

3    analyses, his conclusions on infringement.  And he relied in

4    large part on the testimony of Amazon's witnesses, as well

5    as documents provided by Amazon on the way their products

6    worked and so forth.

7        And I have hopefully sort of short clips here -- I

8    haven't looked at them in a while -- but short clips of some

9    of the witnesses that Mr -- Mr. McAlexander relied on.  So,

10   this is -- these are Amazon's own employees, their own

11   engineers, who told us and told you here in this case a

12   little bit about the way their products work.  And I just do

13   this really as a way of reminding you that this isn't

14   something that Mr. McAlexander just, you know, conjured up

15   on his own.  He was relying on the evidence in this case.

16       So, I hopefully have these -- these three short clips I

17   want to play for you.  The first one was Mr. Zarka.  Let's

18   see if I can make that run.

19                   (Video deposition excerpt played.)

20              Answer:  That's correct, yeah.

21              Question:  Okay.  Can you -- maybe it would be easier

22   for you to just explain, how does Amazon associate --

23   specifically, how does Amazon associate a, for example, Stick

24   4K device to a customer's account?  How is that association

25   made within Amazon's systems?

61

1          Answer:  There is a device identifier that is mapped

2     to a customer identifier.

3          Question:  Okay.  And the customer identifier, is

4     that just a numeric string that Amazon assigns to a particular

5     customer?

6          Answer:  It's not numeric, but that's -- that's the

7     idea.

8          Question:  Is it alphanumeric?

9          Answer:  It is alphanumeric.

10         Question:  Okay.  But it's --

11              (Video deposition excerpt concluded.)

12         MR. JACKSON:  So, there were other witnesses and we

13    played some of those deposition videos for you.

14       Mr. Arlen Dean, for example, he was another witness

15    from Amazon, and he testified about lots of topics, one of

16    which happened to be the ability to make phone calls, which

17    I had no idea when I started this case that you could

18    actually do that through an Amazon Echo and products like

19    that from Amazon.  But I thought -- I found that

20    fascinating.

21       And then also we had Mr. Mark Aiken, another one of the

22    witnesses whose deposition we played for you.  And he talked

23    about how -- how the Amazon Cloud worked.  That was really

24    kind of his more area of expertise.

25       So, I'm going to actually -- just in the interest of

1   saving time, I'm going to -- I had clips from those two

2   individuals, but I'm going to skip through that just to

3   speed things along.

4        Mr. Aiken was -- we didn't have his video but we have

5   his testimony.  And, again, here -- here's where he's

6   talking a little bit about how Ring cameras interface with

7   Echo products.

8        So, this was -- these were things that Mr. McAlexander

9   relied on.

10       He also -- Mr. McAlexander testified about the process

11  that he goes through to analyze these claims.

12       And I apologize for having you sit through and listen

13  to an extremely long day of testimony that was probably very

14  tedious.  Even for -- even for us here at this table it was

15  a bit tedious.

16       But as Mr. McAlexander explained, he has -- he had to

17  do that.  He has to do the analysis on an element-by-element

18  basis, on a claim-by-claim basis, on a product-by-product

19  basis, and it just takes a lot of time.  And I apologize for

20  that, but it goes to his thoroughness.  You know, he did

21  that work, and he did that work so that he could present it

22  to you.

23       And I think that, you know, this was -- this slide here

24  was his trial testimony about his process.  But his process

25  included things like, you know, getting familiar with the

63

1    patents, reading the claims, trying to get an understanding

2    of those claims, making sure he understands the scope of the

3    claims, applying the Court's claim construction.

4         Judge Mazzant has told the parties what certain terms

5    mean where we've had a dispute about what exactly it means.

6         And then, you know, based on the documents produced in

7    the case and the testimony in the case and any additional

8    research he had to do as part of his work as an expert, he

9    comes to the conclusions that he's given you.  I don't need

10   to tell you what those are.  He concluded those products

11   infringed.

12        He also testified that he does this not just as an

13   expert.  He does this type of analysis commercially as well.

14   It's just what he does.  He -- this is simply a courtroom

15   setting where he's applying his expertise.

16        Now, you're going to be asked on the verdict form --

17   this will be actually the first question.  You'll be asked

18   whether Innovation has proven that Amazon's products

19   infringe any of the asserted claims.  And, so, I'm going to

20   put up on the screen, hopefully, what is that -- sorry.  We

21   start with the jury instruction.  I apologize.

22        So, this is the jury instruction you're going to be

23   given, or it's a part of it.  Honestly, it's much longer

24   than this, but I tried to pull out at least what I thought

25   was the most relevant part of the jury instruction for how

1    you are going to be asked to determine whether the Amazon

2    products infringe.

3        And among other things -- this is what we call direct

4    infringement.  That's the first part.  There are multiple

5    ways that a party can infringe a patent, and I'm going to

6    touch on all three of those.

7        There is what's called direct infringement, and that is

8    as stated here.  I'm going to paraphrase this, so you should

9    rely on the instruction and not my -- not my explanation.

10       But it's whether -- whether Amazon, in this case, made,

11   used, sold, offered for sale, or imported a product that

12   literally meets each and every claim element of each of the

13   claims that those products are accused of infringing.

14       That's where you have to go through this laborious

15   process to prove that to the jury, and that's what

16   Mr. McAlexander did.

17       And, so, I want to talk a little bit about direct

18   infringement and just really show you on the verdict form --

19   it's actually very straightforward for this question.  The

20   question is:  Has Innovation Sciences proven, by a

21   preponderance of the evidence -- and I want to talk about

22   that a little bit -- that Amazon has infringed any of the

23   asserted claims?  And it's a yes-or-no question.

24       Now, preponderance of the evidence, I know or you may

25   recall Judge Mazzant told you what that meant at the

1    beginning of the case and you -- I think Ms. Lisa Blue

2    talked about that also during voir dire, that preponderance

3    of the evidence is slightly more in favor of one party than

4    the other.  It's -- it's the most -- it's the smallest

5    percentage in favor of one party or the other.  That's the

6    burden for Innovation to prove infringement.

7         You have to look at the evidence and tell yourself or

8    ask yourself, who does the evidence favor, ever so slightly

9    even?  And that's the party that you should find in favor

10   of. The preponderance of the evidence standard, we'll come

11   back to that again, because that applies to other questions

12   you're going to be asked to decide here as well.

13        So, I'm not going to go through this.  Don't -- please

14   don't be concerned.  I'm going to -- I just wanted to remind

15   you of some of the details that Mr. McAlexander went

16   through.  I picked -- I think this is the Echo 2 Plus

17   product as compared to the '983 patent claim 22, and this is

18   a claim that you've heard quite a lot about in this case.

19        And you remember that Mr. McAlexander put the claim

20   language up and then on the right-hand side he would have

21   some piece of evidence that he pointed to, to show you where

22   in his view he found that claim element.  In fact, in many

23   of the situations there was multiple pieces of evidence,

24   which I'm going to click through quickly here so we're not

25   spending a lot of time on this.

66

1        But here is the -- you know, the first element, the

2   input interface.   The input into structure in the accused

3   product, this was additional support for his input interface

4   analysis.

5        Then he went to the next element, the decoder, and

6   showed you where he found that, with secondary evidence

7   supporting that analysis.

8        Then there was the network interface and he showed

9   that.

10       Then he dealt with some of the "wherein" clauses and

11  again pointed you to where that evidence was shown.   And

12  these are -- this is an Amazon document that we're looking

13  at on the right-hand side here, and it's what we would

14  commonly refer to as block diagram.   It shows the different

15  chips that they are using in their product, how those chips

16  are interconnected, the signals that flow between the two.

17  And so, he's relying on this information from Amazon in his

18  analysis and ultimately in his conclusions.

19       This is the next to last "wherein" clause.   This is the

20  famous I guess we call it subparagraph F that has the

21  short-range wireless communication language in it.   And

22  you've heard the witnesses talk about that at quite a bit of

23  length.

24       And in the blue, that again was Judge Mazzant's

25  construction of the term "an updated status of the item".

67

1     That's how Judge Mazzant said the parties have to construe

2     that phrase, and that's going to be part of what you're

3     going to get in the jury instructions.  You're going to see

4     Judge Mazzant's ruling as to the terms that he construed and

5     the definition that he applied to those terms.  So, this is

6     just an example of that.

7          And, again, Mr. McAlexander also obviously pointed to

8     evidence supporting his conclusion on those claim phrases,

9     and I think there is one more -- one more part of the claim.

10    Again, pointing again back to Amazon's broad diagram

11    documents showing where he found that.

12         So, we asked Mr. McAlexander as part of his testimony,

13    you know, how many instances -- if you break it down, how

14    many instances of infringement did you find?  And recall

15    Mr. McAlexander testified even though he only presented to

16    you one product as a sample from the Echo family and one

17    from the Fire TV and one from the Fire Tablet family, that

18    he had done the same analysis for all those products that he

19    analyzed and confirmed that there were no material

20    differences in the infringement analysis as to the way those

21    products were structured or the way they operated.

22         And he chose this product, in the case of the Echo

23    line, I think it was the Echo Plus 2, as the sample to

24    explain to you the bases for his opinions.

25         But when you add in all those checkmarks up on that

 1   slide that he had -- I think it was his Slide 12 -- it

 2   worked out to 137, 137 instances of the products infringing

 3   a particular claim.  And when you break it down on a

 4   product-by-product basis, claim-by-claim basis, and you

 5   said, you know, in his view, yes, that infringes, yes, that

 6   infringes, yes, that infringes, that totaled 137.  And this

 7   was his -- his blank chart where he started his analysis.

 8        And then when he finished, those were the 137 instances

 9   of infringement that he found.

10        I mentioned the preponderance of evidence standard

11   earlier.  And, again, it's just basically ever so slightly

12   in favor of one party versus another, and that's -- that's

13   what you're going to be asked to decide.

14        Maybe I'm biased, but I think the evidence is more than

15   ever so slightly in favor of Innovation.  But that's all

16   that you have to find.  You can have doubts.  You can have

17   doubts going both ways.  But if you find the greater weight

18   of the evidence supports infringement -- and I respectfully

19   submit that it does -- then you should find in Innovation's

20   favor on that question.

21        You recall Judge Mazzant, in his preliminary

22   instructions, told you it's as much as a feather weight

23   difference in favor of one party or another.  That's all it

24   takes.

25        So, I mentioned there were different ways of

1    infringing, that a party can be found to infringe.  I talked

2    about direct infringement was the first example.

3        The second example is called induced infringement, and

4    I've put up here on the screen part of the jury instruction

5    that you're going to be given.  I'm not going to go through

6    this in great detail, and you should rely on the

7    instruction, not what I tell you about what the standard is.

8        But essentially, in my mind, the way I think of it is,

9    is did, in this case Amazon, induce other people, third

10   parties, for example, or maybe even its customers, to

11   infringe.  The parties and the customers may not even be

12   aware that they are infringing.  But did they do something

13   to encourage others to infringe the patents?

14       And, for example -- I'm going to go through some of the

15   evidence, I think, supporting this.

16       You'll see here Mr. Aiken.  He was one of the Amazon

17   witnesses, and he talked about, in particular, this Alexa

18   Connect Kit.  And you may or may not remember.  I'll remind

19   you.  You should, of course, rely on your own memory.

20       But the Alexa Connect Kit -- and this was presented by

21   deposition.  So, the Alexa Connect Kit was chipsets that

22   were sold or I think he even testified sometimes they were

23   given away, but they were provided to third-party

24   manufacturers, let's say a printer manufacturer.  And if the

25   printer manufacturer chose to include those chips in its

70

1    products, then those products could be automatically

2    configured to work with Alexa.  All -- all that a purchaser

3    of a printer would need to do is -- is --

4         Actually, a printer is probably a bad idea.  I should

5    have said maybe something like a door lock, you know, some

6    sort of smart home device.

7         All that the -- the user would need to do is link that

8    back to their user account, and then the door lock or

9    whatever the device may be has the intelligence, the

10   electronics already built into it, that it can be controlled

11   from an Echo device or a Fire TV or Fire Tablet.

12        So, it's a way of encouraging third-party manufacturers

13   to make and sell products that are specifically designed to

14   work with Amazon's smart home ecosystem and -- and the

15   ability to allow those devices to be managed from these

16   accused products.

17        So, Mr. Aiken talked about the Alexa Connect Kit, and

18   then separately he gave an example, Ring, which

19   subsequently, I guess -- I don't know the timing exactly,

20   but at some point recently was acquired by -- by Amazon, but

21   prior to that it had been a third party.  And they were --

22   they were making products, their smart doorbells and -- with

23   the cameras and so forth, and they were designing those to

24   work with the Amazon ecosystem that allows the smart home

25   control.

1        There are other examples, and I think there's probably

2   many examples in the -- in the record, but I just pulled out

3   this one example here.

4        Mr. C.J. Allen was another Amazon witness, and he

5   testified about these various certification programs.  One

6   of them was called Works with Alexa, and another one is

7   called Certified for Humans, and they are both very similar.

8        Certified by Humans allows for a device to

9   automatically connect to your account so that you don't have

10  to go through the process of manually linking it back to

11  your account.  If you purchase one of these products that's

12  Certified for Human, you take it home, you turn it on.

13  Assuming that you have the proper information stored in

14  Amazon's cloud, Amazon's system will automatically link it

15  to your account, and it will be up and running, and you

16  don't have to go through a setup -- setup process.  Very

17  smart.  You know, it encourages people to buy those

18  products.

19       The Works with Alexa program, as I said, was very

20  similar.  It doesn't have the automatic setup feature, but

21  it's been certified by Amazon to work with its Alexa

22  ecosystem and, therefore, to be capable of being controlled

23  as a smart home device from these accused products.

24       So, they are -- they're -- and these products typically

25  are or almost exclusively, I suppose, made by third parties.

1    They're trying to encourage, again, these third-party

2    manufacturers to make devices that can be integrated and

3    used by customers in the Amazon ecosystem.

4         And this, frankly, touches on a little bit of what --

5    about what Dr. Ikizler talked about earlier today.  You

6    know, Amazon wants to drive customers into its ecosystem as

7    opposed to its competitors, competitors like Apple or

8    Google.  They would -- they would like to have the customers

9    living, so to speak, in the Amazon ecosystem because they

10   derive financial benefit down the road from those kind of --

11   that -- that -- that engagement.

12        So, Mr. Allen talked about both of those programs.  But

13   the point of those programs, as I said, is to get more

14   devices capable of working in the Alexa ecosystem and,

15   therefore, being capable of being controlled by the smart

16   home devices and driving customers, therefore, to that same

17   ecosystem.

18        So, that was the point.  So, they're encouraging --

19   through the Works with Alexa system, they're encouraging end

20   users to purchase devices that could be used with the Echo

21   in a smart home environment.

22        The idea is, you know, if a customer looks at online --

23   let's say you're on Amazon.com and you're looking for a

24   smart doorbell, and one of them is certified as Works with

25   Alexa, one of them is not, you may be more encouraged to buy

1   the one that's certified to work as Works with Alexa.  And,

2   so, they're -- they're encouraging you to buy that product,

3   take it home, make it part of the system, and -- and use it

4   in that system in an infringing manner, allowing you to use

5   the Echo products and the Fire products in an infringing

6   manner to control those devices.

7       Now, the third -- let me switch gears.  The third type

8   of infringement that you can have in a case like this is

9   what's called "contributory infringement."  And, again,

10  you're going to be given a jury instruction on that, and you

11  should follow that jury instruction.  But essentially the

12  idea behind contributory infringement is let's say that the

13  claims cover a system.

14      Now, there's been debate, frankly, in this trial

15  between our experts and Amazon's experts as to whether the

16  claims cover just the Alexa -- or the Echo product or the

17  Fire TV product or whether it requires other pieces.

18      And this kind of a situation, contributory

19  infringement, as well as induced infringement, frankly, both

20  can be applied in that situation where a claim covers a

21  larger system, not just a -- an individual box or product.

22      But -- and, again, I'm just going to give you my sort

23  of thrust of what this means.  You should rely on the

24  instruction.  But I always think of it like a company sells

25  a piece of a system, but that piece, that product, let's

1    say, is really designed to work as part of a larger system.

2    It's not something that can be used in any other situation.

3    It's -- it's really specifically tailored to be used in that

4    environment.

5         And the idea is that your -- the company is selling

6    that -- that product with the idea that it -- it knows that

7    the customer is going to take that piece and put it together

8    with other pieces that will end up constituting the entire

9    system that's claimed.

10        And, so, it doesn't matter that they don't sell the

11   entire system themselves.  It's enough that they sell just

12   the piece that's specifically designed to go into this --

13   this larger system.

14        So, in that regard we had -- and, so, the idea is that

15   this third party -- it could be a customer, could be a

16   manufacturer, it doesn't matter.  But there is some third

17   party that's going to take the pieces and put it together.

18        So, you -- you also may recall that we had -- I think

19   it was Mr. -- we actually had multiple witnesses.  But

20   Mr. Allen talked about Amazon selling bundled products.  And

21   I don't know if that was -- if you recall that or not, but

22   basically they're selling one of these smart home products

23   with something else.  Maybe it's a Philips Hue light bulb or

24   maybe a door lock.  I don't, you know, remember if he gave

25   specific examples.

1    But the idea is they will sell those products together.

2  Maybe the combined price is lower.  You're getting two for a

3  lesser price than you would pay if you bought them

4  individually.  But why are they doing that?  They're doing

5  that because they know that you're going to take it home and

6  you're going to connect it up to your -- your home wireless

7  network, and you're going to be using the Echo device or the

8  Fire device to control that light bulb.  That's probably the

9  reason why the customer bought that bundle.

10    So, here was some testimony from Mr. Allen on that

11  point.  He -- over on the left-hand side, he says, you know,

12  I don't know if it's 100 percent of the time, but I'd say

13  there's a high probability that you would be able to find a

14  bundle from Amazon.

15    And then separately he talked about zero-touch setup.

16  And this is similar or it's related, I guess, to the idea

17  behind Certified with Humans.  Zero-touch setup is this idea

18  that you don't have to know how to actually integrate your

19  smart home device into your network.  If it's part of a

20  zero -- if it works with a zero-touch setup capability, you

21  bring the products home -- actually, I think this actually

22  relates more to the Echo products, the Amazon products

23  themselves.  You bring the Amazon product home and you -- it

24  will automatically join your wireless network.  It will

25  automatically connect itself to your Amazon account.  So,

1    you don't have to go through the process of trying to do

2    that, because I think we've all experienced situations where

3    we've tried to, you know, install some new electronic device

4    in our home and we can't make it work, for whatever reason.

5    The instructions never seem to actually solve the problem.

6         Well, they've come up with a solution.  And why have

7    they come up with that solution?  Again, it's designed to

8    make it easier, to encourage customers to buy those

9    products, bring them home, put them together in a bundled

10   situation, put them together, for example, with other

11   products so that even if you -- even if you say you've got

12   to have the entire claimed system, they have that claimed

13   system.  They're encouraging their customers to do that.

14        Mr. Aiken -- I'm not going to read this to you here,

15   but there was also testimony from Mr. Keith.  He was -- I

16   believe he was a vice-president at Amazon.  He talked about

17   the benefits of bundling up here at the top right-hand

18   column, top right-hand column.  He says -- he was asked

19   what -- what's the benefit of bundling from your

20   perspective?  And he said to drive sales.  Makes sense.

21        Mr. Aiken, again, was -- talked about -- talked about

22   bundling the Show with the smart LED bulb, and he says the

23   reason -- his understanding of the motivation for doing it

24   was to offer customers an easy way to acquire functional --

25   functionally-related products, in other words, products that

77

1    would work together.  That was their goal.

2         So, you're going to be given instructions on the

3    different types of infringement.  And again, I've just

4    summarized them here, but you will be -- Judge Mazzant will

5    give you that orally here and then you will also have those

6    instructions back in the jury -- in the jury room.

7         And the first question is infringement, and you're

8    going to be asked did we prove infringement by a

9    preponderance of the evidence.  And if you agree with us

10   that we have, then you're going to check yes and then you're

11   going to go to the next question.

12        The next question is invalidity.  I'm going to try to

13   speed this up because I feel like I'm spending a lot of time

14   on this.

15        But the next question is invalidity, and you're going

16   to be asked to answer whether Amazon has proven whether each

17   of the claims are invalid.  And again, you'll notice at the

18   very top it says:  Did Amazon prove by clear and convincing

19   evidence that the following claims of the asserted patents

20   are invalid?  And it will tell you what yes and no means.

21   Yes means that you've proven it invalid.  No means they have

22   not proven it invalid by the clear and convincing evidence

23   standard.

24        And you'll also remember that the primary -- in fact,

25   really, the only prior art -- and I'm going to put that in

78

1    quotes, because we dispute whether it's prior art or not.

2    But the only prior art that was presented to you from

3    Dr. Johnson was this so-called HAL system, the system that

4    he testified was put together in 2019.

5         Now, to be prior art, it has to -- it has to be

6    something that was in existence prior to the first time the

7    claims were filed in the Patent Office.  So, you're going to

8    be asked whether this system -- as part of your analysis,

9    you have to determine for yourselves whether this system

10   that Mr. Shriver and Dr. Johnson admitted was put together

11   in 2019, whether that system or one like it existed,

12   actually existed, prior to 2006 or 2007, which would be in

13   the prior art time period.  You've got to make that

14   determination, and they've got to prove that by clear and

15   convincing evidence.

16        We'll talk about clear and convincing evidence in just

17   a minute, but it's their burden.  They have to prove by that

18   burden every aspect of invalidity.  Just like we have to

19   prove every aspect of infringement by the preponderance

20   standard, they have to prove every aspect of invalidity by

21   the clear and convincing evidence standard.

22        And one of those pieces, a major piece in this case, is

23   whether this system ever actually existed.  And we think the

24   answer is very clear.  It didn't.

25        Dr. Johnson was asked, on the right-hand column, about

1   he -- the "he" here in the question is Mr. Shriver -- and he

2   did that at the request of the attorneys, right?

3       These were attorneys that helped him put together the

4   system in 2019.  This was done for purposes of litigation.

5   This isn't a system that was found, you know, in someone's

6   home being used and somebody said, hey, can we -- can we

7   take pictures of that or study that or maybe buy it from you

8   and use it?  This was something that was put together for

9   the purposes of the litigation.

10      So, you recall Mr. -- this is Mr. Shriver's testimony,

11  and he was asked whether a system like that, the one here

12  that is shown on the right with Dr. Johnson, whether a

13  system like that with all the components and all the parts

14  and that he invoiced the lawyers for to the tune of $24,000,

15  whether you'd -- I'm going to paraphrase -- whether he'd

16  seen that type of system before.  And he testified -- this

17  is Mr. Shriver, who was the president of the company -- they

18  are all so unique.

19      He's referring to the systems.  It's not like -- it's

20  like a snowflake.  So, every one was unique.  Every system

21  was unique, in his view.  There wasn't a common template.

22  He's not saying that this system here that Mr. Johnson --

23  Dr. Johnson is pictured with was some sort of a standard

24  system that was normal out there.  He said they're all

25  unique.

80

1         Why?  Because the customers could customize their

2    system in their home however they wanted to.  They were the

3    ones that were responsible for putting the pieces together

4    to work with the software that Mr. Shriver's company sold.

5    At this time they only sold the software.

6         So, he was asked -- and, again, this is -- this is

7    Mr. Shriver in his deposition that was played.  He says --

8    he was asked, well, can you tell me any customer that

9    actually had the system in use at any time, 2006, 2007, or

10   any time earlier than that?

11        Answer:  No.

12        And then the next question on the screen is:  Would you

13   agree with me that there is nobody -- oh, sorry.  This is

14   Dr. Johnson.  I didn't -- we didn't have the notes as to who

15   was testifying here.  I apologize.

16        This says:  Would you agree with me that there is

17   nobody more knowledgeable about the HAL system than

18   Mr. Shriver?

19        Answer:  I would assume that to be the case, yes.

20        So, Dr. Johnson didn't have any more personal knowledge

21   about what the customers of HAL had in their systems way

22   back in 2007, 2006, and earlier.  He deferred to Mr. Shriver

23   on that.  And I think that's entirely appropriate.

24        But Mr. Shriver himself testified that he didn't know

25   whether any customers had actually built that system, used

1    that system in their own homes in that same time period.

2    So, here he's -- so, as far as you know, I'm virtually

3    positive, Mr. Shriver's testimony.  As far as you know, you

4    don't know if any customer has ever shipped a system that

5    looks like this?

6         So, yeah, this is Mr. Shriver.

7         Answer:  We don't -- in that timeframe we weren't

8    selling turnkey systems.  So we wouldn't sell a turnkey

9    system.  We would sell the software and the customer would

10   configure it.

11        They sold the box.  They sold the box with the discs.

12   That's it.  They didn't sell the entire system.

13        I mentioned the clear and convincing evidence standard.

14   It's a different standard than the preponderance.

15   Preponderance we talked about being ever so slightly in

16   favor of one party or the other.  Clear and convincing is a

17   much higher standard.

18        At the end of this -- this is part of the instruction.

19   You must be left with a clear conviction that the claims are

20   invalid.  That clear conviction standard, that's the

21   standard by which you have to weigh the evidence.  It's not

22   that one is slightly more in favor of the other.  You have

23   to have a clear conviction that the evidence favors either

24   Amazon or Innovation.

25        In this case we're talking about invalidity.  It's

82

1   Amazon's burden to prove that by clear and convincing

2   evidence.  So, you have to find that Amazon has shown all of

3   the pieces of its invalidity case by clear and convincing

4   evidence; that is, you have to come away with a clear

5   conviction that they are correct.

6        And I think Ms. Blue mentioned this in her voir dire as

7   well.  This is the same standard that the State of Texas

8   uses when they ask a jury whether a child should be removed

9   from its parents, taken out of the home.  It's not a light

10  standard.  It's very significant.

11       Now, as I said, you know, every piece of the -- of the

12  invalidity case has to be proven by clear and convincing

13  evidence.  The most important, in my mind at least, is

14  whether this even qualifies as prior art.  Did it actually

15  exist?

16       But there are other pieces you're going to have to

17  consider.  You need to determine whether Amazon has shown --

18  even if you assume this is prior art, you have to determine

19  whether Amazon has shown by clear and convincing evidence

20  that every element of the asserted claims is invalid in

21  light of that system.

22       So, you first have to say yes to prior art.  Secondly,

23  you have to weigh the evidence as to each and every element

24  and determine whether or not it is prior art.  And only if

25  you come away with a clear conviction that the evidence

83

1    supports Amazon can you reach that conclusion.

2         Now, I submit that the evidence shows that the system

3    that Dr. Johnson -- that Amazon failed to show that the

4    system Dr. Johnson tested ever existed in the prior art

5    timeframe.  I think we went through some of that testimony

6    here.

7         It was Dr. Johnson, as I mentioned, working with

8    lawyers to try to come up with a system, and they put

9    together that system with pieces and parts.

10        And you heard testimony about how many hours even

11   Mr. Shriver -- I think I said Dr. Johnson.  I meant

12   Mr. Shriver.  Mr. Shriver worked with attorneys to put

13   together that system.  He spent well over 100 hours working

14   to put that together, and he's the most knowledgeable person

15   about those systems.

16        I submit that it is -- use your common sense.  But it

17   seems unlikely to me that anybody out there -- any user or

18   purchaser of the HAL system would have put together that

19   exact same system, given how much time it took Mr. Shriver

20   to put that together.

21        So, let me show you a little bit about the -- these are

22   the jury instructions on obviousness.  There's -- you heard

23   some testimony about this from the expert witnesses, the

24   technical expert witnesses.  There was anticipation and

25   there was obviousness.

84

1          Anticipation is used when you can point to a single --

2    let's say it's a patent, just take a concrete specific

3    example, a typical example.  You're using a particular

4    patent as prior art to another patent.  When you looked at

5    that earlier patent and if you find all of the elements of

6    the claim in that earlier patent in that one document,

7    that's called anticipation.  That earlier document totally

8    discloses what came later in the later patent in those

9    claims.

10          If you don't find that all of the elements are in that

11   earlier document, you can still prove the claims of the

12   later patent are invalid by looking to other references.

13   Maybe it's a technical journal.  Maybe it's another patent.

14   Maybe it's some news article.  You can look to something

15   else.  And then under the appropriate rules, which are going

16   to be provided for you in the jury instructions, you can

17   combine those pieces together to conclude that the claims

18   are invalid.

19          But, as I said, the jury instruction provides the

20   specific rules that you have to follow in order to do that.

21   There's -- the case law as interpreted by the courts over

22   the many years have said you can't just find pieces in

23   multiple references and say, okay, that's enough.  We've

24   shown those claim elements are out there and, therefore, the

25   patent is obvious or the claims are obvious.  There has to

1    be a reason why a person of skill in the art back at the

2    time of the invention would have been -- would have had a

3    reason to combine those pieces together in a way that ended

4    up resulting in the claimed invention or making that claimed

5    invention obvious.

6         And, so, you're going to be given criteria and

7    instructions on how to do that analysis, and I'm not going

8    to spend a lot of time going through that here.  But I just

9    want you to remember that you do have to follow that

10   process.

11        It's -- you heard from Dr. Johnson where Dr. Johnson

12   talked about different concepts being in the prior art.  He

13   talked about ZigBee being in the prior art or WiFi or smart

14   home.  That isn't enough.  You have to find, first of all,

15   on an element-by-element basis.  You have to take those

16   individual paragraphs and find that each of those was in the

17   prior art.  And if it isn't all in one reference and you

18   have to go to a different reference, you have to follow

19   these guidelines and instructions on whether it would be

20   appropriate to combine those references together.

21        And recall that the HAL system, which is really the --

22   the only piece of prior art we're really dealing with -- he

23   did point to a ZigBee specification for certain claims, and

24   I'll set those to the side for now.  But you'll recall that

25   he -- this was a system, by their own admission, that they

86

1    put together.

2          So, he took multiple pieces of hardware, connected them

3    with cables and whatever software he had to load on the

4    computer to make all these things work.  Well, all of those

5    are individual components.

6          Mr. -- as Mr. Shriver testified, they didn't sell these

7    turnkey systems.  Turnkey system is something that you --

8    you buy and you hook it up and it works.  It's the complete

9    system.  They didn't sell those.

10         So, you had to have individual customers out there, or

11   in terms of the analysis as to whether something is obvious

12   or not, it had to be obvious to a person of skill -- what

13   they call a person of skill in the art, that they would have

14   put together all of these disparate pieces.

15         And Dr. Johnson didn't provide any analysis, any

16   explanation of why a person of skill in the art would have

17   gone through and pulled this type of camera in or that type

18   of camera in or hooked it up in this way.

19         And, you know, he talked about writing rules in the

20   software to make the HAL software send e-mail messages or

21   notifications to the customers.  He didn't provide you with

22   any explanation of why a person of skill in the art back in

23   the prior art timeframe would have done that.

24         Instead, you probably recall that he talked about how

25   they used the claims as the -- as the guidepost -- my

87

1    word -- the guidepost by which they tried to assemble the

2    system and then find the features.

3         Well, that's called hindsight, and that's improper

4    under the guidance for finding something obvious.  You're

5    not supposed to take the patent, look at the claims, and

6    then say can I find these claim elements in the prior art.

7    That's -- that's forbidden.  You're supposed to cast

8    yourself back in time.  It's a fictional analysis.  But

9    you're supposed to cast yourself back in time, put yourself

10   in the shoes of a person that's skilled in the art at that

11   time and say, okay, based on what I know, what would I have

12   concluded would have been obvious?  And if it isn't what's

13   in the claims, then the claims are not obvious.  That's --

14   that's part of the analysis you're going to have to do.

15        Let me talk a little bit about written description.

16   You've heard -- you've heard a fair amount about that today,

17   and then I'm going to try to cut through these other

18   questions as quickly as I can.

19        Written description -- Amazon argument -- argues that

20   the claims that we're asserting here are -- are invalid

21   because they failed to comply with what's called the written

22   description requirement.

23        And, again, this is another -- because it's an

24   invalidity challenge, they bear the burden of proving that

25   defense by clear and convincing evidence, and we've talked

88

1    about that.

2         Their position is the -- the disclosure of the patent

3    applications, the specification of the patents that have

4    issued, they don't support those claims.  And you're going

5    to be instructed on the standards for what it means to --

6    for a patent claim to not be supported by the specification

7    appropriately.

8         But I want you to remember that, you know,

9    Mr. McAlexander testified that Dr. Johnson had not performed

10   the detailed element-by-element analysis.

11        This always has to be done on an element-by-element

12   analysis, whether you're talking about infringement, whether

13   you're talking about invalidity.  You have to look at all of

14   these claim elements on an element-by-element basis.  It's

15   not enough just to look and say conceptually was -- was

16   ZigBee known or WiFi.  You have to go through the claim

17   elements.  And Dr. Johnson simply didn't do that.

18        These are excerpts from Mr. McAlexander's testimony

19   where he confirmed that.

20        And Amazon -- recall, Amazon didn't present any other

21   evidence, any other evidence about whether the claims were

22   supported or not.  It was simply Dr. Johnson going through

23   and talking about those concepts.  He didn't -- he didn't

24   put those claim elements up and explain why or where in the

25   specification there was some discrepancy.

1   You also remember -- and I think this is getting to an

2   important point.  Mr. McAlexander testified that he had

3   alternative dates where he thought that the claims from

4   these later patents that we're dealing with were supported

5   back in 2006 and 2007.  And he had an early date, which I

6   believe it was -- I think it was February 2006, and then he

7   had later dates.  One was, I think, February 2007 and the

8   third one was May of 2007.  And he talked about that in his

9   report and he talked about that on the stand.  And we -- I

10  think I was the one that asked him, you know, apply a

11  conservative -- conservative approach to your analysis.

12  Under a conservative approach, that is, giving -- you know,

13  giving the disclosure the least amount of deference, what

14  would -- what would be the date you would say that these

15  claims were supported?  And he pointed to the May 2007 --

16  the application was filed in May 2007 that issued.  I think

17  it was called the '733 patent.

18  And the reason -- his explanation, as you may recall,

19  was because that application had Figures 1 through 16 at

20  least in them.  And Figure 16, we've shown you that figure

21  on the -- on the board several times in the course of this

22  case.  But in his view, Figure 16 is -- if you had to pick

23  one figure, it's the best overall description pictorially of

24  the claimed -- I'm sorry -- the invented system, describes

25  the different pieces of that whole system.

1          And he said, well, Figures 1 through 16, those were in

2     that May 2007 application, so certainly by that point -- I'm

3     giving Amazon's arguments maximum credit -- by May 2007 it

4     was disclosed to the Patent Office.

5               THE COURTROOM DEPUTY:  You have ten minutes.

6               MR. JACKSON:  Thank you.

7          But one thing I want you to know when you look at that

8     exhibit -- and you'll have that back in the -- in the jury

9     room, that patent, it's the '733 patent.  The patent number

10    is up here at the top.  You'll see it's filed May 22, 2007,

11    but I also want you to notice -- and this is in -- on the

12    face page of the patent.  On the left-hand column it talks

13    about whether it relates back or claims the benefit of other

14    applications.

15         And you'll notice here at the bottom it also claims the

16    benefit of this thing called the provisional application

17    Number 60/899,037 filed on February 2, 2007.

18         And I tell you that because that February 2, 2000 (sic)

19    date, that's an important date.  And I'm going to ask you to

20    remember it.  Please remember February 2, 2007, because when

21    you're asked to determine whether the claims that are

22    asserted here comply with the written description

23    requirement, you're going to be given two dates in that jury

24    instruction.  One is the August -- I think it's 10 -- 2006

25    date that Amazon has focused on.  The other is the February

1    2, 2007 date.

2         This application that Mr. McAlexander testified fully

3    disclosed those invention claims benefit back to that

4    February 2, 2007 date.  So, please remember that.

5         Going back to -- this is the verdict form that you're

6    going to be asked to fill out.  And if you agree with

7    Innovation that -- that Amazon has failed to meet its burden

8    of proving these claims invalid, you're going to check these

9    boxes "no" for each of the claims.

10        I'm going to, again, go quickly to the next question,

11   patent eligibility.  This is the form that you're going to

12   be asked to -- to fill out for patent eligibility.  And I

13   want you to note up here at the very top, above that line,

14   it says:  This question relates to patent eligibility and is

15   unrelated to Question 2, invalidity.

16        This question you're going to be asked to decide, but I

17   want you to keep in mind it is unrelated to the question you

18   just answered in Question 2.  It does not relate to

19   invalidity under Question 2.

20        And I'm just afraid that -- that because of the

21   testimony that's been given, there may be confusion when you

22   get back in the jury room about whether the question that

23   you're going to be asked to decide under Question 3 relates

24   to validity or not.  And I'm telling you it does not, and

25   you'll get the jury instructions that I think will make that

1    clear.

2        This question is whether a particular claim element

3    individually or as an ordered combination -- and that's a

4    fancy word for saying the claim as a whole -- whether those

5    things were well-known, routine, and conventional.  And I

6    want to emphasize that again.  It's well-known, routine, and

7    conventional, not or conventional.

8        You're going to be deciding this question, because

9    there may be other issues that Judge Mazzant has to decide

10   and you're providing your -- your determination on this

11   particular issue, but it does not relate to invalidity.

12       And I think you will hopefully remember

13   Mr. McAlexander's testimony about whether things were

14   well-known, routine, or not.  And his testimony was that

15   these things were not well-known, routine, and conventional.

16       You'll see in the patents there will be references to

17   certain things that -- it will say such-and-such is

18   conventional.  But the standard is, is it well-known,

19   routine and conventional.  It's got to be all three.  And I

20   analogize it to be, you know, something that's well-known in

21   whatever the particular subject matter area is.  Some things

22   may be, but you get to find that all of them are.

23       So, again, going back to the verdict form, if you agree

24   with Innovation that Amazon has failed to prove -- and

25   they've got to prove this, again, by clear and convincing

93

1    evidence.  If they fail to prove it by clear and convincing

2    evidence and you agree with Innovation, you will answer no,

3    that Amazon has not shown that these claims constitute

4    nothing more than well-known, routine, or -- and

5    conventional elements.

6        So, let me move to damages, and I'm going to have to

7    short-circuit this a little bit, and I think I can do that

8    because of the testimony of Dr. Ikizler today.  I listened

9    to his testimony today, and I'll be totally honest with you.

10   I am not the expert on the damages in this case, but his

11   testimony today cleared up a lot of issues that I, honestly,

12   had questions about, where the evidence was exactly.  And I

13   thought he did an excellent job of clarifying that not only

14   in response to Mr. Berquist's questions but also in response

15   to Mr. Dacus's questions.

16       So, this is the question you're going to be asked:

17   What sum of money, if paid today, do you find Innovation

18   Sciences has proven, by a preponderance of the evidence,

19   would fairly and reasonably compensate Innovation Sciences

20   for Amazon's infringement?

21       There is a lot of stuff packed in there.  One of them

22   is the preponderance of the evidence standard.  And, again,

23   you have to look at the evidence and say at least by the

24   slight weight of the evidence, which side has prevailed in

25   proving -- in proving the damages.

1        You'll write in a number.  If you get to this question,

2  if you've found that, you know, a claim is valid -- at least

3  one claim is valid and at least one claim is infringed, you

4  will be asked to determine damages.  And in this blank you

5  will simply write in the number that you feel the evidence

6  has proven.

7            THE COURTROOM DEPUTY:  You have five minutes.

8            MR. JACKSON:  Thank you.

9        We talked about the preponderance of the evidence

10  standard, a feather.

11      I want to try to touch a little bit on Amazon's

12  business model.  We talked about this.  You've heard this.

13  Their goal is to get customers in the door, get them

14  involved in the Amazon ecosystem so that they -- their view

15  is long-term.  They are not looking at whether we make a ton

16  of profit on the products sold today.  They would rather

17  have the long-term profits down the road, and that's why

18  they view the profitability of products they sell today with

19  an eye on the future.

20      And this is something that Dr. Ikizler talked about.

21  He referred to the DSI, the DEV.  There are different --

22  different ways of looking at the profitability, but all of

23  it referred to this concept that there is going to be

24  downstream profits Amazon receives as a result of selling a

25  product today.

1    And, so, the product today they may sell at very little

2  or even a loss -- very little profit or even a loss.  But

3  that's not their goal.  Their goal is to look down the line

4  for the long-term and see whether they are going to make

5  profit in the long-run.  And that's why when they look at --

6  when they assess whether they want to introduce a product

7  into the market or not, in that BRD document you've heard so

8  much about, they assess that long-term profitability.  And

9  if the numbers work out so that they've met whatever

10  threshold profit it is long-term, that's one of the factors,

11  they will decide to go forward with that product and

12  introduce that product.

13    So, I'm going to skip ahead a little bit here.  Let me

14  try to clear this off the screen.

15    You heard from Dr. Ikizler.  He talked about customer

16  demand for smart home products.  And I'm not going to

17  reiterate all of his comments today, but you heard those

18  earlier today about how he did that analysis.

19    I mentioned the BRD a moment ago.  Well, in part of

20  Amazon's assessment of whether to introduce a product or not

21  is whether the product is going to help them differentiate

22  themselves and their products from their competitors.  Smart

23  home is one of those criteria.  In fact, this section --

24  you'll see at the top it says top 3 to 5 differentiators

25  plus customer benefits.  Smart home makes that list.

1      This was the e-mail you've heard about.  I'm not going

2  to go through it in great detail, but this was the

3  congratulations, they hit milestones for their smart home

4  products, getting customers engaged on a smart home basis.

5  It's important to Amazon.  It's important to Amazon.

6      This is a timeline, and I show you this complete

7  timeline which has a lot of information on it.  But the

8  point I want to make with this timeline is that since Amazon

9  first introduced the home automation skills that allow smart

10 home to actually work --

11            THE COURTROOM DEPUTY:  Two minutes.

12            MR. JACKSON:  Thank you.

13      -- they introduced 22 products.  All 22 of those

14 products Mr. McAlexander analyzed and found to be

15 infringing.

16      You've heard about the sales -- total sales of the

17 accused products.  Dr. Ikizler went through that.

18 $4.7 billion and that's just from these dates coming

19 forward.

20      These products are hugely successful.  This is from

21 Amazon's own documentation.  To say that these products are

22 not important or not successful is simply denying reality.

23      Dr. Ikizler, you've now heard from him a couple of

24 times.  Well-qualified.  Well-qualified to provide the

25 statistical and economic analysis that he's provided to you.

1        Amazon's own documents -- and on the left-hand side is

2    testimony from -- I believe this was from Mr. Matsumoto

3    about what DSI means, and he talked about this downstream

4    profit that they are going to receive.  This on the

5    right-hand side is an excerpt from one of their BRDs where

6    they are doing the calculation.  And you'll see the $9.37 is

7    how much they expect to make in profit from the sale -- from

8    the immediate sale of that product, but the three-year

9    DSI -- this is at line 10 -- three-year DSI, in three years

10   they expect to receive an additional $76 in profit because

11   that product was sold. And, so, when they assess the

12   profitability of that product, Amazon says total profit --

13   this is line 11 -- $85.81.

14       Causally tied.  This is important.  There was a dispute

15   between our expert and Amazon's expert as to whether that

16   profit, that downstream profit, is tied to the sale of the

17   accused product.  This is from Amazon's own document.  Their

18   assessment is that those downstream sales are, in fact,

19   causally tied.  That is, one thing causes the other.  The

20   sale of the accused product causes that additional profit to

21   be received.

22            THE COURTROOM DEPUTY:  Your time is up.

23            MR. JACKSON:  May I have another five to be deducted?

24            THE COURT:  Oh, of course, yes.

25            MR. JACKSON:  Thank you, Your Honor.

1        So, this is -- this is different.  So, you talk -- I

2   showed you the slide about the $4.7 billion.  That was the

3   revenue of the accused products.  This slide is showing you

4   the $2.4 billion in downstream profits that Amazon expects

5   to make from -- based on the sales of the accused products.

6   Mr. -- actually, Dr. Magee and Mr. Ikizler -- I think this

7   analysis here is GP 13 -- Georgia-Pacific Factor 13, I think

8   was Dr. Ikizler's analysis.  I may be wrong on that.

9        Someone will correct me, I'm sure.

10       But they -- they analyzed the -- this is the

11  apportionment methodology, which you've heard a lot about.

12  There is a lot of debate over that.  And this is the

13  apportionment methodology in particular that Dr. Ikizler

14  talked about, how he looked at the BRDs, that is, the

15  feature sets that Amazon used to consider whether to

16  introduce the products or not.

17       So, these were the features that they were interested

18  in, and he went through and he analyzed those feature sets

19  that they determined should be in the products and allocated

20  a percentage of those features to the smart home technology.

21  And, again, this is using the Amazon BRD.

22       He also did the Amazon customer reviews.  So, these are

23  reviews that -- that are provided to Amazon.  This is --

24  this is separate from the expert's analysis, which is down

25  below, but -- so, these are actually reviews that are

1  provided to Amazon.  And, again, he did the analysis about

2  what percentage of those reviews related to the smart home.

3       Down below -- I'm going to touch on this quickly.  This

4  was the -- Dr. Simonson's supplemental report -- I'm sorry.

5  This is Dr. Ikizler's supplemental report where he analyzed

6  Dr. Simonson's survey results of 944 participants, where he

7  concluded that between 10 and 12 percent of the respondents

8  valued and sought the smart home technology in the Amazon

9  products.

10      So, the result.  Profitability times the apportionment,

11 that's how he -- that's how the -- Dr. Magee and Dr. Ikizler

12 come up with the damages in this case.

13      And, so, they took a range.  They took, on the high

14 end -- just to take the -- they took the largest number, and

15 that's the one in green, 10.6 percent of the apportioned

16 profits, and for the Fire HD 10, it was -- that was the low

17 of 2.4 percent, and they did that for the three products,

18 came up with these ranges.

19      And then Dr. Magee took those ranges and came up with

20 the average apportioned profit, which was 6.4 percent.  He

21 then applied the Georgia-Pacific factors to adjust those

22 numbers; that is, he looked at all the evidence, he went

23 through the different factors that he's supposed to

24 consider, and adjusted those numbers downward, and ended up

25 for the Echo products at a 2.5 percent royalty rate and the

1    Fire products at 2.0 percent.

2        And when you include the total number of sales and --

3    and do the math, that works out to be the equivalent of

4    2.1 percent royalty rate for all accused products.  And,

5    again, that -- that is the $100.7 million.

6        They also importantly determined that it was a running

7    royalty analysis, not a lump sum.  So, one of the questions

8    you're going to be asked to decide is whether the amount of

9    money -- if you get to this question -- whether the amount

10   of money that you're awarding is a royalty or it's a lump

11   sum.  In other words, if it's a lump sum, Amazon has paid

12   everything it ever has to pay for these patents.  If it's a

13   royalty, they pay on a product-by-product basis.  That's the

14   way you're calculating it from the past.  That's the way

15   you've done the analysis, did you look at it as being one

16   lump sum or did you look at it as being a royalty.

17       And if you followed Dr. Ikizler and Dr. Magee's

18   analysis, you will conclude that it's a -- it's a royalty.

19       What are we talking about in terms of -- you know, a

20   hundred million dollars sounds like a huge number.  It

21   certainly is, certainly in my book.  But it's only

22   2.1 percent of the accused sales.  Amazon gets the

23   97.9 percent.

24       I'm going to skip the jury instructions which you'll --

25   you'll receive on whether a license is comparable or not.

1   You know our position.  The LG and Samsung licenses are not

2   comparable for a number of reasons, which were explained

3   yesterday.

4        Verdict form.  This is where you're going to write in

5   your damage amount.

6        The next question, is it a running royalty or lump sum.

7   If you follow Dr. Ikizler and Dr. Magee, it will be a

8   running royalty.

9        Willfulness.  This question is whether -- you're going

10  to be asked to determine whether Amazon's infringement --

11  assuming you find infringement -- whether Amazon's

12  infringement was willful, did they -- it's more than just

13  did they accidently infringe.  Did they essentially intend

14  to infringe once they learned about the patents, and we --

15  we presented evidence -- first of all, this is the

16  questionnaire, so you're going to be asked "yes" or "no" for

17  each of the questions.  It's a preponderance of the evidence

18  standard.

19       And then you're going to be given a jury instruction as

20  to what guidelines you're supposed to use to make that

21  determination.

22       And we presented, for example, Mr. Torok's testimony

23  here at trial where he talked about how Amazon was still

24  working to introduce additional products and intending to

25  develop newer versions of the products.

1          So, they're not changing their behavior.  They haven't

2     changed their behavior to design around the technology.  I'm

3     sure they'll tell you it's because they don't use the

4     technology, but that's a question for you to decide.  And

5     they intend to continue doing so.

6          And, so, the question is, based on the evidence you've

7     seen, does that constitute willful infringement or not?  So,

8     this will be the -- the question you'll be asked to answer.

9          And, again, if you agree with us that we think that the

10    evidence does show willful infringement, you'll answer those

11    questions "yes."  Again, this is a preponderance of the

12    evidence standard, so the feather.  Think of the feather.

13         Thank you very much.  I appreciate your time.  Thank

14    you for serving on this jury.  We -- we truly appreciate it.

15              THE COURT:  Thank you, Mr. Jackson.

16         Closing argument by Amazon, Mr. Hadden?

17              MR. HADDEN:  Good morning.  First, please don't be

18    disappointed that it's me up here.  You will hear more from

19    Mr. Dacus.  I'm going to start the discussion this morning, and

20    then Mr. Dacus will finish for us.

21         This is the first chance I've had to speak with you

22    directly, so I do want to thank you for your service.  These

23    are difficult times, and you have all made sacrifices to be

24    here, away from family and work, and we appreciate that.

25         Beyond that, I have to tell you, from your questions to

1    Judge Mazzant, you are the most engaged, attentive jury I

2    have ever had the pleasure of being in front of.  You are

3    thinking hard about the issues in this case.  And to me and

4    to Amazon, that's all we can ask.  I appreciate that.

5         Now, our patent system, the purpose for our patent

6    system -- and it is our patent system.  It's owned by the

7    citizens, you and me.  The purpose of our patent system is

8    not to print patents.  It's not to print lottery tickets.

9    It's not to generate lawsuits.  Our patent system has a very

10   specific purpose --

11        We need to switch.  Thank you.

12        The patent system has a very specific purpose, and it

13   goes back to the founding of our country, and you may

14   remember this from the patent video.  The specific purpose

15   of our patent system is to promote progress of science and

16   useful arts.

17        "Useful arts" is kind of an old-fashioned phrase.

18   Today we would say "technology."  But the sole purpose and

19   the only reason that the founders of this country came up

20   with the idea of having patents was to promote science and

21   technology.

22        So, that basic fundamental purpose, I think, is a

23   critical lens for you to use to view the evidence and facts

24   in this case.

25        So, what are those facts?  Well, we really have two

1    timelines.  The first timeline begins in 1994 when

2    Mr. Bezos, in that garage you saw, had the idea of selling

3    books online, a wild idea at the time when the Internet was

4    just starting, an idea that proved hugely successful.  And

5    you know that Amazon became what Amazon is today, probably

6    the leading technology company in the world.

7        The next point on our timeline involves Mr. Shriver.

8    Unfortunately, Mr. Shriver couldn't be here to testify.  But

9    in 1997 he founded his own business, Home Automation Living.

10   And he had sold an earlier business that involved automating

11   news television stations, and he decided he was going to do

12   another business and start again, automating homes.  And he

13   built what I think is a remarkable product, and you saw it

14   demonstrated both on the Oprah Winfrey Show and through

15   various videos.

16       And he built that product himself.  He didn't just draw

17   pictures on paper.  He went to work.  He wrote software

18   code.  He created a product.  He worked with the sellers of

19   those components, those cameras and smart light bulbs and

20   switches so that they would inter-operate with the software

21   that he was selling his customers.

22       And as you heard in his video deposition, he did

23   everything, right?  He was the CEO.  He was writing the

24   software.  He was answering the phones, answering the

25   customers' questions.  That's what people who are running

1    their own business have to do, and he did it.  And his

2    company succeeded.

3        And he had an invention.  You saw the invention.  It

4    was in the box that Professor Johnson held up.  It was an

5    invention that was being used by real people in the real

6    world to improve their lives.

7        Now, Mr. Shriver chose not to file patents on his

8    invention.  That doesn't mean he didn't have an invention.

9    He had an invention.  It was widely known.  It was

10   successful, as you saw it featured on the Oprah Winfrey Show

11   in 2000.  It was a real thing.  It wasn't drawings on paper.

12   He built it.  It was an invention.  He had it.

13       Now we skip forward to 2011.  By that point Mr. Torok,

14   who is working as a software engineer at Amazon -- as you

15   heard, he had been working on this incredibly complicated

16   software that would tell you when your package would be

17   delivered within, you know, the range of minutes and doing

18   it, you know, millions of times a minute for every customer

19   at Amazon.  That's what he had been doing.

20       And in 2011 he gets approached to join a secret team to

21   develop a new product at Amazon, and when he joins that

22   team, he is the seventh member of the team.  And what is the

23   project?  It's almost ludicrously ambitious.  Right?  To

24   build a smart speaker that you can talk to and that would

25   intelligently respond to what you said.  That was the goal.

1    As Mr. Torok said, it sounded like something from Star Trek.

2    So, what did he say?  Of course I want to do that.

3        So, he joined the team, and they worked very hard.

4    Right?  And one of the first things they figured out was

5    that to do that, to build that intelligent speaker that you

6    could talk to and that would respond back, the intelligence

7    couldn't be in the device.  It was just -- it would be

8    impossible.  The intelligence would have to be in the cloud

9    on those thousands of servers running that artificial

10   intelligence technology that he and his colleagues were to

11   develop.

12       So, the key insight was there had to be a division of

13   labor.  The device itself, as he explained, had to be dumb.

14   It just had to have good ears.  And they developed a device

15   that did just that.  So, some of his colleagues worked on

16   the ears, right?  That is that array of microphones that you

17   heard discussed that would sense who was talking in the room

18   and point their ears, the microphones, at that person.  So,

19   the only thing the device would have to do to have good ears

20   would be to hear what the person who was intending to speak

21   to the device said, and listen for that wake word, "Alexa",

22   so it could wake up and start listening.  That's what the

23   device did.

24       And the beauty of that design was that all of the

25   intelligence being in the cloud, the device could stay the

1    same and the service could continue to grow.

2         And at first none of this worked, of course, because it

3    was hard.  But they worked and the engineers who were

4    developing the ears got the microphones to work better and

5    the engineers who were working with Mr. Torok developing the

6    brain got those neural networks to work better, after

7    millions of hours of training.

8         Mr. Torok himself wrote the orchestrator, the thing

9    that held it all together, this DEESOS that would allow the

10   information, the audio signals coming up from all those

11   millions of devices to be properly routed through that

12   automated speech recognition, natural language understanding

13   technology that his colleagues were developing, so it

14   ultimately sent the right skill to handle the request.

15        So, they worked and they worked.  Thousands -- hundreds

16   at first and then thousands of the world's leading

17   scientists and engineers joined their project; and by

18   November 6, 2014, they launched Alexa and the first Echo

19   product.

20        And if you just stop and think about it, was there ever

21   even a thing called a smart speaker before then?  There

22   wasn't.  Mr. Torok and his colleagues created an entirely

23   new category of product that we now almost take for granted.

24        But in 2011, it was a pipe dream, right?  It was Star

25   Trek, but they made it happen.

1    And they didn't stop there.  They continued.  How can

2    we make it better?  So, in 2015 -- between 2014 and 2015

3    Mr. Torok joined the smart home team.  And the idea was --

4    of course, Amazon didn't invent smart home technology.  As

5    we saw from Professor Johnson, you could say it goes back to

6    the 1960s and Mr. Sutherland in the basement with a giant

7    computer.

8    But as Mr. Torok explained, smart home technology that

9    you have to control with your phone, right?  If you have to

10   take your phone out, pick an app, slide a button, that's not

11   really any easier than getting up and flipping the switch.

12   The benefit, the magic of a smart home, is that you can have

13   things happen based on what you say.

14   And it's interesting, right?  Mr. Shriver had the same

15   insight, right?  Back in 1997.  And we saw those three

16   videos where he could say turn on the light, Rosy, or -- he

17   even had one where he started his car.  Start my Suburban,

18   Rosy.  So, he had the same basic idea that if you're going

19   to make smart homes useful and appealing and something that

20   people are really going to want in their home, it has to be

21   controlled by your voice.

22   Mr. Torok didn't just have that naked idea, right?  Not

23   just the idea that, gee whiz, it would be cool to do it with

24   my voice.  He had a specific solution for making that work

25   in the context of the entire Alexa system that he and his

1    colleagues had developed.

2         In fact, he filed a patent on it, and as we heard from

3    Mr. Torok, this is just one of his 16 or 17 -- I forgot how

4    many puzzle pieces he has, but he has on that order of

5    patents, and he got them all by working for Amazon.

6         The important thing about this patent is that it

7    describes exactly what IS is accusing in this case.  So,

8    what does this patent describe?  It describes speaking a

9    command, like turn on the desk lamp.  Having that be

10   received by a product, like an Echo, that can hear what you

11   say, having that video -- or that audio recording your voice

12   sent up through these arrows to this cloud where first --

13   and I have the order wrong here -- but first, it is received

14   by this orchestrater component 126.

15        Now, that is the DEESOS, that funny-named system that

16   Mr. Torok worked on when he first joined Alexa.  That is his

17   DEESOS solution, the orchestra.

18        So, it receives the recorded sound wave.  It then sends

19   it to this box, speech processing module.  And that is the

20   combination of that automatic speech recognition and natural

21   language understanding software that Mr. Torok told you

22   about.  That's where Alexa figures out the words that you

23   said and what you meant by them, what your intent was.

24        And then the system is -- in his invention would send

25   them to this thing that is described in the patent as the

1   secondary device drivers.  And if you heard Mr. Torok when

2   he testified, he said that was internal -- the technical

3   name he used to describe what later became skills.

4        So, the idea that Mr. Torok had and that the Patent

5   Office granted him a patent on was exactly this idea where

6   you have a device that records the sound of the user's

7   voice, it sends it over the Internet to a cloud where the

8   sounds are interpreted by first the automatic speech

9   recognition and then the natural language understanding to

10  determine what the user wants, right?

11       What the user wants is not determined at the device.

12  The device can't do that.  It's just the ears.  It's

13  determined in the cloud.

14       And then once what the user wants is determined, it's

15  handed off to something else, and that is this secondary

16  device driver or skill.  And the reason for doing that is

17  Alexa is really good at understanding what you said.  That's

18  what all of those scientists were working on.  But when it

19  comes to turning on a light, or delivering a pizza, or

20  getting you a ride or all the now hundreds of thousands of

21  things that you can do using Alexa, Amazon is not the expert

22  on that.  Right?

23       If you want to turn on a light to go to your Philips

24  light, Philips knows how to do that.  So, the system would

25  send the intent, what the user wants, to the person who is

 1    best able to fulfill it.  And if it's turning on a Philips

 2    light, that would be Philips.  If it's ordering --

 3    delivering a pizza, that may be Domino's.  But that was the

 4    beauty of the system.  All the device has to do is record

 5    your voice and send it off.  Alexa does the hard work of

 6    figuring out what you said and what you want, and then the

 7    person, the company that can do what you want does it.

 8         And that idea has allowed Alexa to grow exponentially.

 9    So, as Mr. Torok explained, there are now over a hundred

10    thousand skills offered for free, and Amazon allows all

11    these companies to use all of that Alexa artificial

12    intelligence to understand what the users said and what they

13    want.  And they just pass that intent on to these other

14    companies who can do what the users want.

15         So if you want Elmo to read your child a bedtime story,

16    you can.  Amazon doesn't read the bedtime story; Sesame

17    Street does.  Or if you want to hear the weather, the

18    Weather Channel will give you the weather.  Amazon doesn't

19    know the weather; the Weather Channel does. So, that is the

20    beauty of the system that Mr. Torok and his colleagues

21    developed and invented.

22         And to be clear, to go back to the patent, this is the

23    patent that Mr. Torok got.  The Patent Office allowed that

24    patent covering this very invention that is being accused in

25    this case.  They allowed that patent and issued it to Amazon

1    over the very same patent applications that were in the

2    Patent Office that they were aware of from Anne Wong.

3        The Patent Office looked at Anne Wong's disclosures.

4    They looked at Figure 16.  They looked at all of that that

5    you've seen and said, no, that is not Mr. Torok's invention.

6    So, Mr. Torok got his patent.

7        As we said, that is, I think, one of 16 patents.

8    Amazon altogether has gotten over 400 patents on Alexa.  And

9    importantly, we're not the ones who are bringing people into

10   court.  Mr. Torok hasn't sued anybody's patents.  Amazon has

11   never sued anybody on any of those 400 patents.  In fact,

12   Amazon hasn't sued anybody on a patent in over 20 years.

13   Amazon gets its patents to protect the innovations of its

14   engineers.

15       The other thing Amazon does is to publish the results

16   that its engineers discover.  All right.  So, let's go back.

17   What is the purpose of the patent system?  It's to put --

18   expand our knowledge, improve our technology.  Amazon did

19   that.  They did that by developing truly remarkable

20   technology.  They got 400 patents on it.  Those patents

21   describe in detail, as Mr. Torok's patent did, their

22   specific solutions that move technology forward.

23       In addition to that, they publish hundreds and hundreds

24   of cutting-edge research papers on the technology and the

25   lessons they've learned.  And they do that so that other

1  companies, other universities can use that information and

2  build farther.

3      So, that's one timeline.  Let's look at the second

4  timeline.

5      The second timeline begins in December 10th, 2005, when

6  Anne Wong sends an e-mail to her brother Ronald attaching a

7  draft patent -- diaper patent.  And this is the figure,

8  right?  And the idea is simple enough.  You have some

9  detector in the diaper.  When the baby wets the diaper, this

10 detector notices it, sends this lightning bolt to this

11 little box with an antenna.  The little box with the antenna

12 sends a notification to the computer.  And, aha, the

13 caregiver learns that the diaper is wet.  That was an

14 invention.  Three boxes, four arrows, and a cartoon.

15     And does -- what does the e-mail say?  It's probably as

16 interesting as the patent.  The e-mail says:  Shall we file

17 now?  Or when?  We can file provisionals, one patent in a

18 series one year adding new features.

19     So, what was the idea?  They file a patent to try to

20 get their stake in the sand saying this is the date I

21 invented everything, and then they add to it.

22     And how did they add to it?  Well, we know that, too,

23 from another e-mail.  They add to it by looking at what

24 other companies are actually doing.

25     So, here's an e-mail from Ronald Wang to Anne Wong and

1    their collaborator.  And it says:  Think about hardly how to

2    make our payment method patentable based on the current

3    markets of Google, eBay, Chase Paymentech, et cetera.

4         So, look at what companies like Google, eBay, and Chase

5    are currently doing and see if we can add that to our

6    patent.

7         And, in fact, that's exactly what they did.  So,

8    August 10th, 2006, they file an updated version of their

9    diaper patent, and this is Defendant's 162.  And we haven't

10   talked a lot about the payment idea in this patent, but if

11   you look at Figure 4 when you are in the jury room, you will

12   see that, true to their promise, they looked at what the

13   payment companies were doing and added a chunk of the patent

14   about payment technology.  They looked at what people were

15   doing, they added it to their patent, and they filed it.

16        And then they started suing people.  So, they sued

17   Samsung, and you saw the settlement.  There was a license.

18   Samsung, a Korean company, paid a relatively small amount to

19   get rid of that litigation.

20        And then Anne Wong starts watching what Amazon was

21   doing.  She buys a Fire Stick.  She gets an e-mail from

22   Amazon announcing that the Fire Stick will now be supporting

23   Alexa.  It's got a -- another description of the Echo.  And,

24   so, she moves on.

25        She files another lawsuit against another Korean

115

1  company, LG.  That lawsuit settles for much less than the

2  cost of what these lawsuits cost to litigate.

3      And after she learns about the Echo and the ability to

4  use Alexa with a Fire TV, she files three more patents, in

5  2016, 2017, and 2017.

6      Now -- and then she comes to court and sues Amazon

7  asking for a hundred million dollars.

8      Now, if you look at this picture, and if you put it

9  next to the other timeline, you will see what I think

10 everyone, including during jury selection, recognized.  How

11 can you possibly file a patent in 2016 and 2017 that covers

12 a product that was in the market in 2014?  So, that posed a

13 problem.

14     So, what they did -- and they didn't do this in front

15 of the Patent Office.  Anne Wong did not tell the Patent

16 Office when she filed these patents in 2017 that I'm really

17 claiming an invention that I described back in 2006.  She

18 made that claim for the first time in this courthouse in

19 front of you, and you saw it in the opening slides.  They

20 put up that date, that August 10th, 2006 date, and said

21 that's her invention.  That claim had never been made in the

22 Patent Office; it was made to you.

23     The other thing that you should note is during this, I

24 guess, 13-year period between the first diaper patent

25 drawing and this lawsuit, Anne Wong and her company did not

1   make any products.  They did not provide any services.  They

2   did not have any customers.  They did not publish any

3   technical articles.  They did nothing but file patent after

4   patent and lawsuit after lawsuit.

5        So, the question is, can you do that?  Can you really

6   do that?  Can you watch what other companies are doing,

7   companies that were investing lots of money, millions of

8   hours developing cutting-edge products, file a patent on it,

9   and then claim a hundred million dollars?  Well, you can't,

10  luckily, and you can't for at least three reasons.

11       The first reason is if you're going to try to do that,

12  you've got to show clearly that you really had your

13  invention, you really had the claims you're asserting back

14  when you put your stake in the sand, when you had that

15  priority date of August 10th, 2006.

16       And just to be clear, you will see in the jury

17  instruction that that August 10th, 2006 date is the priority

18  date that is being claimed in this case.

19       So, you heard some talk from Mr. McAlexander about a

20  May 2000 application.  None of that matters.  Whatever is in

21  that May date patent doesn't matter.  The only thing that

22  matters and the only question is whether this August 10th,

23  2006 priority application or -- and we'll get to this --

24  they mention now another date, February 2006.  But we'll get

25  to that.

1          So, let's start with the August 10th, 2006, patent

2    application.  Now, you heard Mr. McAlexander just yesterday

3    on the stand testifying about this and he couldn't have been

4    clearer.

5          Is there any description of a video decompressing or

6    encoding in this document?  No.

7          So, that was their stake in the sand document.  It has

8    to have everything that the claims require.  Every claim

9    that is asserted in this case requires decoding some signal,

10   encoding some signal, decompressing a signal.  All of these

11   claims require it.  Most of them are specific that it has to

12   be a video signal.  But whether it's video or audio, the

13   words "decompressing" or "decoding" do not appear in that

14   2006 application.

15         Other of the claims in this case require this

16   management control system.  That was that thing you saw in

17   Figure 16.  Again, Figure 16 is not in this patent, and as

18   Mr. McAlexander acknowledged, there is no management control

19   system anywhere in this patent.  That was added later,

20   another one of the things they added later.

21         Professor Johnson went through this in detail.  It is

22   kind of visually obvious here.  There are eight figures in

23   the August 2006 patent.  The patents they are asserting now

24   where they say are 32 figures or 33 figures, they don't

25   match up.

1        And as Professor Johnson explained, right, these

2   patents are this combination.  They have this video

3   processing chunk.  They have this updated status chunk that

4   came from the diaper patent.  The whole top half of the

5   claim, the video part, is nowhere described in that

6   August 10th, 2006 diaper patent.

7        And you will see when you get the Court's instructions

8   that the written description requirement is a strenuous one,

9   right?  The question is not whether you had a wish or plan

10  for including the claimed inventions.  You have to

11  adequately describe it, and that means that the

12  specifications must describe the full scope of the claimed

13  invention, including each element thereof, either expressly

14  or inherently.

15       Mr. McAlexander admitted yesterday on the stand that's

16  not the case.

17       Now, I mentioned this February 2nd, 2007 application.

18  So, when you get the Court's written description

19  requirement, you will see that there are two dates.  The

20  first date is the priority date, this August 10th, 2006

21  application, which the Plaintiff put up on their opening

22  slide and which we talked about extensively.

23       The second date is February 2nd, 2007, and that states

24  a provisional application.  That's not a real patent

25  application.  It's what you can file before you file a real

1    one.  You have never seen that provisional application.  IS

2    never showed it to you.

3         The priority date is 2006.  We dealt with that

4    application.

5         But that February 2nd, 2007, application is not in

6    evidence.  You will not see it.  You have never seen it.

7    Mr. McAlexander didn't show it to you.

8         What Mr. McAlexander showed to you and talked about was

9    another application from May 22nd, 2007.  That application

10   doesn't matter.  You can't -- even if it had the invention,

11   you can't look at that for the required written description,

12   as the Court will tell you.

13        So, when you get to the question -- and this is a

14   crucial question, right?  Written description sounds like a

15   technical term, but think about what it means.  It means did

16   Anne Wong have the invention in her possession back when she

17   filed that initial diaper application, or did she add to it

18   after that date.  Did she enhance it after seeing what other

19   companies, like Amazon, were doing and after she saw that

20   the Echo was in the market and that the Alexa service was in

21   the market and that customers could now use Alexa to control

22   their smart home devices?  Did she add -- did she change her

23   claims in any way after that date?

24        Because if she did, her patents are invalid.  And

25   they're not invalid because of anything the Patent Office

120

1    did wrong.   The Patent Office may have done everything

2    right.   They are invalid because of the position she has

3    taken in this litigation to claim that, in fact, her

4    inventions go back farther than they actually do.

5         That will be for you to decide.

6         Now, the other reason why what is happening here is not

7    allowed by the law and it cannot happen is that even in 2016

8    and 2017 when Anne Wong filed the new patents with the new

9    claims, she could only put together the building blocks of

10   what she had described in some of those other applications

11   that she had filed between 2006 and 2017.   And nowhere in

12   any of those applications did she describe anything that

13   looks like Alexa.

14        So, what did she describe?   Well, we had the diaper

15   patent and then we had this video conversion patent that

16   Mr. -- Professor Johnson talked about.   And, so, her final

17   claims are this kind of weird munging of video conversion

18   with this diaper status update idea.   And she put those

19   together, but that doesn't get you Alexa.

20        And the fundamental reason why it doesn't get you Alexa

21   is that the defining feature of Alexa is understanding what

22   you say and doing something in response.

23        But as even IS and Mr. McAlexander acknowledge, there

24   is no description of that technology in her patents.   Right?

25   They tell you over and over again, they have -- there is no

1    voice technology in these patents.  They didn't claim any

2    speech recognition technology.  They didn't claim any

3    natural language understanding technology.  They didn't

4    claim any artificial intelligence technology, because Anne

5    Wong didn't have any of that and she didn't describe it in

6    her patent.

7         But the truly bizarre thing, to me, about this case is

8    that that is what they are accusing.  They are accusing your

9    ability to say something to an Echo or other device and have

10   the device recognize the wake word "Alexa" and send what you

11   said, the recording of that sound, off to the cloud to do

12   something with it.  And that -- those steps are nowhere in

13   any of her patents.

14        Now, Mr. McAlexander got up here and said the claims

15   define the claims.  It doesn't matter what the invention is.

16   Well, ladies and gentlemen, does that make sense?  Patents

17   are about inventions.  You can claim what you invented.  You

18   can't claim anything else.  And she did not invent what she

19   is accusing in this case, because it is all about your

20   voice.  There is nothing in these patents about your voice.

21        As Mr. Torok explained, the Echo, Fire TV, the Fire

22   Tablet, the way they interact with Alexa is that they are

23   Alexa's ears.  There's no ears in her patent.  There's no

24   need for ears in any of her patents because none of her

25   patents are aimed at the problem that Alexa solves, which is

1   understanding what you said and interpreting it and doing

2   what you asked.

3       And this is Mr. Torok explaining a major point, that

4   these devices are not the brains; they are the ears.

5       Now, Mr. McAlexander talked a lot about these devices

6   are configured to do this or configured to do that.  But, in

7   fact, as we heard, Mr. McAlexander did not even bother to

8   look at the computer code in these devices to see what they

9   are actually configured to do.  You can't understand what a

10  product that has a processor like a Echo or a Fire TV is by

11  taking off the lid.  That's like saying I can take off the

12  back of my television and now I understand how it works.

13  No.  You have to look at the source code, the software that

14  actually causes the device to do what it does.

15      Mr. McAlexander did not even bother to try.

16      So, what do the devices do?  Well, as we heard, what

17  the devices do are very simple.  They listen for the wake

18  word "Alexa."  They record what you say after that word.

19  They digitize it, and they send it out over WiFi to your

20  router.  That, as far as what is accused in this case, is

21  all the devices do.

22      And it doesn't fit the claim for the very basic reason.

23  If you look at this Element F that we've talked a lot about,

24  it requires that one thing is done in connection with

25  another thing.  And the first thing, the thing that is done,

1    is sending your recorded voice over WiFi.  That is what

2    Mr. McAlexander says is the communication, through the

3    network communication channel, information for managing an

4    item status of an item.  That is, sending your recorded

5    voice, what you say after the word "Alexa" over WiFi.

6    Right?

7        But it is undisputed that that was not done in

8    connection with a short-range wireless communication

9    regarding an updated status of the item.  It is undisputed

10   that your voice is only sent to the cloud in connection with

11   one of two things.  If you have an Echo, it is when you say

12   the word "Alexa."  If you have a Fire TV Stick, it is when

13   you push the microphone button.  Nothing else.

14       Professor Johnson explained this, right?  I asked him,

15   if what you say is correct, that when the Echo sends your

16   recorded voice, it is only in connection with the wake word

17   and not a short-range wireless communication.  Can the jury

18   find, just based on that one fact alone, that none of these

19   patents are infringed?

20       He said:  None of the claims in any of the asserted

21   patents would be infringed by just that one reason.

22       So, because Alexa does what it does, it acts as a pair

23   of ears, which is nowhere described in these patents.  It

24   cannot infringe.

25       And, in fact, after some wrestling, Mr. McAlexander

1    agreed.  He says:  So, when the device records yours or the

2    user's voice, digitizes it, and sends it over WiFi to the

3    wireless router, that is only done in connection with the

4    user pushing a button or saying the word "Alexa," right"?

5        And he says:  For that particular initiation, that is

6    correct.

7        Now, just think about this admission for a second.  The

8    claim requires that voice is sent in connection with a

9    short-range wireless signal.

10       Mr. McAlexander acknowledged in this testimony that

11   that is not the case, that it is only sent in connection

12   with the wake word "Alexa" or pushing the button.  So,

13   Amazon cannot infringe.

14       So, why are we still here?  Well, we're still here

15   because Mr. McAlexander did not follow the claim when he

16   testified in front of you.  So, if we start with

17   Mr. McAlexander's testimony, so, he says when he's accusing

18   all of the devices, when he's going through this particular

19   claim element for each device, he says the same thing.  He

20   says:  Information for managing an item status of an item

21   regarding an updated status of the item -- so that means

22   turn on the light -- in connection with a short-range

23   wireless communication.

24       But as you know, as the Court will instruct you and as

25   Mr. McAlexander himself acknowledged, the claim language is

1   what matters.  You have to do precisely what the claim

2   requires, right?  And what did he do?  Well, he rearranged

3   what the claim says.  So, let's look at this.

4        There are three things that are highlighted in

5   different colors.  The first one is information for managing

6   an item status of an item.  Everybody agrees that in the

7   allegations in this case that is you saying, "turn on the

8   light."

9        The next step is what it has to be in connection with,

10  and it has to be in connection with the short-range wireless

11  communication, not the wake word, not pushing the button.

12       And then that short-range wireless communication has to

13  be regarding an updated status of the item.  You have to

14  have some item status update, right?  And then you have to

15  have a short-range communication, and then you have to

16  communicate information about it.

17       What did Mr. McAlexander do?  He arrange -- rearranged

18  the pieces.  He says the information to manage the item's

19  status, which is in turn -- which is -- sorry.  Let me go

20  back.

21       He says:  Information for managing an item status of an

22  item regarding an updated status of the item.

23       But that's not what the claim says.  The "regarding an

24  updated status of the item" is a modifier of the "in

25  connection with a short-range wireless communication."  And

1    the "information for managing" is in connection with "the

2    short-range wireless communication," not the turning on the

3    light.

4         So, Mr. McAlexander just took the claim and rearranged

5    it in a different way so that he could say that the

6    communication didn't -- the communication, the user saying

7    "turn on the light" and sending it out over WiFi did not

8    have to be in connection with the short-range wireless

9    communication.  But that's exactly what the claim actually

10   says.

11        And this wasn't just one time in which Mr. McAlexander

12   made a mistake or misspoke.  He did the same thing time

13   after time after time every time he discussed this element

14   in front of the jury, in front of you.

15        So, if we look at what the claim actually says and what

16   Mr. McAlexander and Professor Johnson agreed the device

17   actually does, there cannot be any infringement.

18        The other issue that came up is this ordering, right?

19   The question is can you communicate -- going back to this

20   slide -- can you have a short-range wireless communication

21   regarding an updated status of the item if there has been no

22   updated status of the item?  Right?

23        If you think about the baby diaper again, it's very

24   simple what the logic is.  The baby wets the diaper; you

25   have an updated status.  The sensor sends a short-range

1   communication to the computer; you have a short-range

2   communication.  And then in connection with that short-range

3   communication, right, when the computer receives the signal

4   from the diaper sensor, it notifies the caregiver.

5        That logic is very clear.  It's clear from the language

6   of the claim.  It's inescapable.

7        Now, when we asked Mr. McAlexander about this statement

8   and I -- I said, right:  Wireless hub system is configured

9   to then communicate, right?  The communication has to happen

10  after the short-range wireless communication.

11       And he said:  No.  You have inserted the word "then."

12  That's not in the claim.

13       But then we looked at the sworn declaration that

14  Mr. McAlexander had submitted just a few months ago, and, in

15  fact, the language that I read him was directly out of his

16  sworn declaration explaining how this patent language works

17  and what it means.  So, he fought with me over the word

18  "then" that I had read directly out of his sworn

19  declaration.

20       And, finally, he admitted that yes, of course, that is

21  what he told the Patent Office in the sworn declaration.

22  He's trying to tell you something different, but that's what

23  he told the Patent Office.

24       Now, one of the instructions you're going to receive at

25  the end of this case is that you have to determine the

1   credibility of witnesses, and that includes expert

2   witnesses.

3        And one of the key things in determining the

4   credibility of a witness is whether or not he or she has

5   made statements at other times and places contrary to those

6   made here on the witness stand.

7        And I would offer you that that requirement takes on

8   even greater weight when those contrary statements were in a

9   sworn declaration under penalty of perjury to an office of

10  this government, of the United States Government.

11       And just to put this timing point in perspective,

12  right, the claim -- particularly when you get to claim 62

13  where the -- where it requires to communicate through the

14  network communication channel information for managing an

15  item status of an item -- again, that's the user's voice,

16  "turn on the light."  And here the claim could not be

17  clearer about the timing and causality.  It has to be based

18  on a signal regarding an updated status, right?  You cannot

19  do something based on something else that hasn't happened,

20  right?

21       And, again, Professor Johnson explained this clearly,

22  right?  What is your understanding of what it means to be

23  based on this signal regarding an updated status of the

24  item?

25       And he says:  To me, it is even more clear language

1    that, sort of, one is the consequence or result of the

2    other.

3        Sending the information for managing an item status of

4    an item is the result of, it's based on, a signal regarding

5    an updated status of the item.

6        That is common sense.  That doesn't take a professor of

7    computer science, but it's clearly correct.

8        The other thing that Mr. McAlexander has done

9    throughout this case to try to find a way to accuse these

10   products is that he has agreed on the one hand that for his

11   direct infringement claim -- and that's the claim that gets

12   to a hundred million dollars in the damages expert

13   calculation -- that these products sitting in the

14   shrink-wrapped box at Amazon, solely by themselves, have to

15   include every element of the claims.

16       But then when he goes and tries to explain how the

17   devices are configured to do all these things they actually

18   are not configured to do, he draws these diagrams, where he

19   takes the Amazon diagram and draws these lines that don't

20   exist anywhere in the diagram.  And what he is trying to

21   imply is that somehow that Echo knows or has a way to

22   connect to some Philips light bulb in somebody's house.

23       As Mr. Torok explained, that's just not the case.

24   Right?  And it's not only not the case by accident, it's not

25   the case by design.  Right?  Because the only purpose of the

1    device is to be the ears, to send what you say to the Alexa

2    Cloud.

3        If the device actually had to be configured and know

4    how to communicate with a light bulb or anything else, you

5    couldn't expand the capability of Alexa.  Right?  You

6    couldn't add those hundred thousand separate skills if every

7    time you added a new one you would have to reconfigure the

8    device.  Right?  It would be like having a remote control

9    with 100,000 different buttons on it.  It wouldn't work.  It

10   only works because the device is dumb.  It doesn't know

11   anything about those hundred thousand skills or light bulbs

12   or Domino's pizzas or anything else.  It has one very simple

13   job that it does very well, which is finding out who is

14   speaking, record their voice when you say "Alexa", and send

15   that voice over WiFi to the cloud.

16       And that -- we have to focus on what is done in that

17   box because that's what Mr. McAlexander says infringes.  So,

18   you can't reach out to the Alexa Cloud.  You can't reach out

19   to Philips or these other companies and say, oh, that's all

20   done by the device.  It's not.

21       So, this is the original document before he drew the

22   lines on it and it's very clear.  If you look at the little

23   Echo device, the only arrows that come out of it is a short

24   arrow and it says customer utterance.  That's just your

25   voice being sent over WiFi to the cloud.  But what comes

1  back is just Alexa's response to you.  There is no arrow in

2  this diagram that goes from an Echo to a light bulb.

3      Again, when I questioned him, he agreed that he has to

4  look only at what the device itself does.  We can't look at

5  what the Philips hub does or the Philips Cloud or even the

6  Alexa Cloud.  He acknowledged that.  But then when he put up

7  the diagrams in front of you, he drew lines that did exactly

8  that.  He relied on this configuration, all of which he

9  acknowledged is controlled and owned by Philips and not

10  Amazon.  Right?

11      The whole point of Mr. Torok's invention is that the

12  Echo doesn't have to know anything about this.  Amazon

13  doesn't have to know anything about this.  This is -- once

14  you get to a skill, once you've figured out what the intent

15  is, you hand it off to whoever can do it best.  That could

16  be Philips, could be Uber, it could be Domino's, it could be

17  Sesame Street.  The device doesn't know or care.

18      And, in particular, the device never knows that there

19  is a short-range wireless signal between a Philips hub and a

20  Philips bulb.  There was no reason for the device to know

21  that.  And if the device did have to know that and had to do

22  something with that information, the whole system that

23  Mr. Torok and his colleagues invented would not work.  You

24  cannot burden the Echo with that knowledge because then you

25  can't expand what Alexa can do.  You would have to change

1    the device every time you added something new.  And the

2    whole point of Mr. Torok's patented design is that you do

3    not do that.

4         So, that brings us to the jury's instructions on direct

5    infringement.  And, again, the requirement, as

6    Mr. McAlexander acknowledged when I asked him, was that

7    Amazon has to make, use, and sell a product that meets all

8    of the requirements of the claim.  You have to focus on does

9    the Echo or the Fire TV and the Fire Tablet, as it sits in

10   the box, meet all the requirements of the claim.  That was

11   the issue we had yesterday when I was trying to get

12   Mr. McAlexander to tell me whether or not an Echo would

13   infringe when there are no Fire -- when there are no smart

14   home skills available, and we went back and forth.  That is

15   the requirement.

16        Now, the other requirement is that Amazon has to

17   control the system as a whole and benefit from it.  There

18   has been no evidence that Amazon controls Philips or how it

19   talks to its bulbs or how it talks to its hubs.  In fact,

20   Mr. McAlexander agreed and testified to the contrary, that

21   all of those communications, all of that technology is

22   owned, designed, and controlled by Philips, not Amazon.

23        So, when you get to infringement, the answer is no.

24   It's no for the reasons I've talked about, but the simplest

25   one is just the acknowledgment that Mr. McAlexander made,

133

1   which is that an Echo device, a Fire TV, a Fire Tablet, it

2   will only send your voice to the cloud when you say "Alexa",

3   not when you -- when it receives a short-range wireless

4   communication, which it never actually receives in the first

5   place.

6        And then we get to the last one.  So, even if Anne Wong

7   had filed these patents in 2006, as she didn't, but even if

8   she had, she couldn't get these patents because she didn't

9   do it first.  The person who did what she is now claiming

10  first is Mr. Shriver, and he invented -- as we saw, he

11  didn't patent it but he had an actual invention.  It was in

12  a box.  It was being sold and it was being used, being used

13  by customers, real people, in their homes to control real

14  devices.

15       We saw videos of this.  We saw pictures of real homes

16  with lights being turned on and off and TVs being turned on

17  and off and cameras -- security cameras being shown on the

18  screen.  These are not, you know, figures on a piece of

19  paper.  He built an entire company.  He built a real product

20  and it was being used and it was being used by lots of

21  people years before these patents.

22       One of the key things, this term "prior art", it sounds

23  kind of technical and legalistic.  What does it mean?  It

24  means you can't take with a patent what people already have

25  and are using.  Right?

1        It's a simple idea.  The patent system protects
2   innovation, new inventions, sure.  But it also protects what
3   is already out there.  You can't reach back and take from
4   Mr. Shriver what he and his customers were already using.
5   That's the basic point of the patent system, right?  It
6   protects both.
7        And you can't use it to take what Mr. Shriver and his
8   customers had.
9        Again, the prior art, this thing that was known and
10  used, doesn't have to be in a patent.  It doesn't have to be
11  in a printed publication.  It doesn't have to be all in one
12  box.  Right?  It can be any product that was publicly known
13  or used by others in the United States before the patented
14  invention was made.
15       Now, Anne Wong didn't make any invention.  She gets the
16  benefit of filing a patent application as if that was making
17  an invention, so, that is what that refers to.
18       It also -- prior art is also any product that was made
19  by anyone before the named inventor created the patented
20  product or the product was not abandoned, suppressed, or
21  concealed.  This applies to Tim Shriver and the HAL system
22  as well.  He invented the product.  He didn't suppress it,
23  abandon it, or conceal it.  He sold it.  The public used it.
24  It was presented on TV in 2000 on the Oprah Winfrey Show.
25  That's kind of the farthest thing from concealment or

1  abandonment.

2          THE COURTROOM DEPUTY:  You have 20 minutes.

3          MR. HADDEN:  Thank you.

4      Now, the only questions that have been raised by

5  Mr. McAlexander is that somehow that this HAL system was

6  some concoction that was made after the fact.  The actual

7  testimony is clear to the contrary.

8      Mr. Shriver was asked:  And do you recall what sort of

9  devices and software you compiled?

10     And this is in response to the subpoena he received in

11 this case.  And he says yeah.

12     That's why I said the computer, monitor, keyboard,

13 mice, all that pre-2006, along with automation hardware,

14 like lamp modules, interface modules, even cables, speakers,

15 and microphones that would be needed to effect home

16 automation at that time.

17     He had all of what Mr. -- what Professor Johnson tested

18 already in pre-2006 and it had been used.

19     And, of course, counsel is right.  These are not

20 turnkey systems, right?  If you have a smart home system,

21 it's designed to fit your home.  Every customer will do it

22 differently, but all of the components -- the cameras, the

23 WiFi router, that standard Dell computer -- those were the

24 items that the customer used before 2006 to operate the very

25 same HAL software in their home.

1    Now, Mr. Shriver testified that he knows this not only

2  because he worked with the developers and manufacturers of

3  those cameras and other components to make sure that they

4  would inter-operate with his software, but he -- that he

5  provided customer technical support.  So, he knew what the

6  customers were using and that it worked with his product.

7    And so he was asked -- and so, one of the examples that

8  Mr. -- Professor Johnson relied on was that moving his hand

9  in front of the camera and having it send him a

10  notification, that motion was detected.

11    And Mr. Shriver is asked at his deposition:  Do you

12  recall when we discussed the rules related to triggering an

13  e-mail in response to a camera picking up motion?  And he

14  said:  Yes.

15    And he was specifically asked:  Was that a particular

16  configuration that you know was used by users of HAL2000

17  prior to August 10, 2006?  And his answer was:  Yes.

18    So, the very interaction that Professor Johnson

19  verified in his testing Mr. Shriver testified was done

20  before 2006 by customers.

21    So, then we get to what does Mr. McAlexander say.  The

22  first important point is Mr. McAlexander nowhere said that

23  what Professor Johnson said about what the HAL system did --

24  nowhere did he say it didn't do that.  Nowhere did

25  Mr. McAlexander identify any claim element that Mr. -- that

1    Professor Johnson had identified was in the HAL system.

2    Nowhere did Mr. McAlexander say no, that element is not

3    there.

4        His only complaint was that he claimed that somehow

5    what Professor Johnson tested was not the same HAL system

6    and software that existed in 2006.

7        And importantly, again, Mr. McAlexander never even

8    looked at the HAL system.  He didn't come and examine the

9    system that Professor Johnson tested.  He was given that

10   opportunity.  He didn't even run the software ever.  So, he

11   had the opportunity to kick the tires on that HAL system,

12   and he chose, instead, not to do it.

13       So, there's a lot of, you know, talk that somehow

14   Professor Johnson did something wrong by testing the system

15   in 2019.  But, right, we're here in 2020.  What else could

16   he have done, right?  If he wanted to confirm that the

17   system in 2006 did what the documentation said it did and

18   did what Mr. Shriver said it did, the only thing he could

19   do, as a careful expert, would be to test the system, which

20   is what he did.  He tested it.  He videotaped those tests,

21   and you saw some of them.

22       Mr. McAlexander did nothing.  He didn't even look at

23   the system.

24       So, when we get to invalidity, the HAL system did

25   everything the claims describe and you should find so.

1      I'm sorry.  I'm running out of time, but let me be fast

2 on one last point.

3      There is a separate issue of eligibility that you heard

4 right at the end.  And the question there is:  Is there

5 anything that was not well-known or unconventional in this

6 patent claim?  Was there any new technology that was

7 developed?

8      And Mr. -- Professor Johnson went through a long

9 history of every one of the technologies that is related to

10 these claims:  Video compression, digital television,

11 wireless networking, and home automation, and he traced the

12 entire history.  And you saw that all of it existed in

13 one -- well-known forms before these patents.

14      And Ronald Wang, the brother who actually has the

15 technical degree, confirmed each in his deposition over and

16 over again.  All of these things were known.  I didn't

17 invent any of this.  All of it was known.  All of it

18 existed.  I did not invent it.  I did not invent it.  I did

19 not invent it.

20      Interesting.  Where's Ronald Wang, right?  He is the

21 technical brother.  He's the one who knows the technology.

22 He's not here telling you that Amazon's Alexa infringes

23 these patents.  He's nowhere here.  He didn't show up.  So,

24 obviously he didn't want to be part of this.  He's not

25 making this claim.

1        So, when you get to the final question regarding patent

2   eligibility, the answer is there's no new technology here.

3   Ronald Wang confirmed it.  Professor Johnson went through

4   the history in great detail.

5        All of these things were known.  This patent just lists

6   a laundry list of technologies that were known and that are

7   now kind of put together in a way that is not new, and it

8   doesn't deserve a patent.

9        Thank you very much for your time.  Let me turn it over

10  to Mr. Dacus.

11            THE COURT:  Thank you.

12       Mr. Dacus, if you want to finish.

13            MR. DACUS:  I will, Your Honor.  Thank you very much.

14

15       I want to do just a couple of things in the last few

16  minutes that we have here to talk with you.  I want to touch

17  very briefly on damages, and then I want to remind you of

18  why Amazon is actually here.

19       You know that it pains me to even talk about damages,

20  because these patents are not infringed.  They are invalid.

21  But that's your decision.  And, so, to the extent you reach

22  that damages question, we need to talk about the evidence

23  that you have in front of you.

24       And to be honest with you, I somewhat like talking

25  about damages because they really just involve common sense.

1    When you walked through those doors last week -- when you

2    walked through those doors every day last week and this

3    week, you brought with you your common sense.  And there's a

4    lot of common sense involved in damages and what you are to

5    do.

6           The Court is going to give you some instructions and

7    rules to follow.  But when you follow those and apply common

8    sense, I think the result comes fairly easily.

9           Now, you already know that you're going to be asked

10   this question about whether or not the damages are lump sum

11   or a running royalty.  The evidence that you have in front

12   of you comes not from me but directly from Professor Magee.

13          So, when I asked him, is this jury going to be asked

14   about this question, he said yes.

15          And he acknowledged the only evidence they have in

16   front of them -- that's the jury -- is all of Amazon's

17   licenses are lump sum -- all of Innovation Sciences's are

18   lump sum, and you've seen no evidence that Innovation

19   Sciences prefers a running royalty.  Is that correct?  And

20   he said that's correct.

21          So, I heard Mr. Jackson say a minute ago that you

22   should listen to their experts.  I certainly agree on this

23   point.  All the evidence in front of you, every bit of it,

24   is that you should check "lump sum" when you answer that on

25   the verdict form.

1        Now, we've got this issue about whether or not you

2   should look to these LG and Samsung licenses as indications

3   of what the values are of these patents.  And you remember I

4   used my shopping for a house analogy with both Dr. Ikizler

5   and Dr. Magee, and I asked them if they agreed and they said

6   no.  They don't -- they don't like that analogy.

7        But what you see here in front of you -- and I'll tell

8   you, for those of you who are note takers, the Court is

9   going to give you written instructions.  Look in those

10  instructions at the heading that says "Damages, Comparable

11  Agreements", and you'll find that the Court says you should

12  use these license agreements just as if you were shopping

13  for a house in a neighborhood.  So, the Court agrees with

14  exactly the procedure and the process that Dr. Ugone

15  undertook in this case.

16       And I'm not going to belabor this.  Dr. Ugone has been

17  through it in detail.  You've seen me put it on the screen.

18       But what LG and Samsung, in sum, got is much more, much

19  more than what you're here to decide.  They got 60-something

20  patents rather than three.  They got worldwide rights.  They

21  got it for a longer term or duration.  So, they got

22  significantly more for 1.8 and $3.9 million than what's at

23  issue in this case.

24       And in case there's any confusion, you remember I had

25  to wrangle a bit with Dr. Wong about whether or not these

142

1    three licenses are, in fact, included in the LG and Samsung

2    license.  One of you asked her that specific question,

3    probably because I did not get it clearly out of her.  And

4    she said unequivocally yes, these three patents are included

5    in those licenses.

6        Now, there is one other issue that I want to touch on

7    with respect to damages.  I told you at the beginning of

8    this case that -- we didn't talk specifics about damages,

9    but I told you damages can tell you two things as a juror.

10       One, they can tell you what cases are really about

11   sometimes.  Sometimes what folks say it is about, there is a

12   little more to it, and damages can give you a clue to that.

13       And the second thing damages can do is they can give

14   you some insight into this credibility that the Judge keeps

15   telling you to look for, because you have differing versions

16   of the story here.

17       And I'm going to submit these facts to you for your

18   consideration on this credibility issue.  Remember that what

19   the Plaintiff says is, no, the lawsuits against LG and

20   Samsung did not really include smart home products.  Well,

21   one, that doesn't make sense, because Innovation Sciences

22   claims their smart home invention goes back to 2006 and

23   these licenses are in 2016.  But there's more to it.

24       You remember that in a sworn declaration -- you saw

25   this in this case -- Anne Wong said that those lawsuits

1   related to -- look at the very bottom line -- smart phone

2   and smart home technology.  She said that for both the

3   Samsung and the LG lawsuits.

4        Now, what they said to you was that she withdrew that

5   declaration.  Now, this was a declaration sworn under oath.

6   She took two days to draft it, by her own admission.  It was

7   drafted by her and this gentleman right here (indicating),

8   Don Jackson.  They took two weeks before she signed it, and

9   that was in May of 2019.

10        Now, fast-forward.  They said we withdrew it.  First of

11  all, if they withdrew it, you would file something formally.

12  You would draft something formally saying, hey, this wasn't

13  the truth.  They didn't show you any of that.  What they

14  really did -- and if they were being truthful, what they

15  should have said the facts are, in February of this year

16  they changed their story.  And you ought to ask yourself

17  why, and I'll give this to you for your consideration.

18        In December of 2019 they got a report from Professor

19  Magee that said we're going to try to get to Amazon for a

20  hundred million dollars.  And, so, by February what they

21  realized is how are we going to tell this jury that we

22  accepted 1.8 million and 3.9 million from LG and Samsung for

23  these very same patents plus a whole bunch more, but we want

24  a hundred million from Amazon?

25        And, so, what they did is they changed their story.

1   Those are the facts.  You can judge whether or not how that

2   affects the credibility of what they told you.  That's your

3   decision.  But those are the facts for you to consider.

4        Now, in the end those licenses provide you -- if you

5   get to damages, those licenses, as Dr. Ugone said, provide

6   you guideposts that you should use, and as the Court has

7   told you in your instructions, you should use, just as if

8   you were shopping for a house, the same way, same common

9   sense.

10       Now, let's contrast the value in those licenses with

11  the calculation that Dr. Ikizler and Dr. Magee have done.

12  And I'm not going to spend a lot of time on this because a

13  lot of this testimony you've heard very recently and I'm

14  confident that you remember it.  But the facts are that that

15  calculation is really inflated sort of at every step.

16       And keep in mind what we're trying to do here and keep

17  in mind what Dr. Ikizler did.  He took an alleged

18  apportionment percentage and he multiplied it by an alleged

19  profit percentage, both of which I believe the evidence

20  shows are highly inflated.  And you've heard all the

21  evidence as to why, but there's a piece of evidence that I

22  would ask you to consider that I think is perhaps most

23  important, and it's this.

24       The first time Dr. Ikizler testified and again this

25  morning, as he must, he admits that his calculation that's

1    based on these terms that Dr. -- I mean that Mr. McAlexander

2    chose --

3                THE COURTROOM DEPUTY:  You have five minutes.

4                MR. DACUS:  Thank you.

5        -- must be tied to the patented feature, not to the

6    Echo.  We know the Echo is successful.  You have to tie

7    these damages to the patented feature.  And he got these

8    terms from Mr. McAlexander.

9        So, what did Mr. McAlexander say that he gave to

10   Dr. Ikizler?  "Was your intent in giving him these terms to

11   capture things that were invented by Anne Wong?"  He said

12   unequivocally, "no."

13       That's exactly the opposite of what Dr. Ikizler is

14   supposed to be doing.  He's supposed to be valuing the

15   patented invention.  He got the terms from Mr. McAlexander.

16   By Mr. McAlexander's own admission, he's giving him terms

17   that have nothing to do with these patents.

18       In the end, as Dr. Ugone told you, if you find damages

19   here, the damages should be somewhere between 1.8 and 2.2

20   million.  Obviously, I think they should be zero.

21       Now, let me finish up here.  I told you at the

22   beginning of this case that this was an important case for

23   Amazon.  I'm sure when you came to court last week, you did

24   not think you were going to be deciding a case that truly

25   impacted our United States patent system and how it

1    functions.  But that's why you're here and that's truly

2    where you find yourself, is with that kind of case to be

3    decided.

4        And in the end, the reason Amazon is here is because

5    this needs to stop.  It needs to stop.  The attempt by folks

6    like Innovation Sciences to take and claim technology from

7    companies that have applied thousands of engineers,

8    thousands of scientists, technology from some of the best

9    and brightest US engineers, needs to stop.

10       There is one piece of evidence in this case that I

11   think best exemplifies what this case is about.  This is an

12   exhibit that the Plaintiff has showed you, 878.  They've

13   showed it to you five or six times.  It's this e-mail from

14   Daniel Rausch at Amazon.  Daniel Rausch is writing to his

15   employees.  He's a manager.  And what the Plaintiff has

16   shown you every time is how successful these Echo products

17   have been.  This is Daniel Rausch writing, saying hey, we've

18   crossed some milestones in how many Echos we're selling, how

19   much money we're making.  That's the point that they have

20   used.

21       But what they have failed to show you is the entire

22   e-mail.

23            THE COURTROOM DEPUTY:  Two minutes.

24            MR. DACUS:  Thank you.

25       And what I want to show you is the very last sentence

147

1   in this e-mail, because I think it exemplifies exactly why

2   we are here.  What Daniel Rausch wrote -- and remember, he

3   wrote this e-mail at a time he had no idea this e-mail would

4   ever see the light of day.  Under this Court's rules, you

5   have to produce all of your e-mails related to issues.

6   Mr. Rausch had no idea this would ever see the light of day.

7   And what he told his Amazon employees is:  All of this

8   success comes directly from your passion for customers and

9   developers, and your very, very hard work, and thanks for

10  all you do.

11      That's what this case is about.  These folks want to

12  claim our success, and they want to conceal from you, as

13  they have done in this e-mail, the reason for that success.

14  And it needs to stop.

15      I appreciate very much your time and attention.  I know

16  it's been a long eight days, but there is no way that I, on

17  behalf of Amazon, can fully express how important this case

18  is and how much we appreciate you being here.

19      I'm going to sit down.  Some lawyer -- I don't know

20  which lawyer, but a lawyer from this table is going to stand

21  up and talk.  I don't get to say anymore.  I need to trust

22  you that whatever they say next, you will think in your

23  mind, well, is that really true?  What does the evidence

24  show?  What would the Amazon lawyer say in response?  And

25  we'll trust you to do that.

1        And I appreciate it, and we look forward to receiving

2   your verdict.

3        Thank you.

4            THE COURT:  Thank you, Mr. Dacus.

5        If Plaintiff wants to conclude the argument and,

6   Mr. Jackson, are you doing that?

7            MR. JACKSON:  Yes, Your Honor.  How much time do I

8   have?

9            THE COURT:  Thirteen minutes.

10           MR. JACKSON:  Thirteen.

11       Thank you, Your Honor.

12       Unfortunately, sometimes on days like today I'm

13  reminded about why people think so little about lawyers.

14  Frankly, I thought things wouldn't work out this way.  But

15  some of the things that you heard from Amazon's counsel are

16  not based on the evidence at all.  And I'm being polite.

17       The personal comment about me writing some declaration,

18  untrue.  I didn't write that declaration.  Somebody else on

19  our team did, but Amazon's counsel was trying to make a

20  point about me personally.  It's not true.

21       Amazon's counsel, early in the presentation, talked

22  about how Mr. Torok's applications -- the Patent Office when

23  it was considering that application was aware of Dr. Anne

24  Wong's patents somehow.  That's not true.  There's no

25  evidence of that.  Nobody -- nobody got up on the stand and

149

1   confirmed that.  It's simply not true.  There were several

2   examples like that.

3        Amazon's counsel told you that Dr. Wong didn't tell the

4   Patent Office about their earlier filings back in 2006 and

5   2007.

6        Paul, can you pull up Plaintiff's Exhibit 1, please?

7        That's simply not true.  Right in the list of

8   applications that they're claiming the benefit of that came

9   earlier are 2007 and 2006 applications.

10       If we can pull that up, I'll show you.

11       First page, please.

12       And this -- this starts here (indicating) where it says

13  related -- related U.S. application data.  This is where the

14  inventors -- if they want to claim the benefit of

15  applications they've previously filed, it gets listed here.

16       Paul, try the second page.  I think this is continued

17  on the second page.  So, if you go to the second page --

18  I've got to clear the screen.  If you can zoom -- no, second

19  page.  Zoom in on this paragraph in the upper left-hand

20  column there.

21       This lists all of the applications that the inventors

22  claimed the benefit of.  And you'll see -- just starting

23  here at the top there's a 16 application, 2013, 2012, 2010,

24  '10, 2006, 2012, 2012, 2011, '11, 2005, 2012, 2011.  There's

25  your May 22, 2007, and there's your August 10, 2006.

150

1        They disclosed all of those prior applications to the

2   Patent Office as part of the process of getting that patent.

3   The suggestion that somehow they didn't tell the Patent

4   Office about those earlier applications, I don't know where

5   that comes from.

6        This is important because this relates to another point

7   that Amazon's counsel made, which is also incorrect, and

8   that is whether an inventor in this situation that you just

9   saw where this -- there's this long chain of applications

10  that go back in time to 2006 and 2007 -- whether in that

11  situation somebody like the Innovation inventors can claim a

12  product that came out during that sequence of applications.

13       They can.  Let me show you a page from the jury

14  instructions you're going to be asked to receive.  Make a

15  note for yourself.  Read it for yourself.  It's on page 24

16  of the version that I have at the bottom, and I'm going to

17  put it on the screen.

18       This is Judge Mazzant's instructions to you as part of

19  your deliberations.  It says:  It is not improper for a

20  patent owner to amend or insert claims in a patent

21  application for the purpose of obtaining a right to exclude

22  a known commercial product from the market.

23       When can you do that?  You can do that when your

24  applications go back prior to that product.  Why?  Because

25  if you disclose your invention first, then the later product

1   isn't prior art to your inventions.  Your inventions came

2   first.

3        You remember last Friday, I hope, when -- I think it

4   was at the end of the day.  Mr. Torok was on the stand, and

5   I went through all of his applications one by one, and he

6   admitted that the Innovation inventors came up with the

7   invention that was disclosed in Figure 16 years, years

8   before every single one of his applications, one of which

9   was the one that Amazon's counsel put on the screen as an

10  example.  That one was filed in 2015.  Dr. Wong and her

11  co-inventors filed the invention described in Figure 16.

12  And the figures, frankly, come before that no later than

13  May of 2007.

14       So, these things are just not right.  You were told

15  things that are just not right.  I mean, contradicted -- I'm

16  shocked, frankly.  You were going to be told something

17  directly opposite of what Amazon's counsel just represented

18  to you.  And I agree with them.  That kind of thing goes

19  directly to the merits of the case.  Why would they make

20  those kind of representations that are not supported by the

21  record?

22       I can't -- I couldn't catalog everything, but Amazon's

23  counsel also made a lot of representations about why they --

24  Amazon's products didn't infringe and so forth.

25       And you have to base your decisions based on the

1    evidence that you've seen, your memory about the witnesses'

2    testimony.  You can't rely on my statements to you, and you

3    can't rely on Amazon's statements to you, either.  That's

4    not evidence.

5         Your memory and the evidence, the documents and so

6    forth that you're going to be given, that's what you have to

7    base your decision on.  A lot of what was said, there was no

8    support in the record for that.  And you -- I'm going to ask

9    you to carefully look at that evidence.  I can't catalog

10   every single instance.

11        You were also -- Amazon's counsel also talked to you

12   about the HAL system, and -- and the -- the statement,

13   again, is -- was careful.  The statements that were made to

14   you were careful about that HAL system.  The statement was

15   Mr. Shriver testified that all the pieces that he used in

16   his system were in existence before 2006.

17        That's not the test.  That's not the test.  Even if

18   true -- and I don't have -- I'm not here to contest that.

19   But even if every single one of those pieces is true, that

20   it was in existence before 2006, remember the question is

21   whether the system, as constructed by Mr. Shriver or as

22   constructed by Dr. Johnson and tested by Dr. Johnson, was

23   that system, did that exist.

24        And that's the question they can't answer, haven't

25   answered.  They'd like to tell you it did, but there's no

153

1   evidence that it did.  In fact, Mr. Shriver's testimony says

2   it didn't.

3       The question -- the rhetorical question you were asked

4   was, what could Dr. Johnson have done differently?  Well,

5   what he could have done is found an actual system that

6   actually existed that was actually being used in somebody's

7   home and use that as the basis of his testimony.

8           THE COURTROOM DEPUTY:  You have five minutes.

9           MR. JACKSON:  Thank you.

10      That didn't happen, either.  Why?  They couldn't find

11  one because it probably didn't exist.  These things are as

12  different as snowflakes.  The thing you saw in his -- in his

13  report and his testimony was like a snowflake; that is, a

14  one of a kind.  It didn't exist before that.  That's

15  Mr. Shriver's -- based on Mr. Shriver's words, not mine.

16      I'm going to change gears a little bit and talk a

17  little bit about damages.  I don't have a lot to say about

18  that, but I do -- I do want to pick up on a point that

19  Amazon's counsel made about the damages.  And in particular,

20  he was asking you to award what he called a lump sum versus

21  a reasonable royalty.  And I just wanted to tell you a

22  little bit about that, a little bit more.  I didn't get the

23  chance before.

24      If you decide -- well, a reasonable royalty -- let me

25  just basically tell you what that means in terms of my

1  understanding, and I think it's going to be in the

2  instructions.  That's where you're deciding that the accused

3  infringer, if you believe they infringe and if you believe

4  the patents are not invalid, they should pay on a per-unit

5  basis.  That seems fair, right?  If they sell a lot of

6  products, they'll pay per unit for each product they sell.

7  But if they don't sell a lot of products, they pay less.

8  Let the market decide how much is paid.

9      What Amazon would like you to decide is that there

10 would be this one-time payment that would forever cover all

11 sales, regardless of how successful they have been in

12 selling products.

13     And in this situation if -- if -- if the parties were

14 in the situation of somebody like a Samsung or an LG, where

15 they didn't require that we bring a jury in and decide the

16 dispute and go through that effort, maybe that would be

17 appropriate.

18     But here this is a different situation.  You've got to

19 assume the hypothetical negotiation situation where Amazon

20 would sit down and say, yep, we assume the patents are

21 valid.  We assume the patents are infringed.  Okay?  Which

22 means they have to take a license.  How much would they

23 agree to pay and how much would Innovation agree to accept

24 in that situation?

25     So, this is a different circumstance than LG and

1    Samsung.  Reasonable royalty is the appropriate measure;

2    lump sum is not.

3         Amazon's counsel also said -- let me have -- thanks --

4    that this case was important to Amazon.  And I asked

5    Mr. Torok earlier, if that's true, with all due respect to

6    Mr. Torok -- he's an engineer -- where was somebody from

7    Amazon to come here and tell you about the business

8    decisions they made, what was important to Amazon, what they

9    expected to make from these products, what was the strategy.

10   Nobody showed up to talk about that.

11        Mr. Bezos' name is on those BRD documents.  Those are

12   the -- where he signs off on approving the further

13   development, manufacture, and sale of the products.

14             THE COURTROOM DEPUTY:  You have two minutes.

15             MR. JACKSON:  Not that I -- thank you.

16        Not that I would expect Mr. Bezos to show up, although

17   it's possible, I suppose.  But where was anybody to talk

18   about a decision that he made or his senior executives?

19   Nobody.  I -- honestly, it's not that important a case to

20   them.  I think it should be, but it -- there's no indication

21   that it is.

22        I would ask you when you go back to the jury room to

23   deliberate, there's this one phrase that -- that Amazon's

24   counsel keeps bringing up as a basis for non-infringement,

25   and it has to do with the short-range wireless communication

1   paragraph.  Shows up in a lot of different claims.

2       I want you to look at that paragraph carefully.  I want

3   you to look at the Judge's claim construction about the term

4   in that claim.  The phrase reads "updated status of the

5   item."  And Judge Mazzant construed that to -- to mean a

6   change in item status.

7       There is nothing about -- and you have to apply Judge

8   Mazzant's constructions, just like the parties do.  That --

9   he's telling us what that claim term means.  And there's

10  nothing about that claim term or his construction that

11  requires that it be based on -- that that signal that's

12  referred to in the claim be something that is based on a

13  past event.  It can include situations where you want to

14  change the status of a lock, for example.  Doesn't have to

15  be the detection of a past event.

16      And I have run out of time.  And, again, thank you very

17  much for your service on this jury.  We do really appreciate

18  it, and we entrust this case to you.

19      Thank you.

20          THE COURT:  Thank you, Mr. Jackson.

21      Ladies and gentlemen, let me just ask you, do you need

22  a break before I give you my final instructions?  We've

23  delayed lunch, so lunch won't be coming until closer

24  between -- you know, I'll be done with my instructions and

25  lunch will be upstairs hopefully by then.

157

1        Does anybody need a break or are you okay continuing?

2   Anybody?  Okay.

3            JUROR:  I could use a quick break.

4            THE COURT:  I'm sorry?

5            JUROR:  I could use a quick break.

6            THE COURT:  Okay.  That's fine.  We'll just take a

7   short break.  And, again, please -- you've heard the closing

8   arguments.  You have not heard my final instruction so you

9   still can't discuss the case.  Just go up and, I guess, take a

10  short break and we'll come right back.  Thank you.

11                      (Jury exits the courtroom, 12:25 p.m.)

12           THE COURT:  I'm going to go ahead and put a copy of

13  the charge in each of their seats.

14      Anything further from Plaintiff right now?

15           MR. JACKSON:  No, Your Honor.

16           THE COURT:  Defense?

17           MR. HADDEN:  No, Your Honor.

18           THE COURT:  Okay.  Does anybody need to use the

19  facilities?  I was going to wait here and have them turn around

20  and come back, so...

21                      (Recess, 12:26 p.m.)

22                      (Open court.  All parties present.)

23                      (Jury present, 12:34 p.m.)

24           THE COURT:  Please be seated.

25      In your chair is a copy of the charge that I'm about to

1  read to you.  The law requires that I read it, so you can

2  follow along.  You have to listen, but you can follow along

3  as well, and you'll be able to take that back with you to

4  the jury room, so...

5      Members of the jury, it is my duty and responsibility

6  to instruct you on the law that you are to apply in this

7  case.  The law contained in these instructions is the only

8  law you may follow.  It is your duty to follow what I

9  instruct you the law is, regardless of any opinion that you

10 might have as to what the law ought to be.

11     If I have given you the impression during the trial

12 that I favor either party, you must disregard that

13 impression.  If I have given you the impression during the

14 trial that I have an opinion about the facts of the case,

15 you must disregard that impression.  You are the sole judges

16 of the facts of this case.  Other than my instructions to

17 you on the law, you should disregard anything that I have

18 said or done during the trial in arriving at your verdict.

19     You should consider all of the instructions about the

20 law as a whole and regard each instruction in light of the

21 others, without isolating a particular statement or

22 paragraph.

23     The testimony of the witnesses and other exhibits

24 introduced by the parties constitutes the evidence.  The

25 statements of counsel are not evidence.  They are only

1    arguments.  It is important for you to distinguish between

2    the arguments of counsel and the evidence on which those

3    arguments rest.  What the lawyers say or do is not evidence.

4    You may, however, consider their arguments in light of the

5    evidence that has been admitted and determine whether the

6    evidence admitted in the trial supports the arguments.  You

7    must determine the facts from all the testimony that you

8    have heard and the other evidence submitted.  You are the

9    judges of the facts, but in finding those facts, you must

10   apply the law as I instruct you.

11        You are required by the law to decide this case in a

12   fair, impartial, and unbiased manner, based entirely on the

13   law and on the evidence presented to you here in the

14   courtroom.  You may not be influenced by passion, prejudice,

15   or sympathy you might have for the Plaintiff or the

16   Defendant in arriving at your verdict.

17        Now, Plaintiff Innovation Sciences, LLC, referred to as

18   Innovation Sciences, has the burden of proving its case by a

19   preponderance of the evidence.  To establish by a

20   preponderance of the evidence means to prove something is

21   more likely so than not so.  If you find that Innovation

22   Sciences has failed to prove any element of its claim by a

23   preponderance of the evidence, then it may not recover on

24   that claim.

25        To prove invalidity of any claim, Defendants

160

1    Amazon.com, Inc. and Amazon Web Services, Inc., also

2    referred to as just Amazon, must persuade you by clear and

3    convincing evidence that the claim is invalid.  Proving a

4    claim or defense by clear and convincing evidence means that

5    it is highly probable that the facts are as the party

6    contends.

7         These standards are different from what you have heard

8    about in criminal proceedings where a fact must be proved

9    beyond a reasonable doubt.  On a scale of these various

10   standards of proof, as you move from the preponderance of

11   the evidence, where proof need only be sufficient to tip the

12   scale in favor of the party proving the fact, to beyond a

13   reasonable doubt, where the fact must be proven to a very

14   high degree of certainty, you may think of clear and

15   convincing evidence as being between these two standards.

16        Now, the evidence you are to consider consists of the

17   testimony of the witnesses, including witnesses whose

18   testimony was provided by prior deposition, the documents

19   and other exhibits admitted into evidence, and any fair --

20   fair inferences and reasonable conclusions you can draw from

21   the facts and circumstances that have been proven.

22        Now, generally speaking, there are two types of

23   evidence.  One is direct evidence, such as the testimony of

24   an eyewitness.  The other is indirect or circumstantial

25   evidence.  Circumstantial evidence is evidence that proves a

1    fact from which you may logically conclude other facts

2    exist.  As a general rule, the law makes no distinction

3    between direct and -- direct and circumstantial evidence,

4    but simply requires that you find the facts from a

5    preponderance of all the evidence or by clear and convincing

6    evidence, both direct and circumstantial.

7         Now, certain charts and summaries have been shown to

8    you solely to help explain or summarize the facts disclosed

9    by the books, records, and other documents that are in

10   evidence.  These charts and summaries are not evidence or

11   proof of any facts.  You should determine the facts from the

12   evidence.

13        Some exhibits have been presented to you as

14   illustrations.  Demonstrative evidence can be used to

15   describe something involved in this trial, but it is not

16   itself evidence.  If your recollection of the evidence

17   differs from the exhibit, rely on your recollection.

18        Now, you alone are to determine the questions of

19   credibility or truthfulness of the witnesses that have

20   testified.  In weighing the testimony of the witnesses, you

21   may consider the witness's manner and demeanor on the

22   witness stand, any feelings or interest in the case, or any

23   prejudice or bias about the case that he or she may have,

24   and the consistency or inconsistency of his or her testimony

25   considered in light of the circumstances.

1       Has the witness been contradicted by other credible

2   evidence?  Has he or she made statements at other times and

3   places contrary to those made on the witness stand?  You

4   must give the testimony of each witness the credibility you

5   think it deserves.

6       Even though a witness may be a party to an action and,

7   therefore, interested in its outcome, the testimony may be

8   accepted if it is not contradicted by direct evidence or by

9   any inference that may be drawn from the evidence if you

10  believe the testimony.

11      You are not to decide this case by counting the number

12  of witnesses who have testified on the opposing sides.

13  Witness testimony is weighed; witnesses are not counted.

14  The test is not the relative number of witnesses, but the

15  relative convincing force of the evidence.  The testimony of

16  a single witness is sufficient to prove any fact, even if a

17  greater number of witnesses testified to the contrary, if,

18  after considering all of the other evidence, you believe

19  that witness.

20      Now, when knowledge of a technical subject matter may

21  be helpful to the jury, a person who has special training or

22  experience in that technical field is permitted to state his

23  or her opinion on those technical matters.  During the

24  trial, you've heard testimony from the following individuals

25  who expressed expert opinions:  Joseph McAlexander,

1    Innovation Sciences' technical expert; Devrim -- and I'm

2    pronouncing -- Ikizler.  I -- I apologize for the

3    pronunciation.  And Stephen Magee, Innovation Sciences'

4    damages experts; David Johnson, Amazon's technical expert;

5    and Keith Ugone, Amazon's damages expert.

6         You are not required to accept these opinions.  As with

7    any other witness, it is up to you to decide whether to rely

8    on their opinions.

9         As I told you in my preliminary instructions, I have

10   given you the opportunity to give me written questions

11   anonymously after a witness testified when you had an

12   important question of the witness that was strictly limited

13   to the substance of the witness's testimony.

14        Remember that I asked you not to be offended if I did

15   not present your question to be answered by the witness.

16   You should not speculate on an answer to any unasked

17   question, and you should not speculate on or consider any

18   facts or events outside the testimony and exhibits that you

19   have heard and seen here in the courtroom.

20        When testimony or an exhibit is admitted for a limited

21   purpose, you may consider that testimony or exhibit only for

22   the specific limited purpose for which it was admitted.

23        A stipulation is an agreement.  When there is no

24   dispute about certain facts, the attorneys may agree or

25   stipulate to those facts.  You must accept a stipulated fact

1    as evidence and treat that fact as having been proven here

2    in court.  Here the parties have stipulated to the

3    following:

4         One, Innovation Sciences is a Texas limited liability

5    company having its principal place of business in Plano,

6    Texas.

7         Two, Virginia Innovation Sciences, Inc. was a

8    corporation organized under the laws of the State of

9    Virginia with a place of business at 6301 Edsall Road,

10   Number 517, Alexandria, Virginia, zip code 22312.

11        Three, effective November 9, 2018, Virginia -- Virginia

12   Innovation Sciences merged into Innovation Sciences.

13        Four, the Court substituted Innovation Sciences for

14   Virginia Innovation Sciences in this case.

15        Five, the current Plaintiff, Innovation Sciences, is a

16   Texas company with an office at 5800 Legacy Circle,

17   Suite 311, in Plano, Texas, zip code 75024.

18        Six, Anne Wong is the CEO and sole owner of Innovation

19   Sciences.

20        Seven, Virginia Innovation Sciences filed a complaint

21   in this case, Civil Action No. 14:18-cv-474 -- and that's

22   just my initials, it was assigned to me -- against

23   Amazon.com, Inc. on July 5, 2018.

24        Eight, Innovation Sciences filed an amended complaint

25   on March 22nd, 2019, adding new defendants.

165

1        Nine, Defendant Amazon.com, Inc. And Amazon Web

2   Services, Inc. are each Delaware corporations having their

3   principal place of business in Seattle, Washington.

4        Ten, the patents-in-suit are U.S. Patent No. 9,912,983,

5   the '983 patent; 9,729,918, the '918 patent; and 9,942,798,

6   the '798 patent.

7        U.S. Patent No. 9,912,983 was filed on June 19, 2017

8   and was issued on March 6th, 2018.  It names Ronald Wang and

9   Anne Wong as co-inventors.

10        12, U.S. Patent No. 9,729,918 was filed on January 26,

11   2017 and issued on August 8, 2017.  It names Ronald Wang and

12   Anne Wong as co-inventors.

13        13, U.S. Patent No. 9,942,979 -- '798 was filed on

14   March 15th, 2016 and issued on April 10th, 2018.  It names

15   Ronald Wang and Anne Wong as co-inventors.

16        14, Ronald Wang is the brother of Anne Wong.

17        15, the '983 patent, '798 patent, and the '918 patent

18   are related and share the same specification.

19        16, the '983 patent is a continuation of the

20   '918 patent that is a continuation of the '798 patent.

21        17, the '983 patent, '798 patent, and the '918 patents

22   are -- are identically titled "Method and System for

23   Efficient Communication."

24        18, the priority date of the '983 patent, '798 patent,

25   and the '918 patent is August 10th, 2006.

1    19, the accused Amazon Echo products in this case are

2    the Echo Gen 1, Echo Gen 2, Echo Dot Gen 1, Echo Dot Gen 2,

3    Echo Dot Gen 3, Echo Dot Kids, Echo Plus Gen 1, Echo Plus

4    Gen 2, Echo Spot, Echo Show -- Echo Show Gen 1, Echo Show

5    Gen 2, and Echo Tap.

6    20, the accused Amazon Fire TV products in this case

7    are the Fire TV Gen 3, Fire TV Stick Gen 2, Fire TV Stick

8    4K, and Fire TV Cube.

9    21, the accused Amazon Fire Tablet products in this

10   case are the Fire HD 6, Fire HD 7, Fire HD 8.9, and Fire HD

11   8, and Fire HD 10.

12   22, Innovation Sciences also accuses the Alexa Voice

13   Service/Amazon Cloud in this case.

14   Now, as I told you at the start of this case, I will

15   give you a summary of each side's contentions in this case.

16   I will then provide you with detailed instructions on

17   each -- on what each side must prove to win on its side of

18   its contentions.

19   The Plaintiff in this case, again, is Innovation

20   Sciences, LLC, which will be referred to simply as Plaintiff

21   or Innovation Sciences.  The Defendants in this case are

22   Amazon.com, Inc. and Amazon Web Services, Inc., also just

23   simply referred to as the Defendant or as Amazon.

24   The patents involved in this case are, we've already

25   mentioned, the '983 patent, the '918 patent, and the

1    '798 patent.

2        Innovation Sciences asserts that Amazon infringes

3    claims 22, 24, 39, 62, 64, 67, 80, 105, and 108 of the

4    '983 patent; claim 28 of the '918 patent; and claims 5, 6,

5    and 52 of the '798 patent.  Innovation Sciences seeks

6    damages from Amazon for allegedly infringing these claims.

7        The products that are involved to infringe are the

8    Amazon Fire TV, Fire Tablet, and Echo products, and the

9    Alexa Voice Service and Amazon Cloud, collectively referred

10   to as the Alexa Voice Service.  These may be referred to

11   simply as the "accused products" or the "accused

12   instrumentalities."

13       Amazon denies that it has infringed, or infringes, the

14   asserted claims of the patents-in-suit.  Amazon also asserts

15   that -- asserts that the asserted patents are invalid.

16       Those are the positions of the parties that are here

17   before you today.  Your job will be to decide whether or not

18   the asserted claims have been infringed and whether or not

19   those claims are invalid.

20       If you decide that any of the -- of the asserted claims

21   (sic) have been infringed and is not invalid, you will then

22   need to decide any monetary damages to be awarded to

23   Innovation Sciences to compensate for the infringement.

24       If you decide that Amazon does not infringe or that the

25   asserted patents are invalid, you will not need to decide

1   any monetary damages.

2        Claims of the patent.

3        Before you can decide many of the issues in this case,

4   you will need to understand the role of the patent claims.

5   The patent claims are the numbered sentences at the end of

6   each patent.  The claims are important because it is the

7   words of the claim that define what the patent covers.  The

8   figures and text in the rest of the patent provides a

9   description and/or examples of the invention and provide

10  a -- a context for the claims, but it is the claims that

11  define the breadth of the patent's coverage.  Therefore,

12  what a patent covers depends in turn on what each claims

13  cover.

14       The patent at issue -- the patents at issue in this

15  case have been provided to you in your jury notebooks.

16  Remember, only certain claims of the three patents are at

17  issue in this case.  Do not attempt to determine

18  infringement or invalidity with respect to any other claim

19  included in the patents-in-suit.

20       Now, claims are usually divided into parts called

21  limitations or elements.  When a thing such as the accused

22  product or accused instrumentality meets all the

23  requirements of a claim, the claim is said to cover that

24  thing, and that thing is said to fall within the scope of

25  that claim.  In other words, a claim covers a product or

1    process where each of the claim elements or limitations is

2    present in that product or process.

3        For example, a claim that covers the invention of a

4    table may recite a tabletop, four legs, and the glue that

5    secures the legs to the tabletop.  In this example, the

6    tabletop, the legs, and the glue are each separate

7    limitations or elements of the claim.

8        Now, this case involves two types of patent claims,

9    independent claims and dependent claims.  An independent

10   claim sets forth all of the requirements that must be met in

11   order to be covered by that claim.  Thus, it is not

12   necessary to look to any other claim to determine what an

13   independent claim covers.  In this case claims 22 and 62 of

14   the '983 patent are each independent claims, and the

15   remaining claims are dependent claims.

16       A dependent claim does not itself recite all of the

17   requirements of the claim but refers to another claim for

18   some of its requirements.  In this way the claim depends on

19   another claim.  A dependent claim incorporates all of the

20   requirements of the claim to which it refers.  The dependent

21   claim adds its own additional requirements.

22       To determine what a dependent claim covers, it is

23   necessary to look at both the dependent claim and the

24   independent claim to which it refers.  For example,

25   claims 67 and 80 of the '983 patent are dependent claims

1  that depend on independent claim 62 of the '983 patent.  The

2  dependent claims asserted in this case are claims 24, 39,

3  64, 67, 80, 105, and 108 of the '983 patent and claim 28 of

4  the '918 patent and claims 5, 6, and 52 of the '798 patent.

5       A product that meets all of the requirements of both

6  the dependent claim and the claims to which it refers is

7  covered by that dependent claim.

8       If you find that an independent claim is not infringed,

9  then you must also find that its dependent claims are not

10  infringed.  If you find that an independent claim is

11  infringed, you must further decide whether its dependent

12  claims that are asserted in this case are also infringed.

13       Now, it is my job as the judge to determine the meaning

14  of any claim language from which these patents -- from these

15  patents that need interpretation.  You must accept the

16  meanings that I give you and use them when you decide

17  whether any claim is infringed.  In your notebook, you have

18  been provided with a copy of the meanings that I have

19  adopted for certain claim terms.

20       You will first need to understand what each claim

21  covers in order to decide whether or not there is

22  infringement of the claim and to decide whether or not the

23  claim is invalid.  Sometimes the words in a patent claim are

24  difficult to understand, and therefore, it's difficult to

25  understand what requirements these words impose.

1        The law says it is my role to define the terms of the
2    claims, and it is your role to apply my definitions to the
3    issues that are -- you are asked to decide in the case.
4    Therefore, as I explained to you at the start of the case, I
5    have determined the meaning of the claims, and I will
6    provide you with my definitions of certain claim terms.  You
7    must accept my definitions of these words in the claims as
8    being correct.
9        By understanding the meaning of the words in the claim
10   and by understanding that the words in the claim set forth
11   the requirements that a product or process must meet in
12   order to be covered by that claim, you will be able to
13   understand the scope of the coverage for each claim.  Once
14   you understand what each claim covers, then you are prepared
15   to decide the issues that you will be asked to decide, such
16   as infringement and invalidity.
17       For any words in the claim for which I have not
18   provided you with a definition, you should apply its
19   ordinary and accustomed meaning as understood by one
20   skill -- one of ordinary skill in the art.  You should not
21   take my definition of the language of the claim as an
22   indication that I have a view regarding how you should
23   decide the issues that you are being asked to decide, such
24   as infringement and invalidity.  These issues -- these
25   issues are for you to decide.

1        My interpretation of the various claim terms and

2   phrases appears in your juror notebook, but I will read them

3   to you now.

4        In the '983 patent, "updated status of an item" means a

5   change in item status.

6        "Updated item status" means a change in item status.

7        "Short-range wireless communication" means a

8   communication using ZigBee, Bluetooth, UWB, or other

9   similarly ranged communication protocols.

10       In the '918 patent claim terms, "updated status of the

11  item" means a change in item status.

12       "Updated item status" means a change in item status.

13       And "short-range wireless communication," again, means

14  a communication using ZigBee, Bluetooth, UWB, or other

15  similarly-ranged communication protocols.

16       In the '798 patent claim terms -- and they're the same

17  here again, but let me read them.  "Updated status of the

18  item" means a change in item status.

19       "Updated item status" means a change in item status.

20       And "short-range wireless communication" means

21  communication using ZigBee, Bluetooth, UWB, or other

22  similarly-ranged communication protocols.

23       I will now instruct you on how to decide whether or not

24  Amazon has infringed the asserted patents.  Infringement is

25  assessed by a claim-by-claim basis.  Therefore, there may be

1    infringement on a particular patent as to one claim but no

2    infringement as to other claims in that patent.

3        There are three possible ways a claim may be infringed.

4    The three types of infringement are called:  One, direct

5    infringement; two, active inducement; and, three,

6    contributory infringement.  Active inducement and

7    contributory infringement are referred to as indirect

8    infringement.  There cannot be indirect infringement without

9    someone else engaging in direct infringement.

10       In this case, Innovation Sciences has alleged that

11   Amazon directly infringes the asserted patents and is liable

12   for -- and is also liable for indirect infringement.

13       In order to prove infringement, Innovation Sciences

14   must prove that the requirements for one or more of these

15   types of infringement are met by a preponderance of the

16   evidence.

17       I will now explain each of these types of infringement

18   in more detail.

19       Direct infringement by literal infringement.

20       In order to prove direct infringement by literal

21   infringement, Innovation Sciences must prove by a

22   preponderance of the evidence that Amazon made, used, sold,

23   offered for sale within or imported into the United States

24   an accused product that meets all of the requirements of a

25   claim and did so without the permission of Innovation

1   Sciences during the time the asserted patents were in force.

2       You must compare each accused Amazon product for each

3   and every one of the requirements of each asserted claim to

4   determine whether all the requirements of that claim are

5   met.

6       Innovation Sciences alleges that Amazon directly

7   infringes claims 22, 24, 39, 62, 64, 67, 80, 105, and 108 of

8   the '983 patent, as well as claim 28 of the '918 patent, and

9   claims 5, 6, and 52 of the '798 patent.

10      Amazon -- or excuse me -- Innovation Sciences alleges

11  that Amazon's Fire TV Gen 3, Fire TV Stick Gen 2, Fire TV

12  Stick 4K, and Fire TV Cube products infringe claims 22, 24,

13  39, 62, and 67 of the '983 patent, and claim 28 of the

14  '918 patent, and claims 5 and 6 of the '798 patent.

15      Innovation Sciences also alleges that Amazon's

16  Fire HD 6, Fire HD 7, Fire HD 8.9, Fire HD 8, Fire HD 10

17  products infringe claims 22, 24, 39, 62, and 67 of the

18  '983 patent, and as well as claim 28 of the '918 patent, and

19  claims 6 and 52 of the '798 patent.

20      Innovation Sciences also alleges that Amazon's Echo

21  Gen 1, Echo Gen 2, Echo Dot Gen 1, Echo Dot Gen 2, Echo Dot

22  Gen 3, Echo Dot Kids, Echo Plus Gen 1, Echo Plus Gen 2, Echo

23  Spot, Echo Show Gen 1, Echo Show Gen 2, and Echo Tap -- Tap

24  infringe only claims 22, 24, 39, 62, 64, and 80 of the '983.

25      Innovation Sciences alleges that Amazon's Alexa Voice

175

1   Service and Amazon Cloud infringes claims 105 and 108 of the

2   '983 patent and claims 5 and 52 of the '798 patent.

3       You must determine separately for each asserted claim

4   and each accused product whether or not there is

5   infringement.  There is not one exception -- there is one

6   exception to this rule.  If you find that a claim to which a

7   dependent claim refers is not infringed, there cannot --

8   there cannot be infringement of that dependent claim.  On

9   the other hand, if you find that the independent claim has

10  been infringed, you must still decide, separately, whether

11  the product meets the additional requirements of the

12  asserted claims that depend from the independent claim,

13  thus, whether those claims have also been infringed.  A

14  dependent claim includes all the requirements of any claims

15  to which it refers, plus additional requirements of its own.

16      A claim limitation is met if it exists in the accused

17  product as it is described in the claim language, either as

18  I have explained that language to you, or if I did not

19  explain it to you, as it would be understood by one of

20  ordinary skill in the art.

21      Direct infringement of a system claim occurs if a

22  single party makes or uses the system as a whole.

23  Innovation Sciences contends that Amazon has made the

24  accused systems.  To prevail on this assertion, Innovation

25  Sciences must prove that Amazon combined all of the claim

1   elements into an operable system.

2      Innovation Sciences also contends that Amazon has used

3   the accused products as a whole.  To prevail on this

4   assertion, Innovation Sciences must prove that Amazon placed

5   the system as a whole into service and that Amazon made the

6   system work for its patented purpose.  This can -- this is

7   be shown by evidence demonstrating that Amazon controlled

8   the system as a whole and obtained a benefit from it.

9      Indirect infringement.

10      Innovation Sciences alleges that Amazon is liable for

11   infringement by actively inducing others to directly

12   infringe the asserted claims of the asserted patents.  A

13   party induces patent infringement if it purposefully causes,

14   urges, or encourages others -- or another to infringe the

15   claims of the patent.

16      Inducing infringement cannot occur unintentionally.

17   This is different from direct infringement, which could

18   occur unintentionally.

19      As with direct infringement, you must decide whether

20   there has been active inducement on a claim-by-claim and

21   product-by-product basis.  To prove that Amazon induced

22   patent infringement, Innovation Sciences must prove by a

23   preponderance of the evidence that:

24      One, the acts that are actually carried out by users of

25   the accused products directly infringe an asserted claim.

1        Two, Amazon took action during the time the patent was

2   in force that was intended to cause and led to the

3   infringing acts by users of the accused products.

4        And, three, Amazon was aware of the patent and knew

5   that the acts, if taken, would constitute infringement of

6   that patent or that Amazon believed there was a high

7   probability that the acts by the users of the accused Amazon

8   product would infringe the patent and took deliberate steps

9   to avoid learning of that infringement.

10       In order to establish active inducement of

11  infringement, it is not sufficient that the end user it --

12  itself directly infringes the claim, nor is it sufficient

13  that Amazon was aware of the acts by the end user that

14  allegedly constitute a direct infringement.  Rather, you

15  must find that Amazon specifically intended the end user to

16  infringe the patent or that Amazon believed there was a high

17  probability that the users of the accused Amazon products

18  would infringe the patent but deliberately avoided

19  hearing -- or avoided learning the infringing nature of the

20  acts of users of the Amazon products and services.

21       Indirect infringement.

22       Innovation Sciences alleges that Amazon is liable for

23  contributory infringement by contributing to the direct

24  infringement by an end user of the asserted claims of the

25  asserted patents.  As with direct infringement, you must

1   determine contributory -- contributory infringement on a

2   claim-by-claim basis.

3         Amazon is liable for contributory infringement of a

4   claim if Innovation Sciences proves by a preponderance of

5   the evidence all of the following requirements:

6         One, Amazon sells, offers to sell, or imports within

7   the United States a component of a product or apparatus for

8   use in a process, during the time the asserted patent is in

9   force.

10        Second, the component or apparatus is not a staple

11  article or commodity of commerce -- commerce suitable for

12  substantial non-infringing use.

13        Three, the component or apparatus constitutes a

14  material part of the invention.

15        Four, Amazon is aware of the asserted patents and knows

16  that the component or apparatus is especially made or

17  adapted for use as an infringement of the claim.

18        And, five, that the use of the product carried out by

19  an end user directly infringes the claim.

20        Now, in this case Innovation Sciences argues that

21  Amazon willfully infringed Innovation Sciences' patents.  If

22  you have decided that Amazon has infringed, you must also go

23  on and address the additional issue of whether or not the

24  infringement was willful.

25        Willfulness requires you to determine whether

1   Innovation Sciences proved that it is more likely than not

2   that Amazon knew of Innovation Sciences' patents and that

3   the infringement by Amazon was intentional.  You may not

4   determine that the infringement was willful just because

5   Amazon was aware of the asserted patents and infringed one

6   or more of them.  Instead, willful infringement is reserved

7   for egregious behavior, such as where the infringement is

8   willful, wanton, malicious, in bad faith, deliberate,

9   consciously wrongful, flagrant or, indeed, a characteristic

10  of a pirate.

11      To determine whether Amazon acted willfully, consider

12  all the facts and assess Amazon's knowledge at the time of

13  the challenged conduct.  This may include, but is not

14  limited to:

15      One, whether or not Amazon acted consistently with the

16  standards of behavior for its industry.

17      Second, whether or not Amazon intentionally copied a

18  product of Innovation Sciences that is covered by the

19  '983 patent, the '918 patent, or the '798 patent.

20      Three, whether or not Amazon reasonably believed it did

21  not infringe or that the patent was invalid.

22      Four, whether or not Amazon made a good-faith effort to

23  avoid infringing the '983 patent, the '918 patent, or the

24  '798 patent, for example, whether Amazon attempted to design

25  around the '983 patent, the '918 patent, or the '798 patent;

180

1        Or, five, whether or not Amazon tried to cover up the

2   infringement.

3        Invalidity.

4        I will now instruct you on invalidity issues you should

5   consider.  An issued patent is accorded a presumption of

6   validity based on a presumption that the United States

7   Patent and Trademark Office, which you've heard referred to

8   throughout this trial as the PTO or the Patent Office, acted

9   correctly in issuing the patent.

10       This presumption of validity extends to all issued

11  United States patents.  In order to overcome this

12  presumption, Amazon must establish by clear and convincing

13  evidence that Plaintiff's patent or any claim in the patent

14  is not valid; that is, you must be left with a clear

15  conviction that the claims are invalid.

16       The time it took the United States Patent and Trademark

17  Office to examine and grant the patents-in-suit is not

18  relevant to any issue in this case.  Even though the PTO

19  Examiner has allowed the claims of the patent, you have the

20  ultimate responsibility for deciding whether the claims of

21  the patent are invalid.

22       Like infringement, invalidity is determined on a

23  claim-by-claim basis.  Claims are construed in the same way

24  for determining infringement as for determining invalidity.

25  You must apply the claim language consistently and in the

181

1   same manner for issues of infringement as for the issues of

2   invalidity.  You must determine separately for each claim

3   whether that claim is invalid.

4        Now, at times you will hear me make references to prior

5   art.  In patent law a system, device, method, publication,

6   or patent that predated the patent claim at issue is called

7   "prior art."

8        You must determine whether disputed alleged prior art

9   can be considered in determining whether claims of the

10  asserted patents are anticipated or obvious.  Prior art

11  includes any of the following items:

12       One, any product that was publicly known or used by

13  others in the United States before the patented invention

14  was made.

15       Two, patents that issued more than one year before the

16  filing date of the asserted patents or before the invention

17  was made.

18       Three, publications, including foreign patent

19  applications, having a date more than one year before the

20  filing date of the asserted patents or before the invention

21  was made.

22       Four, any product that was in public use or on sale in

23  the United States more than one year before the asserted

24  patents were filed.

25       And, five, any product that was made by anyone before

1   the named inventors created the patented product where the

2   product was not abandoned, suppressed, or concealed.

3       Regardless of whether -- regardless whether the

4   particular prior art references were considered by the PTO

5   Examiner during the prosecution of the applications which

6   matured into the asserted patents, Amazon must prove that

7   the challenged claims are invalid.  Amazon must do this by

8   clear and convincing evidence.  This burden of proof on

9   Amazon never changes, regardless of whether or not the

10  Examiner considered the reference.

11      Anticipation.

12      If an invention has been previously invented and

13  disclosed to the public, then it is not new and, therefore,

14  the claimed invention is anticipated by the prior invention.

15  Simply put, the invention must be new to be entitled to

16  patent protection under the U.S. patent laws.

17      To anticipate a claim, each and every element in the

18  claim must be present in a single item of prior art and

19  arranged or combined in the same way as recited in the

20  claim.  You may not combine two or more items of prior art

21  to find anticipation.

22      In addition, to anticipate, a single item of prior art

23  must enable one of ordinary skill in the art to make the

24  invention without undue experimentation.

25      In determining whether every one of the elements of the

183

1    claimed invention is found in the prior art, you should take

2    into account what a person of ordinary skill in the art

3    would have understood from his or her review of the

4    particular piece of art.

5         Anticipation must be determined on a claim-by-claim

6    basis.  Amazon must prove by clear and convincing evidence

7    that all of the requirements of the claim are present in a

8    single piece of prior art.

9         Obviousness.

10        Even though the invention may not have been identically

11   disclosed or described before it was made by an inventor, in

12   order to be patentable, the invention must also not have

13   been obvious to a person of ordinary skill in the field of

14   technology of the patent at the time the invention was made.

15        Amazon may establish that a patent claim is invalid by

16   proving by clear and convincing evidence that the claimed

17   invention would have been obvious to a person having

18   ordinary skill in the art at the -- at the time the

19   invention was made.

20        In determining whether a claimed invention is obvious,

21   you must consider the level of ordinary skill in the field

22   of the invention that someone would have had at the time the

23   claimed invention was made, the scope of the content of the

24   prior art, and any differences between the prior art and the

25   claimed invention and, if present, so-called objective

184

1    evidence or secondary considerations, which I will describe

2    shortly.

3        Do not use hindsight.  Consider only what was known at

4    the time of the invention.

5        Keep in mind that the existence of each and every

6    element of the claimed invention in the prior art does not

7    necessarily prove obviousness.  Most, if not all, inventions

8    rely on building blocks of prior art.

9        In considering whether a claimed invention is obvious,

10   you should consider whether at the time of the claimed

11   invention there was a reason that would have prompted a

12   person having ordinary skill in the art to combine the known

13   elements in the prior art in a way claimed -- the claimed

14   invention does, taking into account such factors as, one,

15   whether the claimed invention was merely the predictable

16   result of using prior art elements according to their known

17   functions; two, whether the claimed invention provides an

18   obvious solution to a known problem in the relevant field;

19   three, whether the prior art teaches or suggests the

20   desirability of combining elements claimed in the invention;

21   four, whether the prior art teaches away the combining

22   elements in the claimed invention; five, whether it would

23   have been obvious to try the combination of elements, such

24   as when there's a design need or market pressure to solve a

25   problem and there are a finite number of identified

185

1   predictable solutions.

2       To find it's -- it rendered the invention obvious, you

3   must find that the prior art provided a reasonable

4   expectation of success.  Obvious is -- to try is not --

5   obvious is -- to try is not sufficient in unpredictable

6   technologies.

7       In determining whether the claimed invention was

8   obvious, consider each claim separately.  Do not use

9   hindsight, i.e., consider only what was known at the time of

10  the invention.  In making these assessments, you should take

11  into account any objective evidence, sometimes called

12  secondary considerations, that may have existed at the time

13  of the invention and afterwards that may shed light on the

14  obviousness or not of the claimed invention regarding:

15      Whether the products covered by the claim were

16  commercially successful due to the merits of the claimed

17  invention, parentheses, rather than the result of the design

18  needs or market-pressure advertising or similar activities,

19  close parentheses.

20      Whether the claimed invention satisfied a long-felt

21  need.

22      Whether others tried and failed to make the claimed

23  invention.

24      Whether others copied the claimed invention.

25      Whether there were changes or related technologies or

1    market needs contemporaneous with the claimed invention.

2         Whether the claimed invention achieved unexpected

3    results.

4         Whether others in the field praised the claimed

5    invention.

6         Whether persons having ordinary skill in the art of the

7    invention expressed surprise or disbelief regarding the

8    claimed invention.

9         Whether others sought or obtained rights to the patent

10   from the patent holder; and

11        Whether the -- the inventor proceeded contrary to the

12   accepted wisdom in the field.

13        For example, if products incorporating the invention

14   were commercially successful as a result of the claimed

15   invention, then that may suggest that the invention was not

16   obvious.  If you find that the claimed invention satisfied a

17   long-felt but previously unresolved need, that may also

18   suggest the invention was nonobvious.

19        On the other hand, if you find that someone else came

20   up with the claimed invention before or around the same time

21   that the inventor thought of it, this may suggest the

22   claimed invention was obvious.

23        Finally, acceptance of the claimed invention by others

24   by licensing of the claimed invention may also show that the

25   claimed invention was not obvious.

1          These factors are relevant only if there is a

2    connection, or nexus, between the factor and -- and the

3    invention covered by the claim term -- by the patent claim,

4    excuse me.  If you conclude that some of the above

5    indicators have been established, those factors should be

6    considered along with all other evidence in this case in

7    determining whether Amazon has proven that the claimed

8    invention would have been obvious.

9          Keep in mind that these factors relate to

10   obviousness -- obviousness only, not anticipation.

11         Patent ineligibility.

12         To succeed on its claims for patent ineligibility,

13   Amazon must show by clear and convincing evidence --

14         Sorry about that.  I don't know why it rings on my

15   iPad, but it's on silent.  Okay.  Let me start that sentence

16   again.

17         To succeed on its claims for patent ineligibility,

18   Amazon must prove by clear and convincing evidence that the

19   elements of the asserted claims, when taken individually or

20   when taken as an ordered combination, involve only

21   technology which a person of ordinary skill in the art would

22   have considered as to being well-understood, routine, and

23   conventional as of August 10th, 2006, which is the priority

24   date of the asserted patents.

25         Whether a particular technology was well-understood,

1   routine, and conventional goes beyond what is known in the

2   prior art.  The mere fact that someone is disclosed in a

3   piece of prior art does not mean it is well-understood,

4   routine, and conventional.

5       At the same time, the specification of the asserted

6   patents may be such evidence if you find that the

7   specification shows that the elements of the asserted

8   claims, when taken individually or when taken as -- as an

9   ordered combination, involve only technology which a person

10   of ordinary skill in the art would have considered

11   well-understood, routine, and conventional.

12       Now, the patent law also contains certain requirements

13   for the part of the patent called the specification.  The

14   written specification -- or the written description

15   requirement is designed to ensure that the inventor was in

16   possession of the full scope of the claimed invention as of

17   the patent's effective filing date.

18       Amazon contends that the claims of -- of Innovation

19   Sciences' patents are invalid because their shared

20   specification does not show by clear and convincing evidence

21   that a person having ordinary skill in the field reading the

22   patent specification as of the patents' effective filing

23   date, which in this case is the August 10th, 2006

24   Application Number 11/501,747, or February 2nd, 2007,

25   Provisional Application Number 60/899,037, would not have

1   been recognized that -- would not have recognized that it

2   describes the full scope of the invention as it is finally

3   claimed in the asserted claims of the asserted patents.  If

4   a patent claim lacks adequate written description, it is

5   invalid.

6        In deciding whether the patents satisfy this written

7   description requirement, you must consider the description

8   from the viewpoint of a person -- of a person having

9   ordinary skill in the field of the technology of the patents

10   as of their effective filing dates.

11        The specification must describe the full scope of the

12   claimed invention, including each element thereof, either

13   expressly or inherently.

14        A claimed element -- a claimed element is disclosed

15   inherently if a person having ordinary skill in the field as

16   of the effective date would have understood that the element

17   is necessarily present in what the specification closes --

18   specification discloses.  It is not sufficient that the

19   specification disclose only enough to make the claimed

20   invention obvious to a person having ordinary skill.

21        The written description does not have to be in the

22   exact words of the claim.  The requirement may be satisfied

23   by any combination of the words, structures, figures,

24   diagrams, formulas, et cetera, contained in the patent

25   specification.  Adequate written description does not

1   require either examples or the actual reduction to practice

2   of the claimed inventions.  However, a mere wish or plan for

3   obtaining the claimed invention is not adequate written

4   description.  Rather, the level of disclosure required

5   depends on a variety of factors, such as the existing

6   knowledge in the particular field, the extent and content of

7   the prior art, the maturity of the science or technology,

8   and other considerations appropriate in the subject matter.

9       It is not improper for a patent owner to amend or

10  insert claims in a patent application for the purpose of

11  obtaining a right to exclude a known commercial product from

12  the market.  However, if those claims were not adequately

13  disclosed in the earlier applications, then those claims may

14  no longer predate the competitor's products.

15      Now, if you find that Amazon infringed any valid claim

16  of the asserted patents, you must then consider what amount

17  of damages to award to Innovation Sciences.

18      Innovation Sciences must prove each element of its

19  damages, including the amount of the damages, by a

20  preponderance of the evidence.  If proven by Innovation

21  Sciences, damages must be an adequate -- an amount adequate

22  to compensate for the entire infringement.

23      The purpose of a damage award is to put Innovation

24  Sciences in about the same financial position it would have

25  been if the infringement had not happened at all.  But the

1  damage award cannot be less than a reasonable royalty.  You

2  may not add anything to the amount of damages to punish an

3  accused infringer or to set an example.

4      The fact that I am instructing you on damages does not

5  mean the Court believes that one party or the other should

6  win the case.  My instructions about damages are for your

7  guidance only in the event you find in favor of Innovation

8  Sciences.  You will need to decide the issue of damages only

9  if you find that one or more of the asserted claims are both

10 valid and infringed.

11     In determining the amount of damages, you must

12 determine when the damages began.  Damages commence on the

13 date that Amazon has both -- has both infringed and been

14 notified of the alleged infringement of the '798, '918, and

15 the '983 patents.  Innovation Sciences and Amazon agree that

16 these dates are as follows:

17     For the '798 patent, July 5th, 2018.

18     For the '918 patent, August 8th, 2017.

19     And for the '983 patent, July 5th, 2018.

20     A royalty is a payment made to a patent holder in

21 exchange for the right to make, use, or sell the claimed

22 invention.  A reasonable royalty is the amount of royalty

23 payment that a patent holder and the alleged infringer would

24 have agreed to in a hypothetical negotiation taking place at

25 a time prior to when the infringement first began.

192

1      In considering this hypothetical negotiation, you

2 should focus on what the expectations of the patent holder

3 and the alleged infringer would have been had they entered

4 into an agreement at that time and had they acted reasonably

5 in their negotiations.

6      In determining this, you must assume that both parties

7 believed the patent was valid and infringed and that both

8 parties were willing to enter into an agreement.  The

9 reasonable royalty you determine must be a royalty that

10 would have resulted from the hypothetical negotiation and

11 not simply a royalty either party would have preferred.

12      Evidence of things that happened after the infringement

13 first began can be considered in evaluating the reasonable

14 royalty only to the extent that the evidence aids in

15 assessing what royalty would have resulted from a

16 hypothetical negotiation just prior to the first

17 infringement.

18      The amount you find as damages must be based on the

19 value attributable to the patented technology, as distinct

20 from the other, unpatented features of the accused products.

21 In other words, you must determine the appropriate royalty

22 that reflects the value attributable to the patented

23 invention alone.

24      In determining the reasonable royalty, you should

25 consider all the facts known and available to the parties at

1    the time the infringement began.  Some of the kinds of

2    factors that you may consider in making your determination

3    are:

4         One, the value that the claimed invention contributes

5    to the accused product.

6         Two, the value that factors other than the claimed

7    invention contribute to Amazon's accused products and

8    services; and

9         Three, comparable license agreements or other

10   transactions, such as those covering the use of the claimed

11   invention or similar technology.

12        No one factor is dispositive, and you can -- you can

13   and should consider the evidence that has been presented to

14   you in this case on each of these factors.  You may also

15   consider any other factors which in your mind would have

16   increased or decreased the royalty the alleged infringer

17   would have been willing to pay and the patent holder would

18   have been willing to accept, acting as normally prudent

19   business people.

20        Now, you have heard throughout the trial references to

21   whether the reasonable royalty should be a running royalty

22   or a lump sum.  If you find that Innovation Sciences is

23   entitled to damages, you must decide whether the parties

24   would have agreed to a running royalty or a fully paid-up

25   lump-sum royalty at the time of the hypothetical

194

1    negotiation.

2        A reasonable royalty can be paid either in the form of

3    a one-time lump-sum payment or as a running royalty.  Either

4    method is designed to compensate the patent holder based on

5    the infringer's use of the patented technology.  It is up to

6    you, based on the evidence, to decide which type of royalty

7    is appropriate in this case.

8        Reasonable royalty awards may also take the form of a

9    lump-sum payment.  A lump-sum payment is equal to the amount

10   the alleged infringer would have paid at the time of the

11   hypothetical negotiation for a license covering all of the

12   sales of the licensed product, both past and future.  When a

13   lump sum is paid, the infringer pays a single price for the

14   license covering both past and future infringing sales.

15       Reasonable royalty awards may also take the form of a

16   running royalty based on the revenue from or the volume of

17   sales of the licensed products.  A running royalty can be

18   calculated, for example, by multiplying a royalty base on a

19   royalty rate or by multiplying the number of infringing

20   products or product units sold by the royalty amount per

21   unit.

22       Comparable license agreements are one factor that may

23   inform your decision as to the proper amount and form of the

24   reasonable royalty award, similar to the way in which the

25   value of a house is determined relative to the comparable

1   houses sold in the same neighborhood.

2       Whether a license agreement is comparable to the

3   license under a hypothetical license scenario depends on

4   many factors, such as whether they involve comparable

5   technologies, comparable economic circumstances, comparable

6   structure, and comparable scope.  If there are differences

7   between a license agreement and the hypothetical license,

8   you must take -- take those into account when you make your

9   reasonable royalty determination.

10      The hypothetical license is deemed to be a voluntary

11  agreement.  When determining if a license agreement is

12  comparable to the hypothetical license, you may consider

13  whether the license agreement is between parties in a

14  lawsuit and whether the license agreement was a settlement

15  influenced by the desire to avoid further litigation.

16      Now, it is your duty to deliberate and to consult with

17  one another in an effort to reach a verdict.  Each of you

18  must decide the case for yourself, but only after an

19  impartial consideration of the evidence with your fellow

20  jurors.

21      During your deliberations do not hesitate to reexamine

22  your own opinions and change your mind if you're convinced

23  that you were wrong.  But do not give up your honest beliefs

24  because other jurors think differently or just to finish the

25  case.

1       Remember at all times, you are the judges of the facts.

2  You have been allowed to take notes during the trial.  Any

3  notes you have taken during the trial are only aids to your

4  memory.  If your memory -- memory differs from your notes,

5  you should rely on your memory and not on the notes.  The

6  notes are not evidence.  If you did not take notes, rely on

7  your own independent recollection of the evidence, and do

8  not be unduly influenced by the notes of other jurors.

9  Notes are not entitled to any greater weight than the

10  recollection or impression of each juror about the

11  testimony.

12       Now, when you go to the jury room to begin your

13  deliberations, you may take with you a copy of the charge,

14  the exhibits that I have admitted into evidence, and your

15  notes.  You must select a jury foreperson to guide you in

16  your deliberations and to speak for you here in the

17  courtroom.

18       Your verdict must be unanimous.  After you have reached

19  a unanimous verdict, the jury foreperson must fill out the

20  answers to the written questions on the verdict form and

21  sign and date it.  After you have concluded your service and

22  I have discharged the jury, you are not required to talk

23  with anyone about this case.

24       If you need to communicate with me during the

25  deliberations, the jury foreperson should write the inquiry

1    and give it to the court security officer.  After consulting

2    with the attorneys, I will respond either in writing or by

3    meeting with you in the courtroom.

4         Keep in mind, however, that you must never disclose to

5    anyone, not even me, your numerical division on any

6    questions.

7         And then, of course, before I say I'm going to send you

8    to the jury room to begin deliberations, I've also attached

9    page 31 through 35.  I'm not going to read that.  That is

10   there for your aid.  It's, again, a glossary of terms that

11   are used in the patent -- in this patent trial, and also in

12   the trial and throughout the -- the charge.

13        So, let me just give you a couple other things to go

14   over.  The questions that are going to be asked that have to

15   be unanimous is called the Verdict of the Jury, and there's

16   a series of questions.  And like, for example, Question 1

17   is:  Has Innovation proved by a preponderance of the

18   evidence that Amazon infringed any of the asserted claims?

19   And Question 2 is about the invalidity question.  You've

20   seen those throughout the closing arguments, but you'll

21   follow those instructions.

22        So, you will use your charge as you go through each of

23   these questions to figure the answer out, as you decide

24   that.

25        So, the first thing you're going to do when you go back

1  to the jury room -- well, of course, you can go ahead and

2  eat lunch.  Your lunch will be waiting there.

3      But second is you should decide who your foreperson

4  will be.  And, so, that will be Juror Note Number 1 you'll

5  send back to the Court just saying Juror Number 1 through 8

6  is the foreperson.

7      Then -- then you can begin your deliberations.  You can

8  have a working lunch.  That's up to you if you want to start

9  that while you're eating lunch.

10     One thing I will remind you is if you take a break or a

11 juror has to go to the restroom, all deliberations must

12 cease.  All deliberations must happen while all eight of you

13 are present.

14     So, I want to thank you -- oh, and then one last thing

15 is I know it's later and we're taking a later lunch.  So,

16 the attorneys -- I'm going to let them go and take a lunch,

17 too.  So, if you ask a question in the next hour, it may

18 take me a little bit longer to get back to you.  So, I just

19 want to under -- manage your expectations because I'm going

20 to release them to go eat lunch for the next hour.  That

21 doesn't mean you can't start getting to work because your

22 lunch is upstairs.

23     So, now I will go ahead and send you back to the jury

24 room to begin your deliberations.  I want to thank you for

25 these last -- these past eight days.  You've been so

199

1   attentive.  You've had great questions.  So, we really

2   appreciate, both on behalf of the Plaintiff and the defense

3   and on behalf of the Court, we thank you.

4        So, now I will send you back to the jury room to begin

5   your deliberations.  Thank you.

6                    (Jury exits the courtroom, 1:29 p.m.)

7             THE COURT:  Okay.  So, I guess first, anything

8   further from the Plaintiff or defense?  And then we'll come

9   back to the objections for the charge but --

10            MR. JACKSON:  Nothing other than the objections that

11  I'm aware of, Your Honor.

12            MS. SHAMILOV:  We just still have that list of

13  exhibits to read in the record.

14            THE COURT:  Oh.

15            MS. SHAMILOV:  Sorry, Your Honor.

16            THE COURT:  I have -- I would say I hadn't forgotten

17  about it, but I probably would have.  So I'm -- I did remind

18  you to remind me, and you did.  So, why don't you go ahead and

19  do that now before we do the objections.

20       These are the exhibits that are part of the record that

21  were admitted by defense that we hadn't taken the time to

22  actually list them in.  So, go ahead.

23            MS. SHAMILOV:  Thank you, Your Honor.  Those exhibits

24  are all defense exhibits:  D1, 2, 3, 4, D74, D75, D79, D80,

25  D90, D91, D92, D1179, D221, D260, D263, D265, D372.

200

1          THE COURT:  Thank you.

2          MR. KRAUSS:  I'm sorry.  Can you tell me what you

3   said --

4          THE COURT:  I don't think your mic is on but...

5          MR. KRAUSS:  I don't know if it's charged.

6          THE COURT:  Well, it may have died.  Just grab

7   another one.

8          MR. KRAUSS:  I was trying to follow along with the

9   list, but there was something around between 92 maybe and 221.

10          MS. SHAMILOV:  It was 221, 260, 263, 265, 372.

11          MR. KRAUSS:  May I see your list?  There was one that

12   wasn't on my list that we discussed this morning.

13          MS. SHAMILOV:  Yeah, of course.  I'm sorry.

14                    (Off-the-record discussion among

15                    (counsel.)

16          MR. KRAUSS:  It's right, Your Honor.  Thank you.

17          THE COURT:  Okay.  Very good.

18     Okay.  So, objections to the charge?  Of course, again,

19   there has been no waiver.  We waited until this point to

20   make them, not to delay the starting of closing arguments.

21          MR. KRAUSS:  Your Honor, objections to the charge.

22   We have two, one with respect to the written description.  It's

23   Innovation's position that the charge that was given, that the

24   written description requirement is designed to ensure that the

25   inventor was in possession of the full scope of the claimed

201

1   invention as of the patent's effective filing date is an

2   incorrect statement of the law, that the written description

3   applies to the specification of the patent at issue and whether

4   that patent specification supports the claim as is, without

5   respect to the filing date.

6        Further, on patent ineligibility, we would like to

7   preserve our objections with regard to submitting Question 3

8   on patent eligibility for the reasons stated in Docket

9   No. 781, page ID 55852 footnote 1.  And because the question

10  ignores the step wise nature of *Alice*, and -- as set forth

11  in the *Alice* case, 870 -- I'm sorry, 573 U.S. 208.

12       Doing so forces the jury to answer the question of fact

13  identified in *Berkheimer* at 881 F.3d 1367 to 68 in a vacuum

14  without a finding that the invention was being directed to

15  an abstract idea.

16       Without an articulation of the abstract idea, the jury

17  will not know what they are comparing the something more or

18  significantly more to.

19            THE COURT:  Okay.

20            MR. KRAUSS:  Thank you.

21            THE COURT:  Okay.  Those objections are overruled.

22       Defense has objections?

23            MR. RANGANATH:  Thank you, Your Honor.  I'm sorry.  I

24  don't have a lot of speaking experience in this courtroom so

25  Amazon --

202

1          THE COURT:  It's good to finally meet you.  I've seen

2   you -- heard you on the phone calls many times so...

3          MR. RANGANATH:  And nice to talk to you, Your Honor.

4       So, Amazon objects to the instruction on -- first on

5   inducement.  There was no evidence in the record to support

6   any claim of inducement, no expert testimony identifying a

7   direct infringer corresponding to any inducing act, and no

8   expert testimony on any inducing act.

9       Amazon objects to the instruction on contributory

10  infringement as well on partially the same basis, no

11  evidence of a single direct infringer, and no evidence of

12  the lack of substantial non-infringing uses.

13       In the instruction given on contributory infringement,

14  Amazon proposed that the jury be instructed to evaluate

15  contributory infringement on a claim-by-claim and

16  product-by-product basis, and understands the Court rejected

17  that proposal, so we'll maintain our objection to that.

18       Amazon objects to the willfulness instruction the Court

19  gave, and that is on pages 16 and 17 of the instructions.

20       And if the Court will indulge, I'd be happy to read

21  Amazon's proposed willfulness instruction, which the Court,

22  I believe, rejected, unless the Court has a different

23  preference.

24          THE COURT:  It's your show right now, so say whatever

25  you want to say.

203

1          MR. RANGANATH:  Okay.  And, so, the instruction

2    Amazon proposes and believes is appropriate is as follows:  In

3    this case Innovation Sciences argues that Amazon willfully

4    infringed Innovation Sciences' patents.  To prove willful

5    infringement, Innovation Sciences must first persuade you that

6    the -- that -- that Amazon infringed a valid claim of the

7    asserted patents.

8          In addition, to prove willful infringement of a claim,

9    Innovation Sciences must persuade you by a preponderance of

10   the evidence that Amazon intentionally ignored or recklessly

11   disregarded that claim.  You must base your decision on

12   Amazon's knowledge and action at the time of infringement.

13   Evidence that Amazon had knowledge of the patent at the time

14   of infringement, by itself, is not sufficient to show

15   willfulness.

16         Instead, willful infringement is reserved for egregious

17   behavior such as where the infringement is willful, wanton,

18   malicious, in bad faith, deliberate, consciously wrongful,

19   flagrant, or, indeed, characteristic of a pirate.

20         In deciding whether Amazon willfully infringed, you

21   should consider all of the facts surrounding the

22   infringement, including whether Amazon intentionally copied

23   Innovation Sciences' patented technology in developing the

24   accused products, whether Amazon knew or should have known

25   that its conduct involved an unreasonable risk of

204

1    infringement, and whether Amazon had a reasonable belief

2    that at the time of infringement, that its products did not

3    infringe the asserted patents or that the patents were

4    invalid.

5        I'd also like to add an objection to the willfulness

6    instruction because there was no evidence in the record to

7    support a claim of willfulness.

8        Amazon also objects to the -- to the instruction on

9    invalidity, and I will read into the record Amazon's

10   proposal on that.

11       So, the instruction on invalidity Amazon believes is

12   appropriate is as follows:  Patent invalidity is a defense

13   to patent infringement.  Even though the PTO Examiner has

14   allowed the claims of a patent, you have the ultimate

15   responsibility for deciding whether claims of the patents

16   are valid.  I will instruct you on the invalidity issues you

17   should consider.  As you consider these issues, remember

18   that Amazon bears the burden of proving by clear and

19   convincing evidence that the claims are invalid.

20       Amazon also objects to the Court's written description

21   instruction.  As the parties have briefed extensively, it is

22   Amazon's position that the priority -- that the written

23   description should be measured by the disclosure in the

24   earliest claimed priority application, which in this case is

25   only the August 10th, 2006 application to which Plaintiff

1    has consistently claimed priority throughout this case.

2        Amazon objects to the instruction -- to -- to a portion

3    of the instruction at the conclusion of the written

4    description section that it is -- that the instruction the

5    Court read it is not proper for a patent owner to amend or

6    insert claims in a patent application for the purposes of

7    obtaining a right to exclude a known commercial product from

8    the market.  This instruction is unnecessary and

9    prejudicial.

10       And, finally, Amazon objects to -- or Amazon would like

11   to preserve an objection to a portion of the instruction in

12   the definition of the reasonable royalty, and I'll read the

13   proposed instruction, which I understand the Court rejected:

14       If you decide Innovation Sciences is entitled to a

15   reasonable royalty, you must account for the relative value

16   of the new and inventive elements of Innovation Sciences'

17   invention in comparison to the conventional elements.  In

18   other words, you may reward Innovation Sciences only for its

19   innovation, the incremental benefit bestowed by only the

20   nonconventional or new elements of a patent claim taken as a

21   whole.

22       And that's all I have, Your Honor.  Thank you.

23           THE COURT:  You did a great job.  I'm still going to

24   overrule the objections, but the presentation was great.

25           MR. RANGANATH:  I'm disappointed, but I accept Your

1   Honor's ruling.

2          THE COURT:  Probably not surprisingly.  But you did a

3   good job, so...

4       Okay.  Anything else from either side then?

5          MS. SHAMILOV:  I wanted to lodge the objections for

6   the verdict form, too, Your Honor.

7          THE COURT:  Go ahead.

8          MS. SHAMILOV:  To preserve the objections there, if I

9   may.

10          THE COURT:  Go ahead.

11          MS. SHAMILOV:  So, Amazon objects to

12   Question Number 1, which is the question on infringement.  It

13   is a general question.  It's improper for several reasons.

14   There are three asserted patents here.  The question does not

15   break up the infringement by patents.

16       The jury instructions tell the jury that the

17   infringement has to be determined on a claim-by-claim basis,

18   yet the question does not ask for it.  And in comparison to

19   the invalidity question, Question Number 2, which breaks the

20   patents and claims one by one, the two questions together

21   become prejudicial to the defense and confusing to the jury

22   in light of the jury instructions.

23       Question Number 3, Amazon preserves the objection to

24   the introductory sentence there that the question -- that

25   this question relates to patent eligibility and is unrelated

1    to Question 2, invalidity.  Because the facts are common to

2    the two questions, it's confusing to the jury that the two

3    questions are unrelated when, in fact, they are not.

4        And then I'd like to preserve an objection with respect

5    to Question Number 4A and 4B.  Question 4B should have

6    preceded Question 4A because the jury has to first determine

7    whether damages are running royalty or lump sum before they

8    can discuss the amount.

9        Thank you, Your Honor.

10          THE COURT:  You're welcome.

11        I'll overrule those objections.

12        Anything else?

13        So, of course, I do like the attorneys to stay in the

14    courthouse, but if you want to go and just be back by 2:30

15    for -- you know, if you want to go eat lunch.  I told them

16    an hour, so the hour time we gave them.

17        And then we'll be in recess awaiting the jury's

18    verdict.

19               (Recess, 1:42 p.m.)

20               (All parties present, 5:06 p.m.)

21          THE COURT:  Let me just, for purposes of the record,

22    any guesses who the foreperson is?  That's Juror Note No. 1.

23    Any guesses who the foreperson is?  No guesses?  No takers?

24    Juror No. 1 is the foreperson.

25          MS. BLUE:  Is it that one?

208

1          THE COURT:  Yes.

2          MS. BLUE:  The woman, the blonde?

3          THE COURT:  Yes.  Then Note No. 2 is we have reached

4  a verdict.

5      So when the jury comes in, I'll have them hand the

6  verdict to me and then I will publish the verdict, and

7  I will also automatically poll the jury after I read the

8  verdict to make sure it's unanimous.

9      And then do the attorneys have any interest in talking

10  to the jury afterwards?  I go talk to them first, and then

11  if the attorneys have any interest -- I try to limit it to

12  three per side, if we could, just because of the room.  If

13  you're interested in talking to the jury, just stay out in

14  the hallway and I'll come get you after I talk to them.

15  I will encourage it.

16      Okay.  So let's bring the jury in.

17                  (Jury seated in the jury box.)

18          THE COURT:  Please be seated, except for Juror No. 1,

19  the foreperson.

20      My understanding is y'all have reached a verdict?

21          JUROR:  Yes, Your Honor.

22          THE COURT:  Is it unanimous?

23          JUROR:  Yes, Your Honor.

24          THE COURT:  If you'll hand the verdict to the court

25  security officer, and you can be seated, ma'am.

1          I'll read it here in a minute and then I'm going to

2     publish it, and then I'm going to ask each of you if this is

3     your verdict to make sure it's unanimous.

4          Okay.  In Case 4:18CV474, Innovation Sciences, LLC

5     versus Amazon.com, Inc., et al, Verdict of the Jury.

6          We, the jury, find as follows:

7          Question one, infringement:  Has Innovation Sciences

8     proved by a preponderance of the evidence that Amazon

9     infringed any of the asserted claims?  Answer:  No.

10         Question two:  Did Amazon prove by clear and convincing

11    evidence that the following claims of the asserted patents

12    are invalid?  For the '983 patent, I'll just say they found

13    yes for every claim.  For the '918 also they found yes.  And

14    for the '978 they found yes for all three claims.

15         Question three, patent ineligibility:  Did Amazon prove

16    by clear and convincing evidence that when taken

17    individually or when taken as an ordered combination, the

18    following claims involve only technology which a person of

19    ordinary skill in the art would have considered to be well

20    understood, routine and conventional as of August 10th,

21    2006?  And for the '983 patent it was yes for all the

22    claims.  For the '918 also yes for claim 28, and for the

23    '798, yes for all three of those.

24         Then, of course, Question 4A, 4B and 5 were not

25    answered.

1    It's dated today and initialed by the foreperson.

2    So, Juror No. 1, is this your verdict?

3         JUROR:  Yes, Your Honor.

4         THE COURT:  Juror No. 2, is this your verdict?

5         JUROR:  Yes, Your Honor.

6         THE COURT:  Juror No. 3, is this your verdict?

7         JUROR:  Yes, Your Honor.

8         THE COURT:  Juror No. 4, is this your verdict?

9         JUROR:  Yes, Your Honor.

10        THE COURT:  Juror No. 5, is this your verdict?

11        JUROR:  Yes, Your Honor.

12        THE COURT:  Juror No. 6, is this your verdict?

13        JUROR:  Yes, Your Honor.

14        THE COURT:  Juror No. 7, is this your verdict?

15        JUROR:  Yes, Your Honor.

16        THE COURT:  Juror No. 8, is this your verdict?

17        JUROR:  Yes, Your Honor.

18        THE COURT:  Well, ladies and gentlemen, thank you.

19   I'll file your verdict as part of the record.

20        And I think as I said during the jury selection

21   process, our system of justice as we know it and practice it

22   would not exist without men and women being willing to serve

23   their constitutional duties and serving as jurors on our

24   cases.  So on behalf of the United States and the Eastern

25   District of Texas, I want to thank you again for your

211

1   service.

2        I'm going to release you back to the jury room.  I want

3   to come up and see if you have any questions.  But, again,

4   thank you again for your service.

5                       (Jury exits the courtroom.)

6             THE COURT:  Anything further from Plaintiff?

7             MR. JACKSON:  Nothing, Your Honor.

8             THE COURT:  Anything else for defense?

9             MR. DACUS:  Nothing, Your Honor.  Thank you.

10            THE COURT:  Okay.  Thank you.  Then, again, if the

11  attorneys want to just wait in the hallway if you want to talk

12  to the jury, I will certainly encourage it.  I've only had one

13  jury say no, and it was in a criminal context.  So I will go

14  talk to them and see if they have any questions and then come

15  down and get y'all probably.

16       So, again, thank y'all again for a very smooth trial

17  and court will be in recess.

18            MS. BLUE:  Do we wait in here?

19            THE COURT:  Just wait in the hallway here.

20       Okay.  We'll be in recess.

21

22

23

24

25

212

1    I certify that the foregoing is a correct transcript from

2    the record of proceedings in the above-entitled matter.

3

4    _____          _____

     CHRISTINA L. BICKHAM                          Date

5

6    _____          _____

     JAN MASON                                      Date

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25